**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ZCAP EQUITY FUND LLC and ROSS MARCHETTA, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LUXURBAN HOTELS INC., BRIAN FERDINAND, and SHANOOP KOTHARI, <br><br> Defendants. | No. 1:24-cv-01030-PAE <br><br> <u>CLASS ACTION</u> <br><br> AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 5

SUBSTANTIVE ALLEGATIONS ...................................................................................... 5

I.  PARTIES .................................................................................................................. 5

    A.  Lead Plaintiffs ............................................................................................. 5

    B.  Defendants ................................................................................................... 5

II.  SUBSTANTIVE ALLEGATIONS ........................................................................ 7

    A.  Background of the Company and Its IPO ................................................... 7

    B.  The Company's MLA-Based Business Model ........................................... 8

    C.  The Company Touts Portfolio Growth and the Partnership with Wyndham ........ 10

    D.  A Short Seller Report Begins to Pull Back the Curtains, and Defendants Respond
        ...................................................................................................................... 12

    E.  Defendants Concede the Short Report Was Right, But Announce Their Largest
        Deal to Date ............................................................................................... 14

    F.  Scrutiny Grows, the Company Delays Releasing Its 2023 Earnings, and Discloses
        Doubt About Its Ability to Continue as a Going Concern ....................... 15

    G.  During this Critical Period, the Wyndham Deal Falls Apart and the Company
        Reports Overstated Revenues and Understated Expenses ........................ 17

    H.  The Company Announces the Formation of a Special Committee to Explore
        Strategic Alternatives, and Defendants Kothari and Ferdinand Leave the
        Company ..................................................................................................... 18

    I.  The Company Withdraws, then Restates, Its Q1 2023 Financial Statements, and
        Its Collapse Appears Imminent ................................................................. 19

III.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 23

    A.  False and Misleading Statements in the Company's May 9, 2023 Press Release
        and May 10, 2023 Form 8-K ...................................................................... 23

    B.  False and Misleading Statements in the Company's Q1 2023 10-Q filed on May 9,
        2023 ............................................................................................................ 24

    C.  False and Misleading Statements in the Company's May 15, 2023 Press Release
        and May 17, 2023 Form 8-K ...................................................................... 24

D.    False and Misleading Statements in the Company's Investor Presentation filed on Form 8-K on May 22, 2023 ................................................................. 25

E.    False and Misleading Statements in the Company's Press Release Issued and Filed on Form 8-K on August 8, 2023 ............................................... 27

F.    False and Misleading Statements in the Company's Q2 2023 10-Q filed August 8, 2023 ........................................................................................... 28

G.    False and Misleading Statements Made During the Company's Q2 2023 Earnings Call on August 9, 2023 ...................................................................... 28

H.    False and Misleading Statements in the Company's Investor Presentation filed on Form 8-K on September 1, 2023 ................................................. 29

I.    False and Misleading Statements in the Company's November 8, 2023 Press Release and November 9, 2023 Form 8-K ......................................... 30

J.    False and Misleading Statements in the Company's Q3 2023 10-Q filed on November 8, 2023 ......................................................................................... 32

K.    False and Misleading Statements Made During the Company's Q3 2023 Earnings Call on November 9, 2023 .............................................................. 32

L.    False and Misleading Statements in the Company's Press Release Issued and Filed on Form 8-K on November 17, 2023 ................................... 33

M.    False and Misleading Statements in the Company's November 30, 2023 Press Release ........................................................................................ 34

N.    False and Misleading Statements in the Company's December 2023 Investor Presentation filed on December 1, 2023 ............................................. 37

O.    False and Misleading Statements in the Company's January 12, 2023 Press Release ........................................................................................ 38

P.    False and Misleading Statements in the Company's January 17, 2023 Press Release ........................................................................................ 39

Q.    False and Misleading Statements in the Company's January 30, 2024 Press Release ........................................................................................ 40

R.    False and Misleading Statements Made During the Company's February 6, 2024 Analyst/Investor Day and Associated Presentation Filed on Form 8-K .............. 41

S.    False and Misleading Statements Made During the Company's Full-Year 2023 Earnings Call on April 16, 2024 ........................................................ 43

T.    False and Misleading Statements in the Company's May 13, 2024 Press Release and May 14, 2024 Form 8-K ....................................................... 44

U.    False and Misleading Statements in the Company's Q1 2024 10-Q filed on May 13, 2024 ............................................................................... 45

V.      False and Misleading Statements Made During the Company's Q1 2024 Earnings Call on May 14, 2024 ........................................................................ 47

IV.     ADDITIONAL SCIENTER ALLEGATIONS ................................................. 48

A.      The Individual Defendants Were Deeply Involved With the Company's Operations ........................................................................................ 48

B.      Defendants' Misstatements Helped Their Efforts to Meet Guidance .................. 49

C.      Defendant Ferdinand's Ownership of Millions of Shares of Common Stock, and Other Related-Party Transactions With the Company, Gave Him An Additional Motive ............................................................................................ 50

D.      Scienter is Established by Defendants' Pattern of Misrepresentations, Continuing Even After Being Forced to Admit Falsity, and Their Shifting Explanations for their Misconduct ........................................................................... 51

E.      Defendant Ferdinand Had a Motive to Mislead Investors to Reap Hundreds of Thousands of Dollars in Proceeds from Insider Sales of LuxUrban Stock at Inflated Prices ...................................................................................... 55

F.      Defendant Kothari Was Intimately Involved in Preparing the Company's Q1 2023 10-Q ............................................................................................... 56

G.      Other Scienter Allegations Concerning the GAAP Violations in the Q1 2024 10-Q ...................................................................................................... 57

H.      The SEC Found that Ferdinand Approved Materially Misleading Periodic Reports and Failed to Report Unusual Securities Transactions at Another Company He Founded ............................................................................................ 58

I.      LuxUrban's Scienter and Liability ............................................................ 62

V.      ADDITIONAL ALLEGATIONS CONCERNING THE INDIVIDUAL DEFENDANTS' CONTROL OF THE COMPANY ...................................................... 62

VI.     LOSS CAUSATION ........................................................................... 64

VII.    CLASS ACTION ALLEGATIONS ............................................................ 71

VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS ............................................... 73

IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ..................................................................................... 74

X.      COUNTS ........................................................................................ 75

PRAYER FOR RELIEF ................................................................................. 80

DEMAND FOR TRIAL BY JURY .................................................................... 80

iii

Lead Plaintiffs zCap Equity Fund LLC ("zCap") and Ross Marchetta ("Marchetta," and together with zCap, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by Lead Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, a review of the Defendants' (defined below) public documents; conference calls and announcements made by Defendants; United States ("U.S.") Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding LuxUrban Hotels Inc ("LuxUrban" or the "Company"); investment analysts' reports about the Company; and information readily obtainable on the Internet. Lead Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1.      This class action asserts securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, 17 CFR 240.10b-5, on behalf of a class consisting of consisting of all persons and entities that purchased or otherwise acquired shares of LuxUrban's common stock and/or 13.00% Series A Cumulative Redeemable Preferred Stock ("preferred stock") during the period May 9, 2023 through August 20, 2024, both dates inclusive (the "Class Period"), and were damaged thereby, with customary exclusions.

2.      These claims are brought against Defendants (i) LuxUrban, (ii) Brian Ferdinand, the Company's founder, former Chief Executive Officer ("CEO") (and later, Co-CEO), and Board

---

[1]      Emphases herein are added unless otherwise noted.

Chairman (and later, Executive Chairman) during most of the Class Period; and (iii) Shanoop Kothari, the Company's former Chief Financial Officer ("CFO"), and later Co-CEO and then sole CEO during most of the Class Period.

3.    LuxUrban's business is to lease existing hotels on a long-term basis under Master Lease Agreements ("MLAs") and then rent out the rooms, generating revenue through rental fees as well as ancillary services and fees such as resort fees, early check-in and check-out fees, baggage fees, parking fees, and grab and go food service fees. The Company went public in August 2022, pivoting from its prior business of short-term rentals of individual and multi-family residential properties, eyeing the opportunity purportedly presented by the COVID-19 pandemic, which saw a massive downturn in the hospitality industry. Because this window of opportunity was limited, and because the Company had limited working capital, Defendants sought to quickly grow the Company's portfolio of hotels, bringing in revenue to fund operations and future growth. Quickly increasing the number of hotel properties in the Company's portfolio was key.

4.    The Company's management had limited experience running hotels. But, in August 2023, the Company announced that it was partnering with Wyndham Hotels & Resorts, Inc. ("Wyndham"), the world's largest hotel franchisor by number of properties. The Company would begin to rebrand its hotels as part of Wyndham's "Trademark Collection" and "Travelodge" brands and would use Wyndham's booking platform, while the hotels would remain under the Company's operational control. Defendants claimed that the increased brand recognition, as well as reduced operating expenses from using Wyndham's booking channel, would contribute to growth and reduce operating expenses. In addition, Wyndham agreed to provide the Company with capital on a property-by-property basis, partially offsetting the Company's capital needs.

5.      During the Class Period, Defendants made materially false and misleading statements about the growth of the Company's portfolio and the transition of properties in its portfolio to the Wyndham platform, as well as about the Company's financial results for the first quarter of 2024.  On May 9, 2023, the Company touted that it had executed an MLA for the Trinity Hotel in Los Angeles; this was false. On November 8, 2023, the Company claimed that it had executed an MLA for the Royalton Hotel in New York City; this was false. On November 30, 2023, it announced execution of an MLA for the Truss Hotel, also in New York City.  Also false. And the executed MLA for the 353-room James NoMad Hotel in New York, which Defendants repeatedly boasted was the Company's largest deal ever, and a sign of management's ability to add large and high-quality hotels to its portfolio?  False.

6.      A short seller exposed the Royalton lie on January 17, 2024. The Company, predictably, attacked the short seller, claiming its report had "multiple inaccuracies."  Doubling down, the Company assured investors that same day that "[a]s previously announced, the Company is scheduled to begin welcoming guests on or before January 30, 2024 at The Royalton by LuxUrban, Trademark Collection® by Wyndham and has a set date with the property's ownership to be delivered possession of the asset."

7.      January 30 came and went, and the Company did not begin welcoming guests to "The Royalton by LuxUrban, Trademark Collection® by Wyndham." Instead, on February 2, 2024, the Company announced "the termination of discussions to add the Royalton Hotel to its roster of properties," and conceded that "a complete set of definitive agreements relating to the lease were not, and will not, be, entered into by the Company."  However, the Company assured investors that, "based on the complexity and multi-step process of closing an MLA from lease execution, which was the previous policy for announcing acquisitions, on a go-forward basis the

Company will only announce acquisitions when they are opened for hosting guests and have completed the entire MLA process." Ironically, January 30, 2024 was the same day Defendants falsely announced that the Company had executed an MLA for the James NoMad Hotel. And, only a week later, the Company harped on the James NoMad deal as the Company's biggest ever, an important sign of management's acumen and the Company's prospects.

8.      As Defendants came under increasing scrutiny, on May 13, 2024, the Company issued financial results for the first quarter of 2024 ("Q1 2024") that painted an egregiously false picture of the Company's condition, reporting, for example, more than double the true net rental revenue, overstating current assets by 400%, and obscuring the improper recognition of $8 million in rents received in advance, which should not have been recognized until services were rendered (that is, generally, when the guest actually stays at the hotel).

9.      Defendants' false and misleading statements drove the Company's common stock price to as high as $6.80 per share, a 70% increase from its initial public offering price of $4 per share. As a short-seller report and the Company's eventual admissions revealed the truth, however, the common stock price fell to **$0.071** per share. The Company's preferred stock fell 42%, to $14.32, from its October 2023 offering price of $25 per share.[2]   After Defendant Ferdinand resigned as both CEO and Executive Chairman, and Defendant Kothari was terminated, new management restated the Company's Q1 2023 financial results. The Company has announced doubt about its ability to continue as a going concern, has received three delisting notices from Nasdaq, and has formed a special committee to explore strategic alternatives. To date, the Company has not filed its quarterly report for the quarter ended June 30, 2024, and as of today,

---

[2] For prices of the preferred stock, which paid dividends, this Complaint uses adjusted numbers that account for dividend payments.

the Company took its investor relations webpage offline. This action seeks to recover the massive

losses suffered by LuxUrban investors as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section

27(c) of the Exchange Act, 15 U.S.C. § 78aa(c). Defendants conduct business in this Judicial

District and a significant portion of Defendants' activities took place within this Judicial District.

13.    In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities

markets.

## SUBSTANTIVE ALLEGATIONS

I.    **PARTIES**

A.    **Lead Plaintiffs**

14.    Lead Plaintiffs acquired LuxUrban common stock at artificially inflated prices

during the Class Period, as set forth in their previously filed Certifications (ECF No. 20-2), and

were damaged upon the disclosure of the true facts and the materialization of the risks concealed

and misrepresented by Defendants.

B.    **Defendants**

15.    Defendant LuxUrban is a corporation formed under the laws of Delaware, with its

principal executive offices in Miami, Florida. LuxUrban's common stock trades on the Nasdaq

under the symbol "LUXH", and its preferred stock trades on the Nasdaq under the symbol "LUXHP".

16.     Defendant Brian Ferdinand ("Ferdinand") co-founded LuxUrban's predecessors and served as the Company's CEO from prior to its August 2022 IPO until November 8, 2023 when Defendant Kothari was named Co-CEO.  Defendant Ferdinand served as Co-CEO with Defendant Kothari until March 1, 2024, when Ferdinand and the Company agreed that during a CEO transition period from that date until May 31, 2024, CEO duties would gradually transition to Kothari, while Ferdinand would remain as Executive Chairman of the Board. As part of this transition, the Company entered into a consulting agreement with Defendant Ferdinand for a term of three years, agreeing to pay him a monthly consulting fee of $50,000, and to continue to provide material compensation and other terms of his employment agreement that were in effect immediately prior to April 22, 2024. Defendant Ferdinand served as Chairman of the Board from before its IPO until becoming Executive Chairman as part of the CEO transition.  The Company disclosed in the IPO Prospectus and through June 2023 that it was a "controlled company" under Nasdaq rules because of Defendant Ferdinand's massive holdings of Company stock.  As of April 18, 2023, Defendant Ferdinand beneficially owned approximately 56.2% of the voting power of the Company's outstanding capital stock. Defendant Ferdinand resigned from the Board on June 27, 2024.

17.     Defendant Shanoop Kothari ("Kothari") served as the Company's CFO from January 2022, and as the President of the Company effective November 30, 2022, until June 2024. Defendant Kothari was also appointed Co-CEO on November 8, 2023, in tandem with his CFO and President duties.  Effective June 4, 2024, the Company hired Michael James to succeed Kothari as CFO. On June 10, 2024, the Company terminated Kothari's employment entirely, elevating

Robert Arigo, who joined the Company as Chief Operating Officer on March 15, 2024, to the role of CEO.

18.    Defendants Ferdinand and Kothari are collectively referred to herein as the "Individual Defendants," and with the Company as the "Defendants."

## II.    SUBSTANTIVE ALLEGATIONS

### A.    Background of the Company and Its IPO

19.    LuxUrban was formed out of two previous entities, SoBeNY Partners LLC ("SoBeNY LLC") and Corphousing LLC ("Corphousing LLC").  Both of those companies were formed in October 2017, co-founded by Defendant Ferdinand and by members who had parallel ownership in each entity, and both companies were under common control. In June 2021, the members of SoBeNY LLC exchanged all of their membership interests therein for additional membership interests in Corphousing LLC, with SoBeNY LLC becoming a wholly owned subsidiary of Corphousing LLC. In January 2022, with a view to becoming a public company, each of Corphousing LLC and SoBeNY LLC converted into a C corporation, with the then-current members of Corphousing LLC becoming the stockholders of Corphousing.

20.    Initially focused on leasing and re-leasing multifamily residential units, in late 2021 the Company began winding down that legacy business and pivoted toward a new strategy of leasing hotels to "capitaliz[e] on the dislocation in the hotel industry created by the pandemic and subsequent rising interest rate environment," as stated in the prospectus and registration statement (together, the "IPO Prospectus") for the Company's August 2022 initial public offering of its common stock (the "IPO").  The Prospectus told investors that "[a]s a result of the global COVID-19 pandemic, we believe long-term leases for many hotel properties can be readily secured on favorable terms and that we can rapidly commercialize acquired units leveraging our established

operating infrastructure." By the time of the IPO, the Company said that its transition to this new business model was substantially complete.

21.     The Company told investors that its strategy was to "build[] a growing portfolio of leased properties that we seek to provide to guests for short-term stays at rental and occupancy rates that exceed our total cost and expenses for such properties the Company." According to the IPO Prospectus, "[w]e target business and vacation travelers under our consumer brand LuxUrban and we market our hotel properties through our proprietary sales portal as well as several worldwide online travel agency ('OTA') channels."

22.      As it was winding down its legacy business, on December 6, 2021, the Company confidentially filed a draft registration statement with the SEC for the planned initial public offering of its common stock. The Company conducted the IPO approximately nine months later, announcing that the IPO was complete on August 16, 2022. In the IPO, the Company sold 3,375,000 shares of its common stock a price of $4 per share, generating gross proceeds of $13.5 million.

23.     The Company told investors that it used approximately $5 million of the net proceeds of the IPO to fund letters of credit on refundable security deposits for properties to grow its hotel portfolio, approximately $2.5 million to repay a portion of its indebtedness to a private investor, and approximately $0.8 million to repay related-party indebtedness and transaction completion bonuses to two executive officers, including Defendant Ferdinand.

**B.     The Company's MLA-Based Business Model**

24.     The Company's growth strategy focused on "[e]xploiting the currently depressed hotel market by leveraging our national cost structure and ground teams to secure unbooked hotel rooms and closed hotels on long-term master leases and marketing them under our *SoBeNY* and *LuxUrban* brands."  A master lease, or MLA, allows a lessee to operate and profit

from a property without owning it outright, offering flexibility and potential cost savings compared to traditional lease agreements.

25.    Defendants believed that MLAs suited the moment because they permitted the Company to add properties to its portfolio with far less capital than purchasing the properties outright. Because the Company did not purchase the properties, this was a so-called "asset light" model.

26.    This minimal capital requirement was key for the Company to take advantage of the large number of hotel properties that were distressed and dislocated during the Class Period, especially in light of the billions of dollars in hotel commercial loans that were coming due in the US--$900 billion in 2023 and 2024, according to Defendants. Indeed, the Company's focus was on growing market share quickly before these circumstances changed: the Company told investors that it expected to have 2,500 to 3,000 rooms (or "keys," in industry parlance) in its portfolio by the end of 2023—a goal that Defendants reiterated as late as December 1, 2023.

27.    The MLA structure presented benefits to hotel owners as well.  As Defendant Ferdinand put it on the first day of the Class Period, "[t]he long-term triple net lease alternatives that we offer allow these owners to improve property cash flows without losing ownership." Specifically, the Company entered into "triple net" MLAs, under which the Company covered operating expenses (including taxes, insurance, utilities, and maintenance costs) as well as paying rent to the property landlords, who maintained their equity in the properties.  The fact that the Company agreed to cover these expenses was especially attractive to hotel owners reeling from COVID-19's economic effects and facing a high interest rate environment.

28.    Defendant Ferdinand stated it this way: "We are focused exclusively on dislocated hotel assets, meaning hotel assets that have debt maturities. The hotel is currently performing, but

they have deficient cap[ital] structures, and their debt maturities goes through 2023 to 2027. And really the ownership groups or owners of those assets require refinancing. And in this current environment really the only way for the owner to refinance into a fixed rate mortgage is through a triple-net master lease. LuxUrban has become and becoming the go to for that." Kothari stated similarly, about the Company's MLA model, that "in terms of what we do in terms of acquisition, there's really no competition. We provide a solution. There's [sic] other solutions, but our solution is unique. We have the business to support that, right, and the credibility."

29.    Employing MLAs in the hotel industry was the distinguishing feature of the Company's business model, and the means by which it pursued its ambitious growth strategy, which Defendants touted and was important to investors.  For instance, one analyst's primary valuation of the Company employed a discounted cash flow process that "assume[d] high levels of growth in additional rooms available to rent in the near-to-mid term as the company continues to add a steady flow of Master Leases on dislocated properties."

### C.    <u>The Company Touts Portfolio Growth and the Partnership with Wyndham</u>

30.    The Company soon began misleading investors about its growth.  On May 9, 2023, the first day of the Class Period, the Company disclosed that it had added the Trinity Hotel, with 179 rooms in in downtown Los Angeles, to its portfolio, listing it as "under lease" in its quarterly report for the first quarter of 2023.

31.    Growing quickly would allow the Company to take advantage of the efficiencies of scale, Defendants said. To that end, Defendants excitedly announced, on August 3, 2023, that the day prior the Company began a partnership with Wyndham. This would initially involve adding seventeen LuxUrban properties to the Trademark Collection® by Wyndham brand under franchise agreements. Pursuant to those agreements, the hotels operated by the Company as well as future acquired properties would become part of the Trademark Collection® by Wyndham and

Travelodge by Wyndham brands while staying under the operational control of the Company. The franchise agreements had initial terms of 15 to 20 years and required Wyndham to provide financial, sales and operational-related support with respect to 16 initial properties. Further, per the agreements, Wyndham would provide capital through development advance notes ("Development Incentive Advances") to the Company. These Development Incentive Advances were only available for properties under lease, and were not repayable if the terms of the agreement were met. The Company also paid a one-time, initial, nonrefundable franchise fee to Wyndham.

32.     Those properties would appear on Wyndham's booking platform, where the more than 100 million members of Wyndham's rewards program could view them.  Further, Defendants said that the Company would benefit from Wyndham's lower online travel agency ("OTA") commission rates, reducing the Company's expenses.

33.     Thus, acquiring more hotel properties and adding them to the Wyndham platform was the core of Defendants' strategy.  Defendants reiterated their expectation that the Company would have 2,500 to 3,000 units under MLA by the end of 2023, and touted the Wyndham relationship at every turn.

34.     Furthering their portrayal of the Company's supposed growth and integration with Wyndham, Defendants announced on November 8, 2023 that the Company had executed a lease for the Royalton Hotel, a 168-room property at 44 West 44th Street in New York City, adding it to the Company's portfolio.  Defendants repeatedly emphasized that the Royalton would be part of the Wyndham partnership.

35.     Just three weeks later, on November 30, Defendants again touted the Royalton deal, alongside the announcement that it had also signed an MLA for the Truss Hotel in New York City. The Company's press release issued that day said it had "signed separate 25-year Master Lease

Agreements (MLA), inclusive of two five-year options, to operate [these] two new boutique hotels in New York City," and that it "expect[ed] both of these properties to be rebranded under the Trademark Collection® by Wyndham name over the next few months."

36.    The Company began including the Royalton and Truss hotels in the total of properties and rooms in its portfolio as soon as it announced the deals, padding those numbers and contributing to apparent progress towards its 2,500-3000 unit goal by the end of 2023.

**D.    A Short Seller Report Begins to Pull Back the Curtains, and Defendants Respond**

37.    However, investors soon began to poke holes in Defendants' portrayal of the Company's growth. On January 17, 2024, at approximately 12:00 PM EST, Bleecker Street Research ("Bleecker Street"), a short seller firm, published a report (the "Bleecker Street Report"), entitled "LuxUrban Hotels (LUXH): The Bed Sheets Should Be Made Out Of Red Flags." The report disclosed that

> LuxUrban's most recent press releases, announcing it had signed a lease for the Royalton Hotel in New York should be read with suspicion. ***The owner of that building told us LuxUrban had not actually signed the lease***. *In one instance, we were told by an executive at a large hotel operator that LuxUrban announced the acquisition of a hotel from a bankruptcy receiver, but that receiver wasn't even aware of the purported acquisition when LuxUrban announced it in a press release*.

38.    The Bleecker Street Report further disclosed that

> **We confirmed with the building's owners and operator that as of January 14, LuxUrban has not officially signed the lease on this property**. While the company first listed The Royalton as "under lease" in the Q3, 2023 10-Q, the company has yet to provide a Letter of Credit, several months after first engaging with the building owner.

39.    According to Bleecker Street, this was not the sole instance of this behavior. "We spoke with another hotel operator who personally knew of three different LuxUrban hotel deals that were announced before the deal had closed.

40.     Bleecker Street also questioned the accuracy of the Company's balance sheet, questioning the meaning of "an odd disclosure that we have never seen before" that appeared in the Company's Q3 2023 10-Q, which stated that "[t]he consolidated balance sheet at September 30, 2023 was derived from the audited consolidated financial statements but does not include all disclosures required by accounting principles generally accepted in the United States of America."

41.     The Bleecker Street Report further observed that the Company's Receivables from On-Line Travel Agents (or "OTAs"), an asset, increased by nearly $13 million over the course of the second and third quarters of 2023. Bleecker reasoned that

> The company recorded $22.8 million in revenues in Q1 2023, with none of those sales resulting in receivables from OTAs. But in Q2 and Q3, the combined revenue of $63 million resulted in ~$13 million in OTA pending payments. Even odder, the company switched to management under Wyndham in early Q3 (August), which management claims will result in fewer OTA bookings, but the QoQ [quarter over quarter] value of OTA Receivables went from $5.9 million to $12.9 million in this first quarter under the Wyndham banner.

42.     In May 2024, Defendants massively overstated this exact line item in its financial statements for the first quarter of 2023, as the Company later disclosed in August 2024, after new management took over from Defendants Ferdinand and Kothari.

43.     Predictably, Defendants issued—that same day, January 17, after market hours—a press release asserting that "the so-called report reflects a fundamental lack of understanding of its operations and industry, contains unsubstantiated claims from anonymous sources, regurgitates dated and previously disclosed information that the Company believes is not germane to the current state of its business and outlook, and relies heavily on speculation and mischaracterizations."

44.     More specifically, Defendants claimed that "[a]s previously announced, the Company is scheduled to begin welcoming guests on or before January 30, 2024 at The Royalton

by LuxUrban, Trademark Collection® by Wyndham and has a set date with the property's ownership to be delivered possession of the asset."

45.     Despite the Company's attempts to rebut the Bleecker Street Report, the Company's stock price fell 12% on January 17, and another 10% the following day, on unusually heavy trading volume, closing at $3.89 per share on January 18, 2024.

**E.      Defendants Concede the Short Report Was Right, But Announce Their Largest Deal to Date**

46.     By January 30, 2024, however, the Company had not "beg[un] welcoming guests . . . at The Royalton by LuxUrban, Trademark Collection® by Wyndham." In what later appeared to be an attempt to distract from this, instead the Company announced on January 30 that it had landed its biggest deal yet, for the James NoMad Hotel in New York City, which Defendants said they "expect[]ed . . . will be rebranded as The J Hotel by LuxUrban, a Wyndham Grand® Hotel."

47.     The press release did not hold back on the purported importance of the deal:

> Boasting an exceptional Beaux-Arts style exterior, the James NoMad is a New York City landmark. This 353-room property – which carries a rating of 4.5 on Tripadvisor® - is conveniently located in midtown Manhattan and just a short walk from the Empire State Building, Madison Square Garden and Grand Central Station. Eclectic, post-modern touches define the lobby and works from local artists adorn the walls. The hotel, designed by renowned architect Thomas Juul-Hansen, has been described as an "urban sanctuary."

48.     In a quote, Defendant Ferdinand touted the deal as "reflect[ing] the growing industry acceptance of our evolving asset-light business model and the inherent, value-driving benefits of our collaboration with Wyndham Hotels & Resorts." He continued: "As our business continues to mature, the size and quality of the hotels we are targeting are expected to continue to improve, as will our ability to be selective in the assets we acquire under long-term MLA."

49.     The Company filed this press release with the SEC as an attachment to a Form 8-K on February 5, 2024. The Form 8-K itself, however, admitted that Bleecker Street was right about the Royalton:

> Today the Company is announcing the termination of discussions to add the Royalton Hotel to its roster of properties. The removal of the Royalton Hotel (the "Royalton") as a prospect for the Company is not expected to have a material impact on the company's ability to achieve its previously stated financial goals for the full year 2024.

> The Company filed its Quarterly Report on Form 10-Q for the three and nine months ended September 30, 2023 (the "10-Q"). Under "Item 2—Management's Discussion and Analysis of Financial Condition and Results of Operations—Property Summary—Properties under lease, not operating," the Company included a reference to the Royalton. The Company made similar references to the Royalton expressing its belief that the Company had entered into a Master Lease agreement and was expecting the Royalton to begin operating as part of the Company's portfolio in subsequent press releases.

> Today the Company is withdrawing its prior statements regarding the Royalton. The parties began working toward a transaction in early fall 2023. The Company believed based on correspondence received that the material terms of the transaction was agreed to. In addition, there was a commitment by a qualified banking institution to fund the letter of credit required under the proposed lease in a form agreeable by the landlord; however, a complete set of definitive agreements relating to the lease were not, and will not be, entered into by the Company.

> In addition, based on the complexity and multi-step process of closing an MLA from lease execution, which was the previous policy for announcing acquisitions, on a go-forward basis the Company will only announce acquisitions when they are opened for hosting guests and have completed the entire MLA process.

50.     This final assurance, that the Company would be more careful in announcing acquisitions, would turn out to be deeply ironic in light of its pairing with the James NoMad announcement.

**F.     Scrutiny Grows, the Company Delays Releasing Its 2023 Earnings, and Discloses Doubt About Its Ability to Continue as a Going Concern**

51.     On March 12, 2024, *Bisnow*, a business to business ("B2B") platform serving the commercial real estate industry, including by news reporting, reported that it had "found *two*

instances of the company announcing it has signed deals to take over hotels, reporting the leases

in filings with the [SEC] but then later admitting the deals were never finalized." The first of these

instances involved the Royalton, as previously reported by Bleecker Street.

52.    The article continued:

The company also said in its two most recent quarterly filings that it had the 179-room Trinity Hotel in Los Angeles "under lease," a deal that was announced in May. The Chetrit Group owns that hotel and denies it has a deal with LuxUrban.

***"The deal did not go through," Michael Chetrit told Bisnow in an email***.

Ferdinand told *Bisnow* that LuxUrban "fully executed a lease," but claimed Chetrit didn't update the building at 741 Eighth Ave. to make the changes necessary for operating the hotel.

"We even wired them money which we have not gotten returned," Ferdinand wrote.

***Ferdinand forwarded Bisnow an email, dated Oct. 2, from one of the company's attorneys, containing a draft letter to Chetrit outlining the lack of repairs at the building and demanding repayment.***

***In that letter, LuxUrban attorneys wrote, "As a result, we will not be executing the proposed lease and will not be taking possession of the Premises."***

53.    Though this contradicted the Company's prior claims that it had entered into an

MLA for the Trinity—and despite Defendant Ferdinand's willingness to provide *Bisnow* with

details about the collapse of the proposed deal—Defendants did not provide any explanation

directly to investors for another two weeks.  On March 26, 2024, Defendants issued a press release

stating that the Company had walked away from an unnamed deal because the landlord had not

made certain repairs, which was later confirmed to be the Trinity.

54.    A few days later, the Company delayed releasing its 2023 10-K, claiming that

because it was expanding its audit procedures, it needed more time to prepare the filing. When it

finally filed the 2023 10-K on April 15, 2024, it disclosed that "[o]ur current liquidity position raises substantial doubt about our ability to continue as a going concern."

55.     Further, the 2023 10-K, which followed Defendants' representation that they would be more cautious in announcing additions to the Company's hotel portfolio, did not include the Truss, the Trinity, or the James NoMad in its list of the Company's properties. In the next day's earnings call, however, Defendants assured analysts that the Company was "in possession" of the James and would begin operating the hotel that quarter.

**G.     During this Critical Period, the Wyndham Deal Falls Apart and the Company Reports Overstated Revenues and Understated Expenses**

56.     On May 10, 2024, *Bisnow* reported that the Company's hotels that had been added to Wyndham's platform "are no longer showing up on Wyndham's website, raising doubts about the status of the partnership. It is unclear what has transpired — representatives for Wyndham and LuxUrban didn't respond to *Bisnow*'s inquiries on Friday." The article noted that "[t]he Wyndham partnership was a key pillar in LuxUrban's plans to grow its hotel business."

57.     Defendants did not acknowledge this development until May 13, 2024, when they disclosed that the Company had terminated its franchise agreements with Wyndham on May 6, and was "de-platforming" its properties from Wyndham and moving the hotel listings back under its full control. It seemed the James NoMad would not, in fact, "be rebranded as The J Hotel by LuxUrban, a Wyndham Grand® Hotel."

58.     The collapse of the Wyndham deal, with its Development Incentive Advances and other benefits, heightened the importance of the Company's revenues, expenses, losses, and current assets and liabilities.

59.     The same day Defendants acknowledged the termination of the Wyndham partnership, the Company filed its quarterly report for the first quarter of 2024 (the "Q1 2024 10-

Q"). On the balance sheet, the Q1 2024 10-Q reported, inter alia, total current assets of over $20 million, including over $6.7 million in receivables from OTAs, over $2.6 million in processor retained funds, net, and $1.5 million in channel retained funds, net, as well as over $6 million in receivables from the City of New York and Landlords, net. The Company also reported $51.9 million in total current liabilities. For the Company's statement of operations, the Q1 2024 10-Q reported net rental revenue of over $29 million, a gross loss of $4.6 million, operating expenses of $7.6 million, and a net loss of approximately $16.8 million. On the statement of cash flows, the Company reported, among other things, $186,485 in receivables from OTAs, negative $1.4 million in receivables from the City of New York and Landlords, net, and approximately $2.1 million in rents received in advance.

60.     Analysts were disappointed, as the Company's reported loss per share of $0.35 was well below the consensus estimate of $0.11 per share. Nevertheless, the news could have been worse. In fact, the reality was *far* worse, as investors learned when the Company was forced to restate those results in August, after Ferdinand resigned and Kothari was terminated.

**H.     The Company Announces the Formation of a Special Committee to Explore Strategic Alternatives, and Defendants Kothari and Ferdinand Leave the Company**

61.     June 2024 was an even more eventful month for the Company and its beleaguered investors. On June 3, 2024, the Company announced that its Board of Directors had formed a special committee comprised of independent directors to explore potential strategic initiatives, "including, without limitation, equity and debt financings, a sale of the Company or some or all of its assets, a merger, strategic acquisitions, or other strategic initiatives and alternatives." The press release announcing this news stated that the Company did not have a timetable to complete this process, was not currently engaged in any potential strategic transaction, and had not engaged professional advisors in connection with any such transaction.

62.     On June 6, 2024, the Company announced that it had elevated Michael James, who joined the Company in February 2024 as Senior Vice President and Controller, to the role of CFO.

63.     The following week, on June 11, 2024, Nasdaq notified the Company that, for the prior 30 consecutive business days (through June 10, 2024), the closing bid price of the Company's common stock, had been below the minimum of $1 per share required for continued listing on the Nasdaq Capital Market, and that the Company would be afforded 180 calendar days (until December 9, 2024) to regain compliance. In order to regain compliance, the closing bid price of the Company's common stock would have to be at least $1 for a minimum of ten consecutive business days.  The Company disclosed receipt of this notification on June 17, 2023.

64.     On June 11, 2024, the same day it received this noncompliance notification from Nasdaq, the Company announced that it had terminated Defendant Kothari's employment the day prior, and that Robert Arrigo, who had been hired as Chief Operating Officer in March 2024, had replaced Kothari as CEO.

65.     Then, on June 27, 2024, after the market closed, the Company announced that Defendant Ferdinand—the Company's founder—was resigning from the Board.

66.     By this point, the Company's common stock price had fallen to *$0.234* per share.

**I.      The Company Withdraws, then Restates, Its Q1 2023 Financial Statements, and Its Collapse Appears Imminent**

67.     With new leadership in place, the Company took stock of its prior representations to investors.  On August 9, 2024, after the market closed, the Company dropped a bombshell, disclosing that new CFO Michael James, in consultation with the Board and the Company's auditor, concluded that the Company's previously issued unaudited condensed consolidated financial statements contained within the Q1 2023 Form 10-Q should no longer be relied upon due to an overstatement of revenues and other errors in such financial statements, and therefore a

restatement of these prior financial statements was required. The announcement disclosed that impact of this restatement on the Company's first quarter 2024 unaudited condensed consolidated financial statements is expected to be approximately a $13.75 million decrease in revenues, a write-off of approximately $1.5 million for deposits with third party reservation processors, an increase in unearned revenue of approximately $8.05 million, and an increase in net loss of approximately $9.55 million.

68.    The Company further disclosed that its management had determined that "management's previous conclusions regarding the effectiveness of the Company's disclosure controls and procedures as of March 31, 2024 need[ed] to be modified."

69.    In response, the price of the Company's common stock fell from a closing price of $0.092 per share on August 9, 2024 to $0.079 per share at the close of trading on August 10, 2024, a decline of over 14%.

70.    Only a few days later, on August 14, 2024, after market hours, the Company announced that it could not timely file its quarterly report for the second quarter of 2024.

71.    The Company's common stock price fell 3.95%, from a closing price of $0.076 per share on August 14 to close at $0.073 per share on August 15.

72.    On August 20, 2024, after market hours, the Company filed its restated financial statements for the first quarter of 2023 (the "Restatement"). The Restatement revealed that the Company's financial condition as of March 31, 2024 was vastly different than Defendants originally reported. Total current assets were not $20.4 million, but only $5 million. Net rental revenue reported to be $29 million was, in fact, less than $14 million. Operating expenses were not $7.6 million, but $16 million. A net loss of $16.79 million was revealed to be, instead, over ***$42 million***.

73.    With respect to cash flow—critically important for the Company's business strategy—the Company revealed that a huge portion of the Company's cash flow consisted of rents received in advance: over $10 million, rather than the originally reported $2.2 million.  The Company assured investors in each Form 10-K and Form 10-Q that "[p]ayment received for the future use of a rental unit is recognized as a liability and reported as rents received in advance on the balance sheets. Rents received in advance are recognized as revenue after the rental unit is occupied by the customer for the agreed upon length of time." According to the Restatement, however, the Company deviated from this policy in the first quarter of 2024, when it "incorrectly recognized revenue in the first quarter of 2024 for reservations that were booked and paid for, but the guest had not yet stayed at the property." As a result, the Company improperly reported nearly $8 million in revenue that was, in fact, a liability.

74.    A selection of the many adjustments made by the Restatement to the Company's financial statements as of March 31, 2024 are as follows (all figures in US dollars):

| | As Previously Reported | Restatement Adjustments | As Restated |
|---|---|---|---|
| **CONDENSED CONSOLIDATED BALANCE SHEET** | | | |
| *Current Assets* | | | |
| Channel Retained Funds, Net | 1,500,000 | -1,500,000 | - |
| Processor Retained Funds, Net | 2,633,926 | -2,633,926 | - |
| Receivables from On-Line Travel Agencies, Net | 6,749,769 | -6,749,769 | - |
| | | -984,744 | |
| Receivables from City of New York and Landlords, Net | 6,018,035 | -3,201,640 | 1,831,651 |
| Prepaid Expenses and Other Current Assets | 1,361,114 | -342,212 | 1,018,902 |
| *Total Current Assets* | 20,416,565 | -15,412,291 | 5,004,274 |
| Bookings Received in Advance | 6,576,403 | 8,050,248 | 14,626,651 |
| *Total Current Liabilities* | 51,982,785 | 9,961,316 | 61,944,101 |

| *Stockholders' Deficit* | | | |
|---|---|---|---|
| Accumulated Deficit | -116,735,370 | -25,373,607 | -142,108,977 |
| *Total Stockholders' Deficit* | -18,279,845 | -25,373,607 | -43,653,452 |
| *CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS* | | | |
| *Net Rental Revenue* | 29,101,207 | -15,143,846 | 13,957,361 |
| *Gross (Loss) Profit* | -4,594,878 | -16,986,058 | -21,580,936 |
| *Total Operating Expenses* | 7,617,003 | 8,387,549 | 16,004,552 |
| *(Loss) Income from Operations* | -12,211,881 | -25,373,607 | -37,585,488 |
| *Net Loss* | -16,785,875 | -25,373,607 | -42,159,482 |
| Basic Loss Per Common Share | -0.35 | -0.52 | -0.87 |
| **CONDENSED CONSOLIDATED STATEMENT OF CASH FLOWS** | | | |
| *Cash Flows from Operating Activities* | | | |
| Writeoff of bad debts | | 7,843,456 | 7,843,456 |
| Receivables from On-Line Travel Agencies, Net | 186,485 | 2,524,983 | 2,711,468 |
| Receivables from City of New York and Landlords, Net | -1,432,665 | 3,201,640 | 1,768,975 |
| Prepaid expense and other assets | -4,415,639 | 342,212 | -4,073,427 |
| Rents received in advance | 2,172,187 | 8,050,248 | 10,222,435 |

75.    Following the Restatement, the Company's common stock price fell 3.95%, from a closing price of $0.076 per share on August 20 to close at $0.073 per share on August 21, 2024.

76.    After the Class Period, on August 23, 2024, the Company disclosed that it had received two additional noncompliance notices from Nasdaq. First, on August 20, 2024, the Company received notice that it was not in compliance with Nasdaq's listing rules because it "did not timely file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2024," erroneously referring to the third quarter of 2024 rather than, of course, the second quarter ending June 30, 2024. Second, Nasdaq notified the Company on August 23, 2024 that, because the Company's common stock had a closing bid price of $0.10 or less for ten consecutive trading days, Nasdaq staff had determined to delist the Company's securities. The Company disclosed that unless it requested an appeal of this delisting decision by August 30, 2024, trading of the

Company's common stock and preferred stock will be suspended at the opening of business on September 4, 2024.

77.     The Company stated that it intended to appeal the Nasdaq's determination to delist the Company's securities, which would forestall delisting during the appeal process. Though it has not publicly stated that it has appealed Nasdaq's determination, the common stock and preferred stock are still trading.  When the markets closed on September 3, 2024, the Company's common stock price was $0.073 per share, and the preferred stock price was $15.25 per share. Remarkably, today, September 4, 2023, the Company took the investor relations section of its website offline.

## III.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.  False and Misleading Statements in the Company's May 9, 2023 Press Release and May 10, 2023 Form 8-K

78.     On May 9, 2023, the Company issued a press release entitled "LuxUrban Hotels Inc. Announces Record 2023 First Quarter Financial Results." On May 10, 2023, the Company filed this press release with the SEC as an attachment to a Form 8-K.  Defendant Ferdinand signed the Form 8-K and Defendants Ferdinand and Kothari were both quoted in the press release, which identified Kothari as the Company's corporate contact person.

79.     The press release stated that "[a]s of May 9, 2023, the Company had 20 short-term stay hotels under MLA consisting of 1,673 rooms that will be hosting guests from early Q2 to early Q3."

80.     The above statement was materially false and misleading because it included the 179 rooms in the Trinity Hotel even though the Company did not fully execute an MLA for that property, and created a false impression of the Company's growth.

**B.** **False and Misleading Statements in the Company's Q1 2023 10-Q filed on May 9, 2023**

81.    On May 9, 2023, the Company filed its Q1 2023 10-Q, reporting results for the quarter ended March 31, 2023.  Defendants Ferdinand and Kothari signed and certified the Q1 2023 10-Q.

82.    The Q1 2023 10-Q stated that "[w]ith recent hotel rooms becoming available, as of May 9, 2023, we have approximately 1,673 under lease."

83.    The Q1 2023 10-Q stated, under "Property Summary:"

We enter into triple net leases in which we are responsible for all of the costs on the property outside of exterior structural maintenance. As of March 31, 2023, we leased 12 properties with 1,034 units available for rent. ***As of May 9, 2023, we leased 20 properties with 1,673 units. Our portfolio of properties as of May 9, 2023, was as follows[.]***

84.    The table immediately following the above quote included the "Trinity: 741 8th 851 South Grand Avenue, Los Angeles, CA 90017," in the list of "Properties added subsequent to 3/31/2023," and included its 179 rooms in the total of 1,673 rooms "[u]nder lease."

85.    The Q1 2023 10-Q also included the Trinity Hotel, and its 179 rooms, in a table under "Our Business Strategy," which reported that, including "Properties added after March 31, 2023," the Company's portfolio consisted of 20 properties and 1,673 units.

86.    These statements in the Q1 2023 10-Q were materially false and misleading because the Company did not fully execute an MLA for the Trinity Hotel, it was not "under lease" by the Company, and thus it was not one the the of the Company's properties, and the statements created a false impression of the Company's growth.

**C.** **False and Misleading Statements in the Company's May 15, 2023 Press Release and May 17, 2023 Form 8-K**

87.    On May 15, 2023, the Company issued a press release entitled "LuxUrban Hotels Signs Master Lease Agreement to Operate Luxury Hotel in New York City Adding 204 Units to

Property Portfolio." On May 17, 2023, the Company filed this press release with the SEC as an attachment to a Form 8-K. Defendant Ferdinand signed the Form 8-K and was quoted in the press release, which identified Kothari as the Company's corporate contact person.

88.     The press release stated, under "Updated Property Summary," that "[a]s of March 31, 2023, we leased 12 properties with 1,034 units available for rent. As of May 15, 2023, we leased 20 properties with 1,807 units and our portfolio is as follows[.]"

89.     The table immediately following the above quote included the "Trinity: 741 8th 851 South Grand Avenue, Los Angeles, CA 90017," in the list of properties and and included its 179 rooms in the total of 1,807 rooms "[u]nder lease."

90.     The press release also stated that "[o]ur units by location as of May 15, 2023 are as follows[,]" and included a table reporting that the Company's portfolio included two properties and 247 units in Los Angeles under "Properties added after March 31, 2023," and reported that the Company had a total of 20 properties and 1,807 rooms.

91.     These statements in the Q1 2023 10-Q were materially false and misleading because the Company did not fully execute an MLA for the Trinity Hotel, it was not "under lease" by the Company, and thus it was not one the of the Company's properties, and the statements created a false impression of the Company's growth.

**D.      False and Misleading Statements in the Company's Investor Presentation filed on Form 8-K on May 22, 2023**

92.     On May 22, 2023, the Company filed a Form 8-K with the SEC attaching an investor presentation dated "May / June 2023."  Defendant Kothari signed the Form 8-K.

93.     The investor presentation stated that the Company had 1,807 "Hotel Units Under Master Lease (5/15/23)."

94.     The investor presentation also contained the following slide:



95.    The investor presentation also contained the following slide:



## PROPERTY SUMMARY (as of May 15, 2023)

O Hotel: 819 South
Flower Street, Los            Licensed
Angeles, CA 90017    68    hotel

Bogart: 101 Bogart
Street, Brooklyn, NY          Licensed
11206                65    hotel

Be Home: 741 8th
Avenue, New York,             Licensed
NY 10036            44    hotel

Trinity: 741.8th 851
South Grand
Avenue, Los Angeles,          Licensed
CA 90017            179    hotel

Condor: 56 Franklin
Ave, Brooklyn, NY             Licensed
11205                35    hotel

Hotel 57: 130 East 57th
Street, New York, NY          Licensed
10022                204    hotel

Hanbee Hotel: 231
Grand St, New York,           Licensed
NY 10013            101    hotel

MB Hotel: 63 Chrystie
St, New York, NY              Licensed
10002                77    hotel

Under lease          1,807

### Units by location as of May 15, 2023

| Location | Miami Beach | New York | NOLA | DC | LA | Total |
|---|---|---|---|---|---|---|
| Units | 252 | 627 | 60 | 95 | - | 1,034 |
| Properties at March 31, 2023 | 5 | 4 | 1 | 2 | - | 12 |
| | | | | | | |
| | Properties added after March 31, 2023 | | | | | |
| Units | - | 526 | - | - | 247 | 773 |
| Properties | - | 6 | - | - | 2 | 8 |
| | | | | | | |
| Total | | | | | | |
| Units | 252 | 1,153 | 60 | 95 | 247 | 1,807 |
| Properties | 5 | 10 | 1 | 2 | 2 | 20 |

11

26

96.     The statements in the three paragraphs above were materially false and misleading because they included the Trinity Hotel in the number of properties and units "under MLA" and in the Company's portfolio, but the Company did not fully execute an MLA for the Trinity Hotel, it was not "under MLA" by the Company, and thus it was not one the of the Company's properties, and the statements created a false impression of the Company's growth.

**E.      False and Misleading Statements in the Company's Press Release Issued and Filed on Form 8-K on August 8, 2023**

97.     On August 8, 2023, the Company issued a press release entitled "LuxUrban Hotels Inc. Announces Record 2023 Second Quarter Financial Results." On August 9, 2023, the Company filed this press release as an exhibit to a Form 8-K.  Defendant Ferdinand signed the Form 8-K and Defendants Ferdinand and Kothari were both quoted in the press release, which identified Kothari as the Company's corporate contact person.

98.     The press release quoted Defendant Ferdinand as stating:

By continuing to employ a disciplined, asset-light growth strategy, strict underwriting criteria, and a commitment to delivering the highest-level customer experience, in Q2 2023 we delivered significant quarter-over-quarter increases in net rental revenue, EBITDA, and cash net income, strengthened our financial position, and ***expanded our operations portfolio to 17 properties under Master Lease Agreements and 1,625 rooms available for rent as of August 8, 2023***.

99.     The press release also stated that "[a]s of August 8, 2023, the Company had 17 short-term stay hotels under Master Lease Agreements consisting of 1,625 rooms."

100.    These statements were materially false and misleading because the "17 properties under Master Lease Agreements and 1,625 rooms available for rent as of August 8, 2023" included the Trinity Hotel, but the Company did not fully execute an MLA for the Trinity Hotel, it was not "under [a] Master Lease Agreement[]" by the Company, and thus it was not one the of the Company's properties, and the statements created a false impression of the Company's growth.

### F.    False and Misleading Statements in the Company's Q2 2023 10-Q filed August 8, 2023

101.    On August 8, 2023, the Company filed its Q2 2023 10-Q, reporting results for the quarter ended June 30, 2023.  Defendants Ferdinand and Kothari signed and certified the Q2 2023 10-Q.

102.    The Q2 2023 10-Q stated, under "Property Summary:"

We enter into triple net leases in which we are responsible for all of the costs on the property outside of exterior structural maintenance. ***As of June 30, 2023, we leased 12 properties with 1,086 units available for rent. As of August 8, 2023, we leased 15 properties with 1,411 units available for rent. As of August 8, 2023, including properties under lease but not yet available for rent we leased 17 properties with 1,625 units. Our portfolio of properties as of August 8, 2023, was as follows[.]***

103.    The table immediately following the above quote included the "Trinity: 741 8th 851 South Grand Avenue, Los Angeles, CA 90017," and its 179 rooms under "***Properties under lease, not operating.***"

104.    These statements in the Q2 2023 10-Q were materially false and misleading because the Company did not fully execute an MLA for the Trinity Hotel, it was not "under lease" by the Company, and thus it was not one the of the Company's properties, and the statements created a false impression of the Company's growth.

### G.    False and Misleading Statements Made During the Company's Q2 2023 Earnings Call on August 9, 2023

105.    On August 9, 2023, the Company held an earnings call regarding its Q2 2023 earnings. During the call, Defendants Ferdinand and Kothari presented to investors.

106.    During the call, Defendant Kothari stated: "We have under -- ***we currently have under MLA 17 properties totaling 1,625 short-term rental units***."

107.    Defendant Kothari further stated: "We continue to expect year-end operating units to be between 2,500 and 3,000 short-term hotel units ***under MLA***, up from 844 at December 31, 2022, and ***1,625 as of today***."

108.    These statements were materially false and misleading because the 1,625 units to which Defendant Kothari referred as being "under MLA" included the Trinity Hotel, but the Company did not fully execute an MLA for the Trinity Hotel, and thus it was not one the of the Company's properties, and the statements created a false impression of the Company's growth.

**H.      False and Misleading Statements in the Company's Investor Presentation filed on Form 8-K on September 1, 2023**

109.    On September 1, 2023, the issued filed a Form 8-K with the SEC attaching an investor presentation.  Defendant Ferdinand signed the Form 8-K.

110.    The investor presentation also contained the following slide:



111.    The statements in the slide above were materially false and misleading because they included the Trinity Hotel in the total of properties and units under lease, but the Company did not fully execute an MLA for the Trinity Hotel, it was not "under lease" by the Company, and thus it was not one the of the Company's properties, and the statements created a false impression of the Company's growth.

I.    **False and Misleading Statements in the Company's November 8, 2023 Press Release and November 9, 2023 Form 8-K**

112.    On November 8, 2023, the Company issued a press release entitled "LuxUrban Hotels Inc. Announces Record 2023 Third Quarter Financial Results." On November 9, 2023, the Company filed this press release with the SEC as an attachment to a Form 8-K.  Defendant Ferdinand signed the Form 8-K and Defendants Ferdinand and Kothari were both quoted in the press release, which identified Kothari as the Company's corporate contact person.

113.    The press release stated: "As of November 8, 2023, we had 1,599 units available for rent and 2,032 units under long-term Master Lease Agreements but not yet available for rent."

114.    The press release also stated:

**Operational Highlights**

- RevPAR for the 2023 nine-month period rose to $274 from $149 in the same period in 2022, and from $247 as of the year ended December 31, 2022.

- As of September 30, 2023, the Company:

    o   leased 16 properties with 1,466 units available for rent

- *As of November 8, 2023, the Company*:

    o   leased 18 properties with 1,599 units available for rent

    o   *leased 21 properties with 2,032 units, including properties under lease but not yet available for rent*

30

115.    The Form 8-K also attached an investor presentation that included the following slide:



116.    The statements in the three paragraphs above were materially false and misleading because they included both the Trinity Hotel and the Royalton Hotel in the "2,032 units under long-term Master Lease Agreements but not yet available for rent," in the "21 properties with 2,032 units, including properties under lease but not yet available for rent," and in the total of properties and units under lease that Defendants stated the Company had as of November 8, 2023, but the Company had not fully executed an MLA for either the Trinity Hotel or the Royalton Hotel, they were not "under lease" by the Company, and thus were not among the of the Company's properties, and the statements created a false impression of the Company's growth.

**J.** **False and Misleading Statements in the Company's Q3 2023 10-Q filed on November 8, 2023**

117.    On November 8, 2023, the Company filed its Q3 2023 10-Q, reporting results for the quarter ended September 30, 2023.  Defendants Ferdinand and Kothari signed and certified the Q3 2023 10-Q.

118.    The Q3 2023 10-Q stated, under "Property Summary:"

We enter into triple net leases in which we are responsible for all of the costs on the property outside of exterior structural maintenance. ***As of September 30, 2023, we leased 16 properties with 1,446 units available for rent. As of November 8, 2023, we leased 18 properties with 1,599 units available for rent. As of November 8, 2023, including properties under lease but not yet available for rent we leased 21 properties with 2,032 units. Our portfolio of properties as of November 8, 2023, was as follows[.]***

119.    The table immediately following the above quote included the "Trinity: 741 8th 851 South Grand Avenue, Los Angeles, CA 90017," and its 179 rooms, as well as the "Royalton: 44 W 44th Street, New York, NY 10036," with its 168 rooms, under "***Properties under lease***, not operating."

120.    These statements in the Q3 2023 10-Q were materially false and misleading because the Company did not fully execute an MLA for the Trinity Hotel or the Royalton Hotel, they were not "under lease" by the Company, and thus they were not among the of the Company's properties, and the statements created a false impression of the Company's growth.

**K.** **False and Misleading Statements Made During the Company's Q3 2023 Earnings Call on November 9, 2023**

121.    On November 9, 2023, the Company held an earnings call regarding its Q3 2023 earnings. During the call, Defendants Ferdinand and Kothari presented to investors.

122.    During the call, Defendant Kothari stated:

During the quarter, we added four properties, a total of 360 units all in New York City. Looking at our portfolio, as of September 30, 2023, the company leased 16 properties with 1,446 units available for rent. As of November 8, 2023, the

company leased 18 properties with 1,599 units available for rent. ***And as of November 8, 2023, we leased 21 properties with 2,032 units, and these includes properties under lease but not yet available for rent***.

123.    These statements were materially false and misleading because they included the Trinity and Royalton hotels in the 21 properties with 2,032 units the Company purportedly "leased" as of November 28, 2023, even though the Company had not executed lease agreements for those two hotels, and the statements created a false impression of the Company's growth.

**L.    False and Misleading Statements in the Company's Press Release Issued and Filed on Form 8-K on November 17, 2023**

124.    On November 17, 2023, the Company issued a press release entitled "LuxUrban Hotels Announces Non-Dilutive Financing of Up to $10 Million to Accelerate Growth." That same day, the Company filed the press release with the SEC as an attachment to a Form 8-K. Defendant Kothari signed the Form 8-K, which quoted both Defendants Ferdinand and Kothari.

125.    The press release stated:

The Company currently manages a portfolio of hotel rooms in New York, Washington D.C., Miami Beach, New Orleans and Los Angeles. ***As of November 8, 2023, the Company had 2,032 hotel rooms under lease***, including properties not yet available for rent, and seeks to rapidly build its portfolio on favorable economics through the acquisition of additional accommodations that were dislocated or are underutilized as a result of the pandemic and current economic conditions.

126.    The statements in the paragraph above were materially false and misleading because they included both the Trinity Hotel and the Royalton Hotel in the "2,032 units under lease" that Defendants stated the Company had as of November 8, 2023, but the Company had not fully executed an MLA for either the Trinity Hotel or the Royalton Hotel and thus the rooms in those properties were not "under lease," and the statements created a false impression of the Company's growth.

M.    **<u>False and Misleading Statements in the Company's November 30, 2023 Press Release</u>**

127.    On November 30, 2023, the Company issued a press release on *Business Wire*, a national newswire service, entitled "LuxUrban Hotels to Operate Two New Four-Star Boutique Hotels in New York City: The Royalton Hotel and the Truss Hotel Times Square to Begin Welcoming Guests in December."

128.    The press release, which listed Defendant Kothari as the Company's contact, stated:

> ***LuxUrban Hotels Inc.*** ("LuxUrban" or the "Company") (Nasdaq: LUXH), which utilizes an asset-light business model to lease entire hotels on a long-term basis and rent out hotel rooms in these properties in key major metropolitan cities, today ***announced that it has signed separate 25-year Master Lease Agreements (MLA), inclusive of two five-year options, to operate two new boutique hotels in New York City: The Royalton Hotel and the Truss Hotel. These properties will be re-branded as "The Royalton by LuxUrban" and "The Truss Hotel by LuxUrban" and are expected to begin welcoming guests early next month. LuxUrban expects both of these properties to be rebranded under the Trademark Collection® by Wyndham name over the next few months.***

129.    These statements were materially false and misleading because (1) the Company had not signed an MLA for either the Royalton Hotel or the Truss Hotel, (2) the Company had no basis to state that either hotel "will be re-branded," or would welcome guests early the "next month," i.e., December 2023, (3) the Company had no basis to expect that both of those hotels would be "rebranded under the Trademark Collection® by Wyndham name over the next few months," and (4) the statements created a false impression of the Company's growth

130.    The press release quoted Defendant Ferdinand as follows:

> ***"These newest hotels add density to our primary market of New York City and increase our portfolio of properties that will be integrated into the LuxUrban operating platform***," said Brian Ferdinand, Chairman and Co-Chief Executive Officer of LuxUrban Hotels. "We are continuing to manage a robust opportunity pipeline and expect to consummate several additional MLAs in the near term."

131.    These statements were materially false and misleading because the Royalton had not been "add[ed]" to the Company's portfolio and thus would not "be integrated into the

34

LuxUrban operating platform," and the statements created a false impression of the Company's growth.

132.    The press release also stated that "[a]s of November 30, 2023, the Company leased 20 properties with 1,853 units available for rent and, including properties under lease but not yet available for rent, leased 21 properties with 2,032 units."

133.    These statements were materially false and misleading because they included the Trinity Hotel and the Royalton Hotel in the total of properties and units the Company "leased" or had "under lease," but the Company did not fully execute an MLA for either the Trinity Hotel or the Royalton Hotel, they were not "under lease" by the Company, and thus they were not among the of the Company's properties, and the statements created a false impression of the Company's growth.

134.    The press release contained the following statement and table:

The Company's portfolio of properties effective with the opening of the Royalton Hotel and the Truss Hotel on or around December 1, 2023, is as follows:

| Property | # of Units | Property Type | Lease Term | Extension Option | Annual Escalation |
|---|---|---|---|---|---|
| | | | Weighted Avg[1] | Weighted Avg[1] | Weighted Avg[1] |
| **As of September 30, 2023** | | | | | |
| Subtotal Operating Units | 1,446 | | 12.6 | 17.8 | 3.0% |
| **Properties operating subsequent to 9/30/2023** | | | | | |
| **Hotel 46**: 129 West 46th Street, New York, NY 11206 | 79 | Licensed hotel | 25.0-year | None | 4.2% |
| **Hotel 27**: 62 Madison Ave, New York, NY 10016 | 74 | Licensed hotel | 15.0-year | 10-year | 3.0% |
| **Royalton**: 44 West 44th Street, New York, NY 10036 | 168 | Licensed hotel | 15.0-year | 10-year | 3.0% |
| **Truss**: 515 9th Avenue New York NY 10018 | 86 | Licensed hotel | 15.0-year | 10-year | 3.0% |
| **As of November 30, 2023, pro forma for the opening of Royalton Hotel and Truss Hotel** | | | | | |
| Subtotal Operating Units | 1,853 | | | | |
| **Properties under lease, not operating** | | | | | |
| **Trinity**: 741 8th 851 South Grand Avenue, Los Angeles, CA 90017 | 179 | | | | |
| **Under lease** | 2,032 | | | | |

(1) Averages are weighted by unit count

135.    These statements were materially false and misleading because (1) the Company had not signed an MLA for either the Royalton Hotel or the Truss Hotel, and neither property was an "operating" property for the Company, (2) neither the Royalton Hotel or the Truss Hotel were "under lease," (3) the Company had no basis to state that the Royalton Hotel or the Truss hotel would "open[]" "on or around December 1, 2023," (4) the Trinity Hotel in Los Angeles was not "under lease," (5) the Company's reported totals of properties under lease, operating, and properties under lease, not operating, were materially overstated, and (6) the statements created a false impression of the Company's growth.

36

**N.    False and Misleading Statements in the Company's December 2023 Investor Presentation filed on December 1, 2023**

136.    On December 1, 2023, the Company filed a Form 8-K, signed by Defendant Kothari, attaching an investor presentation.

137.    The presentation included the following slide:



138.    These statements were materially false and misleading because they included the Trinity, Truss, and Royalton hotels in the number of properties and units "under lease" as of November 2023, but the Company did not fully execute an MLA for those hotels, they were not "under lease" by the Company, and thus they were not among the of the Company's properties, and the statements created a false impression of the Company's growth.

O.    **<u>False and Misleading Statements in the Company's January 12, 2023 Press Release</u>**

139.    On January 12, 2024, the Company issued a press release entitled "LuxUrban Hotels Announces that The Royalton by LuxUrban, Trademark Collection® by Wyndham Will Begin Welcoming Guests in January."

140.    The press release, which identified Defendant Kothari as a contact, stated that "The Royalton by LuxUrban, Trademark Collection® by Wyndham is expected to begin welcoming guests on or before January 30, 2024."

141.    These statements were materially false and misleading because the Company had not signed an MLA for the Royalton and thus it would not "begin welcoming guests" on or before January 30, 2024, nor be part of the Wyndham "Trademark Collection®" on or before that date, and created a false impression of the Company's growth and the false impression that the Royalton would begin generating revenue and cash for the Company on or before January 30, 2024.

142.    That press release also stated:

> *As of November 30, 2023 the Company had 2,032 hotel rooms under lease, including properties not yet available for rent*, and seeks to rapidly build its portfolio on favorable economics through the acquisition of additional accommodations that were dislocated or are underutilized as a result of the pandemic and current economic conditions.

143.    These statements were materially false and misleading because they included the Trinity, Truss, and Royalton hotels in the number of properties and units "under lease" as of November 30, 2023, but the Company did not fully execute an MLA for those hotels, they were not "under lease" by the Company, and thus they were not among the of the Company's properties, and the statements created a false impression of the Company's growth.

P.      **Underline:** False and Misleading Statements in the Company's January 17, 2023 Press
        Release

144.    On January 17, 2024, the Company issued a press release entitled "LuxUrban
Hotels Responds to Inaccurate and Misleading Short Seller Report." The press release, which
identified Defendant Kothari as a contact, attacked "a short sale report issued on January 17, 2024,"
that is, the Bleecker Street Report.

145.    The press release stated that "[a]s previously announced, the Company is scheduled
to begin welcoming guests on or before January 30, 2024 at The Royalton by LuxUrban,
Trademark Collection® by Wyndham and has a set date with the property's ownership to be
delivered possession of the asset."

146.    It further stated that "[t]he Company is transparent and consistent in discussing its
growth and operating strategies and remains optimistic about its prospects and the strength of its
evolving business profile."

147.    These statements were materially false and misleading because the Company had
not signed an MLA for the Royalton and thus was not scheduled to welcome guests at the Royalton
"on or before January 30, 2024," the Royalton would not be part of the Wyndham "Trademark
Collection®" on or before that date, the Company did not have "a set date" to be delivered
possession of the Royalton, and the Company was not "transparent and consistent" in disclosing
its growth to investors, and the statements created a false impression of the Company's growth.

148.    That press release also stated:

> *As of November 30, 2023 the Company had 2,032 hotel rooms under lease,*
> *including properties not yet available for rent*, and seeks to rapidly build its
> portfolio on favorable economics through the acquisition of additional
> accommodations that were dislocated or are underutilized as a result of the
> pandemic and current economic conditions.

39

149.     These statements were materially false and misleading because they included the

Trinity, Truss, and Royalton hotels in the number of properties and units "under lease" as of

November 30, 2023, but the Company did not fully execute an MLA for those hotels, they were

not "under lease" by the Company, and thus they were not among the of the Company's properties.

**Q.     False and Misleading Statements in the Company's January 30, 2024 Press
         Release**

150.     On January 30, 2024, after market hours, the Company issued a press release

entitled "LuxUrban Hotels to Operate James NoMad Hotel in New York City," stating that the

Company

> has signed and funded a 15-year Master Lease Agreement (MLA), plus two, five-
> year options, to operate The James NoMad Hotel in New York City. LuxUrban
> expects that The James will be rebranded as The J Hotel by LuxUrban, a Wyndham
> Grand® Hotel. The Company expects to take possession of the property and begin
> welcoming guests on or before March 1, 2024.

151.     The press release quoted Defendant Ferdinand as stating: "The J Hotel will mark

LuxUrban's 13th hotel under long-term lease in our core market of New York City and expand

our range of offerings to business and leisure travelers."

152.     Defendant Ferdinand was further quoted as stating:

> By ***acquiring the long-term operating rights*** to select hotels, LuxUrban allows
> owners and operators to retain ownership of their properties while unlocking the
> full commercial potential of each asset. We believe that ***this transaction reflects
> the growing industry acceptance of our evolving asset-light business model and
> the inherent, value-driving benefits of our collaboration with Wyndham Hotels
> & Resorts***.

153.     It further quoted Defendant Ferdinand as stating that the James NoMad acquisition,

the Company's purported "largest hotel transaction to date," signified a maturation of the

Company's business:

> As our business continues to mature, the size and quality of the hotels we are
> targeting are expected to continue to improve, as will our ability to be selective in
> the assets we acquire under long-term MLA.

154.    Further, Defendant Ferdinand was quoted as stating: "We expect to realize scale-driven cost efficiencies more fully as we build property density in our existing cities."

155.    These statements were materially false and misleading because the Company had not signed an MLA for the James NoMad Hotel and, therefore, Defendants had no basis to expect that it would be rebranded as "The J Hotel by LuxUrban, a Wyndham Grand® Hotel" or that the Company would take possession of the property and begin welcoming guests on or before March 1, 2024, and also, therefore, that the purported James NoMad deal did not reflect acceptance of the Company's business model or the "benefits of our collaboration with Wyndham," nor did it signify a maturation of the Company's business or an improvement in the size and quality of the hotels the Company would target, or the Company's ability to be selective in the assets it "acquire[d] under long-term MLA," or that increasing "property density in our existing cities" that would drive "scale-driven cost efficiencies," and created a false impression of the Company's growth and relationship with Wyndham.

R.    **False and Misleading Statements Made During the Company's February 6, 2024 Analyst/Investor Day and Associated Presentation Filed on Form 8-K**

156.    On February 6, 2024, the Company held an "analyst/investor day" to present its business.  Defendants Ferdinand and Kothari presented to attendees, and used a slide presentation that the Company filed that same day as an attachment to a Form 8-K signed by Kothari.

157.    Regarding the James NoMad Hotel, Defendant Kothari stated:

Look, in 2024, what we've done so far to date, 1 month in -- we acquired The James, ***our largest property to date, our best property in terms of quality, asset quality. Look, our goals are to continue acquiring larger scale***. So you'll see acquisitions that are greater unit count. So we have to do less of these higher quality, what's in the pipeline as well. Pipeline will change.

158.    Continuing on that subject, Defendant Kothari stated:

But what makes this relevant is really 2 specific things. One is it's our **largest acquisition to date. So what we're seeing now in the pipeline are bigger acquisitions, greater impact to unit count growth with less individual transactions, right?**

So cleaning really sort of coming down and making the larger impact with smaller -- with less deals. The second is -- ***it's the highest quality today, right? So in terms of star category, it's 4.5 to 5 stars, slightly better than where we are maybe at this property or some of the other properties in our portfolio. Has on-site facilities that are going to be third-party operated and it's a New York City landmark property, right? So we're very proud of this. Just shows the ability of our team to execute as well as the support that we're getting not only from our partner, but also from third parties like The James***.

159.    The presentation that Defendants presented included the following slide:



160.    These statements were materially false and misleading because the Company had not executed an MLA for the James NoMad hotel, and therefore, the purported transaction did not signify that the Company's pipeline of properties would improve in size or quality, and the statements created a false impression of the Company's growth.

161.    In response to the question "Did you tell us what the key money was on the James hotel?," either Ferdinand or Kothari (the transcript does not identify who) responded: "We're not allowed to tell you."

162.    This statement was materially false and misleading because Wyndham "key money" was only available for properties under lease, so the true reason Defendants could not tell investors "what the key money was on the James hotel" was that the James hotel was not under lease, and the statement created a false impression of the Company's growth and relationship with Wyndham.

S.    **False and Misleading Statements Made During the Company's Full-Year 2023 Earnings Call on April 16, 2024**

163.    On April 16, 2024, the Company held an earnings call to discuss its results for the year ended December 31, 2023. Defendants Ferdinand and Kothari presented to investors.

164.    During the earnings call, an analyst directly asked: "Can you comment if the James NoMad Hotel is in possession in March as expected?" Kothari directed this to Ferdinand, stating "Brian, do you want to go through that?"  In response to the analyst's question, Ferdinand stated:

> Sure. So we are currently not operating, ***but in possession***. Highgate is still managing the process, and we're working through the union bond issues with the union and the owner, and we do expect to take possession of that property as we work through the balance of the union bond issues, which we're in deep negotiations with the union currently.

165.    These statements were materially false and misleading because the Company had not executed an MLA for the James NoMad, as it had previously stated and which misstatement Defendants failed to correct, and thus was not "in possession" of the hotel, which the Company's own disclosures made clear only happened after lease execution, and they created a false impression of the Company's growth and the false impression that the James NoMad hotel would begin generating revenue and cash flow that quarter.

43

166.    The analyst followed up, asking: "Okay. And that's expected this quarter? Or can you comment on the timing of that?"

167.    In response, Defendant Kothari stated: "Yes, I would expect this quarter. Yes, this quarter. Yes."

168.    These statements were materially false and misleading because the Company had not executed an MLA for the James NoMad, as it had previously stated and which misstatement Defendants failed to correct, and thus there was no basis to "expect" that the Company would begin operating the hotel "this quarter," and they created a false impression of the Company's growth and the false impression that the James NoMad hotel would begin generating revenue and cash flow that quarter.

T.    **False and Misleading Statements in the Company's May 13, 2024 Press Release and May 14, 2024 Form 8-K**

169.    On May 13, 2024, the Company issued a press release entitled "LuxUrban Hotels Inc. Announces 2024 First Quarter Financial Results," which it filed the following day as an attachment to a Form 8-K signed by Defendant Kothari. The press release, which quoted Defendant Kothari, announced financial results for Q1 2024.

170.    The press release stated that, for Q1 2024, with comparisons to Q1 2023 unless otherwise stated:

- Net rental revenue rose 27.6% to $29.1 million from $22.8 million[.] . . .

- Gross profit (loss) was $(4.6) million as compared to gross profit of $5.4 million. . . .

- Total operating expenses rose to $7.6 million, or 26.2% of net rental revenue, from $4.2 million, or 18.5% of net rental revenue[.] . . .

- Net loss was $(16.8) million compared to a net loss of $(2.8) million.  . . .

171.    These statements were materially false and misleading, creating a false impression of the Company's financial condition and prospects because, as revealed by the Restatement, for Q1 2024: (1) net rental revenue was $13,957,361; (2) gross loss was $21,580,936; (3) total operating expenses were $16,004,552; (4) net loss was $42,159,482.

U.    **Underline**{False and Misleading Statements in the Company's Q1 2024 10-Q filed on May 13, 2024}

172.    On May 13, 2024, the Company filed its Q1 2024 10-Q, reporting results for the quarter ended March 31, 2024.  Defendant Kothari signed the Q1 2024 10-Q and certified that it fairly presented, in all material respects, the financial condition, results of operations, and cash flows of the Company.

173.    The Q1 2024 10-Q reported financial results as set forth in Section II.I., *supra*.

174.    Those statements were materially false and misleading because, as revealed by the Restatement, those financial results were materially incorrect as set forth in Section II.I., *supra*.

175.    The Q1 2024 10-Q stated that the consolidated financial statements it contained had been "prepared . . . in accordance with accounting principles generally accepted in the United States of America ('U.S. GAAP')."

176.    This statement was materially false and misleading because, as the Restatement revealed, the Company reported materially incorrect financial results as a result of its violations of U.S. GAAP (or, simply, "GAAP").

177.    The Q1 2024 10-Q made several misstatements concerning the Company's revenue recognition policies, including:

> ***Revenue Recognition*** — The Company's revenue is derived primarily from the rental of units to its guests. The Company accounts for revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. ***The Company recognizes revenue when obligations under the terms of a contract are satisfied and control over the***

*promised goods and services is transferred to the guest. For the majority of revenue, this occurs when the guest occupies the unit for the agreed upon length of time and receives any services that may be included with their stay.* Revenue is measured as the amount of consideration it expects to receive in exchange for the promised goods and services. The Company recognizes any refunds and allowances as a reduction of rental income in the consolidated statements of operation.

*Payment received for the future use of a rental unit is recognized as a liability and reported as rents received in advance on the balance sheets. Rents received in advance are recognized as revenue after the rental unit is occupied by the customer for the agreed upon length of time. The rents received in advance balance as of March 31, 2024, and December 31, 2023, was $6,576,403 and $4,404,216, respectively and is expected to be recognized as revenue within a one-year period.*

. . .

*We record cash collected prior to stays as "bookings received in advance" on our balance sheet as a liability. These collections are then recognized as revenue when guests stay at our properties.* In the event that there is a refund in accordance with our refund policy, revenue is not recognized.

178.    These statements were materially false and misleading because, as revealed by the Restatement, the Company "recognized revenue in the first quarter of 2024 for reservations that were booked and paid for, but the guest had not yet stayed at the property." As a result, the Company improperly reported nearly $8 million in revenue that was, in fact, a liability, in violation of GAAP.

179.    Defendant Kothari further certified that he had "[e]valuated the effectiveness of the [Company's] disclosure controls and procedures and presented in this report [his] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation," and disclosed all "significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]"

180.    These statements were materially false and misleading because, as the Company admitted on August 9, 2024, its Q1 2024 10-Q could not be relied upon, would need to be restated, and Defendant Kothari's certification that the Company's internal controls were effective as of March 31, 2024 needed to be "modified."

## V.    False and Misleading Statements Made During the Company's Q1 2024 Earnings Call on May 14, 2024

181.    On May 14, 2024, the Company held an earnings call regarding its financial results for Q1 2024. Defendant Kothari led the presentation.

182.    During the call, Defendant Kothari stated:

Let's discuss our results for the first quarter. Net rental revenue rose 27.6% to $29.1 million from $22.8 million driven by an increase in average units available to rent to 1535 from 571 partially offset by lower total RevPAR, the impact of seasonality to our current portfolio and other operational impacts mentioned above.

. . .

We reported a gross profit loss of $4.6 million as compared to a gross profit of $5.4 million.

. . .

Total operating expenses, including non-cash items, comprised $26.2 million of net rental revenue on Q1 2024 compared to $18.5 in last year's first quarter. Our operating loss for the quarter was $12.2 million. Net loss was $16.8 million compared to a net loss of $2.7 million.

. . .

Moving to the balance sheet, as compared to December 31, 2023, cash and cash equivalents rose to approximately $1.0 million compared to $0.8 million at December 31, 2023. Total debt was approximately $6.8 million as compared to total debt of $4.3 million. Accounts payable and accrued expenses increased approximately $28.9 million from $23.2 million.

183.    Those statements were materially false and misleading because, as revealed by the Restatement, the financial results reported by Defendant Kothari were materially incorrect as set forth in Section II.I., *supra*.

IV.     **ADDITIONAL SCIENTER ALLEGATIONS**

A.     **The Individual Defendants Were Deeply Involved With the Company's Operations**

184.    Defendant Ferdinand and Kothari's integral involvement with and oversight over the Company's operations establishes a strong inference that they acted with scienter.

185.    First, employing MLAs in the hotel industry is a distinctive deal structure employed by the Company: it is a key feature of the Company's business model.

186.    Second, Defendants' own statements are evidence of their familiarity with the process. Their repeated touting of the benefits of triple-net MLAs, for the Company's business shows that they were keenly aware of the structure of MLAs. For instance, Defendant Kothari repeatedly—during investor calls where he co-presented with Defendant Ferdinand—spoke about the "complexity" of MLAs, emphasizing "variability of the deal cycles and what can happen, ***what can go wrong associated to it.***" While he said that "we simplify the complexity[] [s]o people think it's a very simple process," ***he*** was aware of the complexity.

187.    Similarly, Defendant Ferdinand's statements about the details of MLA negotiations shows his knowledge of the process. For instance, when Bisnow reached out to him about the Defendants' false claim that the Company had signed and MLA for the Trinity hotel, he provided a copy a letter from the Company's lawyers to the Trinity's landlord, indicating his knowledge of the negotiations involved and of "what can go wrong."

188.    Furthermore, despite the complexity of "what can go wrong" when the Company sought to add a property to its portfolio, the question of whether an MLA or lease agreement was executed or not is simple, indicating that Defendants were at least reckless when they falsely reported that they had executed MLAs and had hotel properties "under lease."

B.    **Defendants' Misstatements Helped Their Efforts to Meet Guidance**

189.    The fact that Defendants emphasized the importance of growth and issued ambitious guidance as to the number of properties and rooms in the Company's portfolio provided an additional motive.

190.    Defendants repeatedly told investors that they expected the Company to end 2023 with 2,500 to 3,000 units, a goal they reiterated as late as December 1, 2023.

191.    Defendants also issued guidance for 2024. On January 12, 2024, the Company told investors, that it "expected to have approximately 3,500-4,000 hotel rooms available for rent under long-term MLA by the end of the first quarter of 2024 and approximately 6,000 hotel rooms available for rent under MLA by June 30, 2024."

192.    Defendants told investors that this goal did not necessarily mean the properties would be operational before the end of 2023, so prematurely announcing MLA executions would contribute to reaching the goal. For instance, during the November 9, 2023 earnings call, an analyst asked: "you have guidance of 2,500 to 3,000 rooms under MLAs by the end of this year. I'm not sure if that actually means that many there are operational." Defendant Kothari responded:

> So I mean, we have 2,032 units under MLA, of which 600 are operating. ***The bulk of that will be operating***, I would say, 1,800-plus units shortly maybe in the next week or two, actively discussing that on the operational level. So my thought on this is the cycles, in some cases, are longer just based on the process that we're going through. But I would say between 2,000 to 2,500 would be what is operational. So maybe somewhere in the middle of that, with the balance being under MLA. So we'll enter 2024 somewhere in between 2,500 to 3,000, maybe on the higher end.

193.    Meeting this guidance, which Defendants said was key to their overall strategy, provided an additional motive and contributes to the strong inference of scienter.

**C.      Defendant Ferdinand's Ownership of Millions of Shares of Common Stock, and Other Related-Party Transactions With the Company, Gave Him An Additional Motive**

194.    Defendant Ferdinand had the additional motive to maintain and increase the Company's share price because of his extensive control over the Company, his massive share holdings, and his related-party transactions with the Company.

195.    First, inference of Defendant Ferdinand's scienter is further strengthened by his extensive control and oversight over the Company's operations. Defendant Ferdinand founded the Company and served in its most senior leadership roles during nearly all of the Class Period and, indeed, when all of the misstatements were made. The Board itself, when explaining why it was appropriate for Defendant Ferdinand to serve as both CEO and Chairman, emphasized his "his in-depth knowledge of our operations." Because of Defendant Ferdinand's "in-depth knowledge of [the Company's] operations," the inference of his scienter is stronger than any non-culpable inference.

196.    Second, Defendant Ferdinand's numerous related-party transactions with the Company contribute to an inference of his scienter.  As alleged herein, Defendant Ferdinand received hundreds of thousands of shares of stock and warrants to purchase stock, and thus had a motive to inflate the Company's stock price. In addition to that equity-related motive, Defendant Ferdinand was required by certain landlords, lenders, and other parties, including Wyndham, to provide personal guarantees in connection with certain leases and loans obtained by the Company and in connection with other transactions entered into by the Company.[3] These personal guarantees establish a strong motive to inflate the Company's stock price.

---

[3] Ferdinand was handsomely rewarded for providing these guarantees. For instance, in December of 2023 and during the three months ended March 31, 2024, the Company paid him $1,350,000 and

197.    Further, the fact that his father, Lane Ferdinand, received 675,000 shares of common stock in connection with the IPO, establishes yet another motive for Defendant Ferdinand to inflate the stock price.

D.    **Scienter is Established by Defendants' Pattern of Misrepresentations, Continuing Even After Being Forced to Admit Falsity, and Their Shifting Explanations for their Misconduct**

198.    Defendants' inconsistent, inaccurate, and evasive comments concerning their prior misstatements, and the fact that they continued to mislead investors even after the truth began to leak out, strongly suggests that they knowingly, or at least recklessly, made misstatements with scienter.

199.    After the Bleecker Street report was published, the Company falsely denied the report's information, telling investors that "[a]s previously announced, the Company is scheduled to begin welcoming guests on or before January 30, 2024 at The Royalton by LuxUrban, Trademark Collection® by Wyndham and has a set date with the property's ownership to be delivered possession of the asset."

200.    However, not only was that false, but Defendants then subsequently falsely claimed that the Company had executed an MLA for the James NoMad Hotel. Moreover, the fact that the James NoMad announcement was made almost contemporaneously with Defendants' admission that the Bleecker Street report was accurate as to the Royalton suggests that it was intended to prevent the Company's stock prices from declining in response to the Royalton news.

201.    And, of course, it was at that same time that Defendants told investors that "based on the complexity and multi-step process of closing an MLA from lease execution, which was the

_____

$351,000, respectively as part of his personal guarantees on the Wyndham agreements and the Development Incentive Advances.

previous policy for announcing acquisitions, on a go-forward basis the Company will only announce acquisitions when they are opened for hosting guests and have completed the entire MLA process." But that was misleading, because the Company did not complete "lease execution" for the Trinity, the Truss, the Royalton, or the James NoMad hotels.

202.    As Defendant Kothari explained during the Company's February 6, 2024 analyst/investor day, as he attempted to resuscitate the Company's credibility:

> "Talking a little bit about MLAs and why the MLAs have a significant amount of variability associated to them. So they come with multiple layers of approval. The document that governs it primarily is a lease. From there, there's a number of other documents that have to get done [indiscernible] 2 signed off. There's transition, there's union, there's operators, there's all kinds of complexity to it. Again, we oversimplify the business from an investor perspective, but there's a number of layers and complexity associated to it.
>
> The transition time for MLA possession varies. We've got 2 examples on the right. 57 took 3 weeks and 123 Washington, former W, took about 6 months, right? So they can vary drastically to when we get off the phone and say, we have a deal, to when we actually generate revenue. Hence, part of the change in how we're approaching this going forward."

203.    Defendants Kothari made these statements while directing investors to the following slide in the Company's presentation:



## PROPERTY OVERVIEW

- MLAs come with multiple layers of approval
- Time to transition from MLA to possession varies
- A complex process with an elongated sales cycle in some cases
- Due to complexity of the process, moving to only announce upon possession / hosting

**MLA to Possession
Times Can Vary Greatly**



Hotel 57
3 Weeks



123 Washington
6 Months

24

204.    Defendant Kothari's statements, and the associated slide, are evidence of his and Defendant Ferdinand's detailed knowledge of the MLA process, indicating that they were familiar with its "complexity" and the "significant amount of variability associated to them." Indeed, elsewhere during that same presentation, Kothari told investors that

> We're going to limit the announcements of MLAs. We're going to really tie to more operations just based on the variability of the deal cycles and what can happen, ***what can go wrong associated to it. It's a very complex transactions from taking over operations. I think we simplify the complexity. So people think it's a very simple process, but there's a number of steps that go through that have to get done, and so things can go sideways throughout this process***. So we're changing our approach to it.

205.    Kothari's statements that "***we oversimplify the business from an investor perspective***" and that "we simplify the complexity[] ***[s]o people think it's a very simple process***" is further evidence that Defendants misled investors.

206.    Despite this, Defendants did not correct any of their prior misstatements until forced to do so, and even then gave conflicting explanations for their behavior. For instance, when *Bisnow*

53

learned that the Trinity Hotel deal had not gone through, Defendant Ferdinand emailed *Bisnow* to claim that "[w]e call this 'pending' does not contribute to revenue and is not operating." However, as *Bisnow* correctly noted, "there is no indication in the filing that the deals weren't final." The article disclosing this information was published on March 12, 2024. Not until March 26, 2024 did Defendants issue a press release that appeared to concede, in a veiled reference, that the Trinity deal did not go through. Alongside the disclosure that the Company "surrendered four properties that had created a consistent drag on its operating results,"[4] Defendants disclosed that

> in late 2023, the Company decided to not move forward on a previously agreed to Master Lease Agreement due to repairs not being completed by the landlord. As a result of this, the Company wrote off approximately $3.0 million in security deposits and accrued $2.8 million in potential claims against the Company.

207.    Of course, this was ***over six months after*** the Company's lawyers sent a letter to the landlord of the Trinity stating that "we will not be executing the proposed lease and will not be taking possession of the Premises."

208.    And, even after ***that***, the Company misled investors about the James NoMad Hotel. During the April 16, 2024 earnings call, an analyst directly asked: "Can you comment if the James NoMad Hotel is in possession in March as expected?" In response, Ferdinand said "we are currently not operating, but in possession," and Kothari confirmed, in response to a follow-up question, that the Company expected to begin operating the James NoMad during that quarter. Neither Ferdinand nor Kothari disclosed that they had never executed a lease for the James Nomad and thus could not have been "in possession"—which the Company's own disclosures made clear only happened after lease execution.

209.    These facts establish a strong inference of Defendants' scienter.

---

[4] The Company's 2023 10-K filed on April 14, 2024 revealed, by their omission, that the four surrendered properties were the Astor Hotel, the Impala/Flora, the Georgetown, and the 1200 O.

**E.    Defendant Ferdinand Had a Motive to Mislead Investors to Reap Hundreds of Thousands of Dollars in Proceeds from Insider Sales of LuxUrban Stock at Inflated Prices**

210.    Defendant Ferdinand purchased significant amounts of Company common stock during the Class Period at prices ranging from $3 to $3.6847 per share, then, after making misrepresentations to the market, unloaded thousands of shares at higher prices before the truth was revealed to investors.

211.    On May 19, September 1, and September 13, 2024, Defendant Ferdinand bought a total of 70,000 shares of Company common stock at prices ranging from $3 to $3.6847 per share.

212.    Then, after Defendants made additional misstatements, Defendant Ferdinand began to liquidate a significant portion of his holdings.  On November 21, 2023, through a limited liability company he controlled and operated, Ferdinand sold 38,277 shares of Company common stock at a weighted average price of $5.10 per share, pocketing $195,212.70 in proceeds.  This was his first reported sale of Company common stock ever. The next day, November 22, 2024, through another LCC under his control, Ferdinand sold another 6,556 shares of Company common stock at a weighted average price of $5.21 per share, for another $34,156.76 in proceeds.

213.    Just a few days later, Ferdinand sold yet more stock.  On November 30, 2024, through an LLC, Ferdinand sold 62,000 shares of Company common stock at a weighted average price of $4.46 per share, for proceeds of $276,520.  The next day, on December 1, 2024, through an LLC, Ferdinand sold 14,219 shares of Company common stock at a weighted average price of $4.45 per share, for proceeds of $63,274.55.

214.    Thus, within just a few days of falsely reporting investors that the Company had added the Royalton to its portfolio, Defendant Ferdinand sold $569,164.01 in Company common stock, which was significant relative to his 2023 base salary of $675,000.  These sales were ***not***

made pursuant to a plan intended to satisfy the affirmative defense conditions of SEC Rule 10b5-1(c).

**F.      Defendant Kothari Was Intimately Involved in Preparing the Company's Q1 2023 10-Q**

215.      Defendant Kothari, the Company's CFO from before the Class Period until a week before he was terminated from the CEO position, was intimately involved in preparing the Company's Q1 2023 10-Q, which required restatement.

216.      Kothari presented the results reported in that 10-Q in the Company's May 14, 2024 earnings call, where he spoke in detail about the Company's financial results and accounting. For instance, one analyst posed the question: "Just the other expense line item in the income statement that was over $12 million in the quarter. I was wondering if you could kind of just provide a little more detail in terms of what's included in that incremental increase? And how do you expect that to progress throughout the year?"

217.      In response, Kothari said:

Yes. So significant amount of initiatives were taken in the first quarter, which you've mentioned the unwind as well as the surrender of certain properties. There's a significant impact to the surrendering properties with regard to additional costs, labor costs, commission costs, relocation costs, OTA costs, et cetera. So the impact is in that line. And as we navigate through that, you'll see that return back to where it was, call it, Q3 of last year in terms of the overall metrics.

Look, I've spent a significant amount of time sort of digging through the impacts and, look, from an overall profitability and EBITDA perspective, once we are done with some of this volatility, we wholeheartedly feel like we'll get back to the EBITDA margins, potentially even higher with some of the initiatives Rob laid out.

218.      The level of detail in Kothari's response, and his statement he "spent a significant amount of time sort of digging through the impacts" indicates that he was extensively involved in preparing the financial statements and establishes his scienter with respect to the misstatements in the Q1 2024 10-Q.

219.    Earlier in the Class Period, during the February 6, 2024 analyst/investor day, Kothari noted that he previously worked at a Big 4 accounting firm (he was a Senior Accountant at Pricewaterhouse LLP), and emphasized that "[w]e have a very strong relationship with our auditor. We are lockstep with them in terms of how we do our accounting. We call them proactively to help us through complicated pieces of our business."

220.    Kothari's "strong relationship" with the Company's auditor further evidences his personal involvement in the accounting process and contributes to an inference of his scienter.

### G.    Other Scienter Allegations Concerning the GAAP Violations in the Q1 2024 10-Q

221.    The fact that Bleecker Street drew Defendants' attention to two of the specific line items that they improperly reported in the Q1 2024 10-Q contributes to scienter.    The Bleecker Street Report called into question the Company's reported receivables from OTAs, observing that that they rose sharply during Q2 and Q3 2023. And, of course, because the Company responded directly to the Bleecker Street Report, it is clear that Defendants read it, so it was at least reckless for them not to pay close attention, when preparing the Company's SEC filings, to accounting for receivables from OTAs.

222.    Nevertheless, while they originally reported assets including $6,749,769 in receivables from OTAs in the Q1 2024 10-Q, the Restatement changed this to *zero*, which constituted almost half of the reduction in total current assets made in the Restatement.

223.    Bleecker Street also reported that "[m]any of LuxUrban's properties don't have the best reviews, with travelers complaining about not being able to get refunds they are entitled to." Bleecker Street cited to a November 2022 Bisnow article reporting that, according to LuxUrban employees, "Team members have been instructed to respond to refund requests by assuring

customers the refund was on its way, but not to provide a specific timeline."  "It felt like our job wasn't customer service," one former employee said. "Our job was to buy time for refunds."

224.    For this reason, Defendants should have taken pains to ensure that they properly accounted for payments that were subject to refund policies, i.e., prepayments for future reservations at the Company's hotels.  Again, however, that is one of the line items restated in the Restatement. The Q1 2024 10-Q originally reported $2.1 million in "rents received in advance." But, the Restatement revealed that this figure was actually over $10.2 million.

225.    Further, the fact that the Company reported materially more positive results for Q1 2024 than was accurate, but did not—as far as it has admitted—made those same errors in the quarters immediately before or after, is suggestive of an attempt to boost the Company's results in response to increasing investor scrutiny.

## H.    The SEC Found that Ferdinand Approved Materially Misleading Periodic Reports and Failed to Report Unusual Securities Transactions at Another Company He Founded

226.    Finally, Defendant Ferdinand's scienter is further established by his prior settlement with the SEC in a proceeding where the SEC found that Ferdinand reviewed and approved materially misleading SEC filings for another company he founded, Liquid Holdings Group, Inc. ("Liquid"), which sold software to the financial services industry.[5]  The SEC found that Ferdinand signed off on a Form 10-Q and a Form 10-K for Liquid that failed to disclose that Liquid's largest customer, QuantX Management LLP ("QuantX"), which Ferdinand owned and controlled in part, relied on capital from Ferdinand to pay software subscription fees to Liquid.

---

[5] *In re: Brian L. Ferdinand*, U.S. Securities and Exchange Commission, File No. 3-19578, Order Instituting    Cease-and-Desist    Proceedings    (April    22,    2020),    available    at https://www.sec.gov/files/litigation/admin/2020/33-10775.pdf.

227.    In early 2013, Ferdinand sought to expand QuantX's trading operations by recruiting additional QuantX Traders and allocating greater amounts of capital to them. Because QuantX lacked sufficient capital to fund the allocations, Ferdinand asked Liquid's largest shareholder ("Shareholder A")—which also owned QuantX in part through entities jointly controlled by Ferdinand and that shareholder—to loan QuantX approximately $7.5 million in February 2013, which he did. QuantX used some of that loan to pay a portion of the software subscription fees that QuantX owed to Liquid during the first nine months of Liquid's 2013 fiscal year.

228.    However, In the third and fourth quarters of 2013, QuantX, which was a partner-funded trading firm that allocated capital to traders, was not generating consistent and sufficient profits to support QuantX's expansion.  Further, QuantX owned hundreds of thousands of Liquid shares that it used as collateral with its prime broker, and the combination of Liquid's falling share price and trading losses resulted in margin calls from QuantX's prime broker in the third and fourth quarters of 2013. These margin calls increased in size and frequency over these two quarters, forcing QuantX had to reduce its holdings and the size of its allocations of trading capital to its traders to meet or partially meet the calls. During the third and fourth quarters of 2013, QuantX was not generating sufficient profits to make all of its allocations of trading capital, and also pay, among other corporate obligations, the software subscription fees it owed Liquid.

229.    In October 2013, Ferdinand asked Shareholder A to invest another $4 million in QuantX, which he did. On October 11, 2013, $391,147 of this investment was transferred to Liquid to pay QuantX's outstanding software subscription fees for the third quarter, which totaled $556,312. Approximately half of Liquid's revenue for the first nine months of 2013 originated from Shareholder A's 2013 loans to, and investments in, QuantX.

59

230.    During the fourth quarter of 2013, QuantX continued to receive margin calls, to have uneven trading profits, and increased capital allocations to the additional traders it brought on. By November 2013, the SEC found, Ferdinand knew or should have known that QuantX would not be able to pay its quarterly software subscription fees to Liquid in full. In November and early December 2013, Ferdinand loaned QuantX approximately $1 million. On December 30, 2013 approximately $473,500 of the proceeds from this loan were transferred to Liquid to pay QuantX's October and November 2013 invoices, which totaled $751,710. In 2013, Liquid was reliant on loans and investments from Ferdinand and Shareholder A to QuantX to fund approximately 70 percent of QuantX's software subscription fees that it paid to Liquid.

231.    In short, the SEC found that Ferdinand was propping up Liquid's largest customer and, thus, Liquid.  Despite Ferdinand's personal involvement, these facts were not disclosed Liquid's Form 10-Q for the third quarter of 2013 or Form 10-K for 2013, rendering them materially misleading.  Liquid also held a secondary public offering in May 2014 that was materially misleading for the same reasons.

232.    Just a few months later, in December 2014, QuantX's financial condition forced it to cease operations.  When Liquid disclosed that it had ended its relationship with QuantX, the share price dropped 46%.  Liquid filed for Chapter 11 bankruptcy protection the next month, which was then converted to a Chapter 7 liquidation, and control of the company was transferred to a court-appointed bankruptcy trustee.

233.    Were that all.  To make matters worse, the SEC found that from March 2014 through March 2015—as QuantX, and thus Liquid, collapsed—Ferdinand failed to timely report, or report at all, a series of unusual securities transactions.  In March 2014, Ferdinand sold a put option for up to one million shares of Liquid common stock to the same "Shareholder A," but

never reported it to the SEC.  Later that same month, Ferdinand and Shareholder A provided a put option to another Liquid shareholder ("Shareholder B"), permitting Shareholder B to sell up to one million shares of Liquid common stock to Ferdinand and Shareholder A if Shareholder B incurred any losses on Liquid shares that Shareholder B purchased in the public market at a price below $5.51 between March 23 and April 15, 2014.  Though this transaction involved *4%* of Liquid's then-current outstanding common stock, Ferdinand never reported the transaction to the SEC.

234.    In May 2014, Ferdinand gifted over one million shares of Liquid common stock to a family trust, but did not report it for 56 days.  In September 2014, Ferdinand sold a call option for over one million shares of Liquid common stock to Shareholder B, but never reported it.  And in March 2015, when Liquid was being liquidated, Ferdinand transferred over two million shares of Liquid common stock to Shareholder B, but did not report it for 117 days.

235.    The SEC found that Ferdinand caused Liquid to violate Section 17(a)(2) of the Securities Act of 1933 (the "Securities Act") by offering or selling securities by means of materially false or misleading statements, and caused Liquid to violate Section 13(a) of the Exchange Act by filing periodic reports that were materially false or misleading. Further, the SEC found that Ferdinand violated the Exchange Act's requirements for reporting his own transactions in Liquid common stock.

236.    To resolve these claims, Ferdinand agreed to cease and desist from violating Section 17(a)(2) of the Securities Act or Section 13(a), 13(d)(2), and 16(a) of the Exchange Act, and agreed to pay a civil penalty of $114,000.

237.    In light of these events, Ferdinand was intimately aware of his duty to confirm that the public statements made by him, Kothari, and LuxUrban were not materially false and did not omit any information necessary to avoid misleading investors.  This strongly contributes to an

inference that Ferdinand acted at least recklessly, if not knowingly, in making, approving, and/or failing to stop or correct the making of material misstatements to investors.

      **I.**      **LuxUrban's Scienter and Liability**

      238.    LuxUrban is liable for the acts of the Individual Defendants under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

      239.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles. Indeed, in the 2023 10-K, and elsewhere, the Company acknowledged that "[w]e rely on the efforts of our management team, including our co-Chief Executive Officers [i.e., the Individual Defendants] and the loss of services of any of our key employees could harm our business." The Company further emphasized that "[w]e have a management team of limited size" and "[w]e depend on the efforts of our management team individually, and as a team, to oversee our business and implementation of our growth strategies." Accordingly, regardless of whether the allegations against each Individual Defendants are sufficient, the facts alleged in this complaint must be imputed to the Company.

**V.**      **ADDITIONAL ALLEGATIONS CONCERNING THE INDIVIDUAL DEFENDANTS' CONTROL OF THE COMPANY**

      240.    Defendants Ferdinand and Kothari, the Company's most senior executives at the time of the misstatements alleged herein, had control over the Company and its public statements.

      241.    Defendants Ferdinand and Kothari regularly spoke to investors and the press on behalf of the Company during the Class Period. They presented to investors during each Class Period earnings call in which they made the misstatements alleged herein, as well as during the

Company's February 6, 2024 analyst/investor day. Further, Defendant Ferdinand made statements to the press on behalf of the Company as alleged herein.

242.    As the Company's principal executive officer, Defendant Ferdinand certified that the Company's annual report on Form 10-K for the fiscal year ended December 31, 2023 (the "2023 10-K"), and the Company's quarterly reports on Form 10-Q for the first, second, and third quarters of 2023 (respectively, the "Q1 2023 10-Q," "Q2 2023 10-Q," and "Q3 2023 10-Q") fairly presented, in all material respects, the financial condition and results of operations of the Company. Defendant Ferdinand further certified that the 2023 10-K, the Q1 2023 10-Q, the Q2 2023 10-Q, and the Q3 2023 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by those reports. Defendant Ferdinand also signed the Forms 8-K filed on May 10, 2023, May 17, 2023, August 8, 2023, and November 9, 2023 that contained, or had exhibits containing, material misstatements as alleged herein.

243.    Further, an entity controlled and managed by Defendant Ferdinand loaned over a million dollars to the Company during the course of 2019, 2021, and 2022, and Defendant personally provided the Company $750,000 in financing in June 2022 "for operating expenses relating to the launch of certain of our newer properties." Defendant Ferdinand received hundreds of thousands of shares of common stock and warrants to purchase common stock in connection with these transactions. In addition, Defendant Ferdinand's father, Lane Ferdinand, served as the Company's general counsel at the time of the IPO, and also loaned hundreds of thousands of dollars to the Company pursuant to a note that was converted to 675,000 shares of common stock in connection with the IPO.

244.    As the Company's principal financial officer, and later its principal executive officer, Defendant Kothari signed and certified the Q1 2023 10-Q, the Q2 2023 10-Q, the Q3 2023 10-Q, the 2023 10-K, and the Q1 2023 10-Q. Defendant Kothari was listed as the corporate contact in the Forms 8-K filed on May 10, 2023, May 17, 2023, August 8, 2023, and November 9, 2023 that contained, or had exhibits containing, material misstatements as alleged herein, and signed the other Forms 8-K that contained, or had exhibits containing, material misstatements as alleged herein.

## VI.    LOSS CAUSATION

245.    From January 17, 2024 through the end of the Class Period, a series of disclosures corrected Defendants' misstatements and/or constituted the materialization of risks concealed by Defendants, including the risks that the Company's portfolio growth would falter because it was based on "deals" that were never executed, that the Company's transition of properties to Wyndham would falter for that same reason, with negative effects on the Company's financial condition and prospects.

246.    On January 17, 2024, at approximately 12:00 PM EST, Bleecker Street Research published a report, which revealed that the Company had not actually signed a lease with the Royalton Hotel. The report started the owner of the Royalton hotel building confirmed that LuxUrban never actually signed a lease, nor even provided a letter of credit. This news revealed that Defendants' prior statements that the Company had executed an MLA for the Royalton Hotel, and listing the Royalton Hotel in its portfolio, were false, but was partially counterbalanced by the Company's January 17, 2024 statements reiterating that it had signed a lease for the Royalton Hotel. This news also constituted a partial corrective disclosure regarding Defendants' similar misstatements about the Trinity Hotel, the Truss Hotel, and overall growth in the Company's portfolio and its integration with Wyndham, which were later confirmed to be false.

247.    On this news, the Company's common stock price fell $0.58, or 12%, to close at $4.32 on January 17, 2024, on unusually heavy trading volume. Despite the Company's attempt to rebut the Bleecker Street report in its press release issued after the market closed on January 17, 2, the common stock price continued to fall an additional $0.42, or 10%, to close at $3.89 on January 18, 2024, on unusually heavy trading volume. The preferred stock fell from $21.47 at the close on January 17, to a closing price of $19.11 on January 18, also on unusually heavy volume.

248.    On February 2, 2024, after the market closed, LuxUrban announced the "termination of discussions to add the Royalton Hotel to its roster of properties" and that it was "withdrawing its prior statements regarding the Royalton" including prior quarterly reports which listed the Royalton under "Management's Discussion and Analysis of Financial Condition and Results of Operations—Property Summary—Properties under lease, not operating."  This news further confirmed that the Company's prior statements about the Royalton Hotel were false, and constituted a further partial corrective disclosure regarding Defendants' similar misstatements about the Trinity Hotel, the Truss Hotel, and overall growth in the Company's portfolio and its integration with Wyndham.

249.    On this news, the Company's common stock price fell $0.99, or 22%, to close at $3.50 per share on the next trading day, February 5, 2024, on unusually heavy trading volume. The Company's common stock price continued to fall during the following two days, closing at $3.26 per share on February 6 and $2.73 per share on February 7. The preferred stock price fell from its $19.40 closing price on February 2 to $19.30 at the close of trading on February 5, and continued falling to $19.18 per share on February 6 and $18.83  on February 7. The stock prices would have fallen further had Defendants not falsely announced that the Company had executed

an MLA for the James NoMad Hotel on January 30, 2024, which announcement was filed with the SEC on February 2, 2024.

250.　　On March 12, 2024, *Bisnow* published an article entitled "Dogged By 'Mistakes,' $1.2M Fine, Lawsuits And A Short Seller, Hotel Chain Shakes Up Leadership." The article reported that "*Bisnow* also found two instances of the company announcing it has signed deals to take over hotels, reporting the leases in filings with the Securities and Exchange Commission but then later admitting the deals were never finalized." The first of these instances involved the Royalton, which *Bisnow* described as an "explosive claim [] that LuxUrban had announced a lease for a major Manhattan hotel when no deal was final." The article continued:

> The company also said in its two most recent quarterly filings that it had the 179-room Trinity Hotel in Los Angeles "under lease," a deal that was announced in May. The Chetrit Group owns that hotel and denies it has a deal with LuxUrban.
>
> ***"The deal did not go through," Michael Chetrit told Bisnow in an email***.
>
> Ferdinand told *Bisnow* that LuxUrban "fully executed a lease," but claimed Chetrit didn't update the building at 741 Eighth Ave. to make the changes necessary for operating the hotel.
>
> "We even wired them money which we have not gotten returned," Ferdinand wrote.
>
> ***Ferdinand forwarded Bisnow an email, dated Oct. 2, from one of the company's attorneys, containing a draft letter to Chetrit outlining the lack of repairs at the building and demanding repayment.***
>
> ***In that letter, LuxUrban attorneys wrote, "As a result, we will not be executing the proposed lease and will not be taking possession of the Premises."***

251.　　This news revealed that Defendants' prior statements about the Trinity Hotel, including those that counted the Trinity and its room in the Company's portfolio, were false and misleading.

252.    As this news was gradually digested by the market, including through another article reporting this information on March 18, 2024, the Company's common stock price fell from $2.16 per share at the close on March 11, 2024 to close at $2.08 at the close on March 19, 2024.

253.    On March 26, 2024, the Company issued a press release entitled "LuxUrban Hotels Inc. Provides Preliminary Unaudited 2023 Fourth Quarter and Full Year Financial Results."  The press release disclosed that "[a]s of December 31, 2023, the Company leased 18 properties with 1,599 units available for rent."  It further stated that "in late 2023, the Company decided to not move forward on a previously agreed to Master Lease Agreement due to repairs not being completed by the landlord. As a result of this, the Company wrote off approximately $3.0 million in security deposits and accrued $2.8 million in potential claims against the Company." The press release did not specify the "previously agreed to Master Lease Agreement" that the Company had decided not to move forward on.

254.    This news constituted a partial corrective disclosure of Defendants' prior misstatements about the Trinity Hotel, the Truss Hotel, the James NoMad Hotel, and overall growth in the Company's portfolio and its integration with Wyndham.

255.    The Company's common stock price fell accordingly, falling from $2.14 at the close on March 26, 2024 to $1.50 per share at the close on March 27, 2024—a decline of 29.9%. The preferred stock fell during that period from $20.77 to $20.14 per share.

256.    On April 15, 2024, after market hours, the Company filed issued a press release, which it filed on Form 8-K, announcing its 2023 financial results, as well as its 2023 10-K. The press release stated that that: "given the pro forma effect of" the previously-announced surrender of four properties, and the decision not to move forward on the "previously agreed to Master Lease Agreement," "as of December 31, 2023 the Company leased 14 properties with 1,406 units

available for rent with an average weighted lease term of 14.2 years and 19.0 years, including extension options." The 2023 10-K listed the Company's portfolio of properties as of December 31, 2023, "as adjusted for the surrender of properties in March 2024," identifying the fourteen properties noted in the press release. Neither the Trinity, nor the Truss, nor the James NoMad were included. The 2023 10-K also disclosed doubt about the Company's ability to continue as a going concern.

257.    These constituted partial corrective disclosures of Defendants' prior misstatements about the Trinity Hotel, the Truss Hotel, the James NoMad Hotel, and overall growth in the Company's portfolio and its integration with Wyndham.

258.    The Company's common stock price fell $0.01 from April 15, 2024 to April 16, 2024, while the preferred stock fell from $19.85 to $18.63 per share.  The prices were prevented from falling further by Defendants' additional false statements to investors. During an earnings call on the morning of April 16, 2024, Defendant Ferdinand falsely told investors that the Company was "in possession" of the James NoMad Hotel, and Defendant Kothari assured investors that the Company would begin operating the hotel "this quarter." However, the Company had not even signed a lease for the property.

259.    On May 10, 2024, *Bisnow* published an article strongly suggesting that the Company's partnership with Wyndham was in limbo or had terminated.  This constituted a partial corrective disclosure of Defendants' prior misstatements concerning the growth of the Company's portfolio and its integration with Wyndham.  The common stock price fell from a closing price on May 9, 2024 of $0.709 per share, to close at $0.624 per share on May 10, 2024.

260.    On the next trading day, May 13, 2024, after market hours, the Company issued a press release, which it filed on Form 8-K, announcing its Q1 2024 financial results, as well as its

Q1 2024 10-Q. These releases disclosed that "[i]n May 2024, in light of discussions between our Company and Wyndham on the initial and projected future performance of our properties within the franchise relationships, we commenced the return of all property listings to our control, terminating our franchise relationship with Wyndham." These releases also listed the Company's portfolio of properties as of March 31, 2024, as consisting of thirteen properties. Neither the Trinity, nor the Truss, nor the James NoMad were included.

261.    This constituted a partial corrective disclosure of Defendants' prior misstatements about the Trinity Hotel, the Truss Hotel, the James NoMad Hotel, and overall growth in the Company's portfolio and its integration with Wyndham.

262.    The Company's common stock price fell from $0.544 per share at the close of trading of May 13 to close at $0.457 per share on May 14, and continued falling the next trading day, closing at $0.40 per share on May 15, 2024. As the impact of this new information was digested by the market, the common stock price began a severe and lengthy decline, closing at less than a penny per share by August 7, 2024. On that date, the price of the preferred stock had fallen to $13.92 per share.

263.    On August 9, 2024, after market hours, the Company announced that its Q1 2024 10-Q could not be relied upon, would need to be restated, and that the prior management's conclusion that the Company's internal controls were effective as of March 31, 2024 would need to be "modified."

264.    This constituted a partial corrective disclosure of Defendants' misstatements concerning the Company's Q1 2024 financial results and the Company's internal controls. The common stock price fell over 14%, from a closing price of $0.092 on August 9 to close at $0.079

the next trading day, August 12, 2024. The preferred stock fell from $14.21 to $13.23 per share during that same period.

265.    On August 14, 2024, after market hours, the Company filed a Notification of Late Filing on Form 12b-25 stating that it could not timely file its quarterly report on Form 10-Q for the second quarter of 2024 because, in connection with the forthcoming restatement of the Q1 2014 10-Q, the Company was reexamining "the financial figures and disclosures, including without limitation the Management Discussion & Analysis, contained in the draft of the Form 10-Q" for the second quarter of 2024.

266.    This constituted a partial corrective disclosure of Defendants' misstatements concerning the Company's Q1 2024 financial results and the Company's internal controls.

267.    The price of the Company's common stock fell 3.947%, from a closing price of $0.076 on August 14 to a closing price of $0.073 on August 15, 2024, and fell to $0.070 the following trading day.

268.    On August 20, 2024, after the market closed, the Company filed an amendment on Form 10-Q/A for the quarter ended March 31, 2024, which restated the Company's unaudited condensed consolidated financial statements for that quarter.  The Form 10-Q/A stated:

### Restatement Items

**Channel Retained Funds and Other Expenses** – The Company did not correctly apply the charges allocated to the Channel Retained Funds by the vendor. The corrections resulted in a decrease in Channel Retained Funds in the amount of $1,500,000 and resulted in an increase in Other Expenses, Cost of Revenue in the amount of $1,500,000. Refer to reference "a" below.

**Processor Retained Funds, Receivables from On-Line Travel Agencies, Receivables from City of New York and Landlords, Accounts Payable and Accrued Expenses and Net Rental Revenue** – The Company did not properly reserve for bad debt expense of $7,843,456 in the first quarter of 2024. The Company incorrectly recognized revenue in the first quarter of 2024 for reservations that were booked and paid for, but reservations were cancelled by the merchant service provider. The corrections resulted in a decrease in Processor

Retained Funds of $2,633,926, Receivables from On-Line Travel Agencies of $6,749,769, Receivables from City of New York of $984,744 and increase in Accounts Payable and Accrued Expenses of $3,738,224 and a decrease in Net Rental Revenue of $6,263,207 and increase in General and Administrative Expenses of $8,387,549. Refer to reference "b" below.

**Receivable from City of New York, Accounts Payable and Accrued Expenses and Net Rental Revenue** – The Company did not reflect the net receivable due from the City of New York. The corrections reflect the net amount due from the City of New York in conjunction with the landlord. The receivable has been reduced by $3,201,640, the payables have been reduced by $1,827,157 and the Net Rental Revenue has been reduced by $830,390. Refer to reference "c" below.

**Prepaid Expenses and Other Current Assets and Other Expenses** – The Company did not properly amortize the prepaid real estate taxes in the first quarter of 2024. The correction resulted in a decrease in Prepaid Expenses and Other Current Assets and an increase in Other Expenses, Cost of Revenue in the amount of $342,212. Refer to reference "d" below.

**Bookings Received in Advance and Net Rental Revenue** – The Company incorrectly recognized revenue in the first quarter of 2024 for reservations that were booked and paid for, but the guest had not yet stayed at the property. The corrections resulted in an increase in Bookings Received in Advance in the amount of $8,050,248 and a decrease in Net Rental Revenue in the amount of $8,050,248. The future revenues will be recognized when the guest checks in. Refer to reference "d" below.

269.    The Restatement constituted a corrective disclosure concerning the Company's financial statements in the Q1 2024 10-Q and Defendants' statements concerning the Company's internal controls over financial reporting as of March 31, 2023.

270.    The Company's common stock price fell 3.947%, from a closing price of $0.076 on August 20 to a closing price of $0.073 on August 21, 2024, and fell to $0.071 the following trading day.

## VII.    CLASS ACTION ALLEGATIONS

271.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed Class consisting of all persons and entities that

purchased or otherwise acquired shares of LuxUrban's common stock and/or preferred stock during the Class Period, and were damaged thereby.

272.    Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of LuxUrban and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) LuxUrban's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories.

273.    The members of the Class are so numerous that joinder of all members is impracticable. Lead Plaintiffs believe that Class members number at least in the thousands. Shares of LuxUrban's common stock and preferred stock traded actively on the NASDAQ during the Class Period.

274.    Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class are similarly situated in that they acquired LuxUrban common stock or preferred stock and were similarly affected by the Defendants' wrongful conduct in violation of federal law that is complained of herein.

275.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

276.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Defendants' acts violated the federal securities laws as alleged herein;

- whether the Defendants made materially false or misleading statements to the investing public during the Class Period;

- whether the Individual Defendants were controlling persons under Section 20(a) of the Exchange Act; and

- whether the Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of LuxUrban common stock and preferred stock were artificially inflated during the Class Period because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

277. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

278. There will be no difficulty in the management of this action as a class action. Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

279. Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the Defendants' omissions and misrepresentations were material;

- LuxUrban common stock and preferred stock traded in an efficient market;

- LuxUrban common stock and preferred stock was liquid and traded with moderate to heavy volume during the Class Period, with an average weekly trading volume during the Class Period of over four million shares for the common stock and over 16,000 shares for the preferred stock;

- LuxUrban common stock and preferred stock traded on the NASDAQ, and the Company was covered by seven analysts during the Class Period;

- during the Class Period, there were eighty-two market makers for LuxUrban common stock;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of LuxUrban common stock and preferred stock; and

- Lead Plaintiffs and members of the Class purchased, acquired and/or sold LuxUrban common stock and/or preferred stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

280.    Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

281.    Alternatively, Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

282.    The protections applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that

existed at the time the statements were made. No cautionary language could, or did, protect Defendants' material misstatements of present and historical fact.

283.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures the Company or Individual Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of the Company who knew that the statement was untrue or misleading when made.

## X.    COUNTS

### COUNT I

### Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5(b) Against All Defendants

284.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, with the exception of any disclaimers of fraud, recklessness, and intentional misconduct.

285.    This Count is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

286.    This Count is asserted against all Defendants. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of LuxUrban common stock and preferred stock. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of LuxUrban common stock and preferred stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire LuxUrban common stock and/or preferred stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

287.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each Defendant participated directly or indirectly in the preparation and/or issuance of the SEC filings and press releases described above, investor presentations and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for LuxUrban common stock and preferred stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about LuxUrban's growth, integration with Wyndham, and financial results.

288.    By virtue of their positions at LuxUrban, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of

Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

289.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives of LuxUrban, Defendants Ferdinand and Kothari had knowledge of the details of LuxUrban's internal affairs.

290.    Defendants Ferdinand and Kothari are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants Ferdinand and Kothari were able to and did, directly or indirectly, control the content of the statements of LuxUrban. As the CEO and CFO, respectively, of a publicly-held company, Defendants Ferdinand and Kothari had a duty to disseminate timely, accurate, and truthful information with respect to LuxUrban's businesses, operations, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of LuxUrban common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning  LuxUrban's growth, integration with Wyndham, and financial results which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired LuxUrban common stock and/or preferred stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

291.    During the Class Period, LuxUrban common stock and preferred stock traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the

materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired LuxUrban common stock and/or preferred stock at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired LuxUrban common stock and/or preferred stock, or would not have purchased or otherwise acquired such securities at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of LuxUrban common stock and preferred stock was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market prices of LuxUrban common stock and preferred stock declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

292.    By reason of the conduct alleged herein, Defendants Ferdinand and Kothari, and thereby LuxUrban, knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

293.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of LuxUrban common stock and/or preferred stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Securities Exchange Act of 1934
### Against Defendants Ferdinand and Kothari

294.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, with the exception of any disclaimers of fraud, recklessness, and intentional misconduct.

295.    This Count is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

296.    This Count is asserted against the Individual Defendants: Ferdinand and Kothari. During the Class Period, the Individual Defendants participated in the operation and management of LuxUrban, and conducted and participated, directly and indirectly, in the conduct of LuxUrban's business affairs. Because of their senior positions, they knew the adverse non-public information about management statements described above.

297.    As the CEO and CFO, respectively, of a publicly owned company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to LuxUrban's businesses, operations, and future prospects, and to correct promptly any public statements issued by LuxUrban which had become materially false or misleading.

298.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, presentations and public filings which LuxUrban disseminated in the marketplace during the Class Period concerning LuxUrban's businesses, operations, and future prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause LuxUrban to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of LuxUrban within the meaning of Section 20(a) of the Exchange Act. In

this capacity, the Individual Defendants in the unlawful conduct alleged which artificially inflated the market price of LuxUrban's common stock and preferred stock.

299.    Each of the Individual Defendants, therefore, acted as a controlling person of LuxUrban. By reason of their senior management positions and/or being directors of LuxUrban, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, LuxUrban to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of LuxUrban and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

300.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by LuxUrban.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B.    Awarding damages, including prejudgment and post-judgment interest, to Lead Plaintiffs and the Class;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

Dated: September 4, 2024

Respectfully submitted,

**POMERANTZ LLP**

<u>*s/ Jonathan D. Park*</u>
Jeremy A. Lieberman
Jonathan D. Park
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
jpark@pomlaw.com

*Counsel for Lead Plaintiffs zCap Equity Fund LLC and Ross Marchetta, and Co-Lead Counsel for the Class*

**PORTNOY LAW FIRM**
Lesley F. Portnoy
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Lead Plaintiffs zCap Equity Fund LLC and Ross Marchetta*