# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZCAP EQUITY FUND LLC and ROSS MARCHETTA, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>v.<br><br>LUXURBAN HOTELS INC., BRIAN FERDINAND, and SHANOOP KOTHARI,<br><br>                Defendants. | Case No. 1:24-cv-01030-PAE |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants LuxUrban Hotels Inc., Brian Ferdinand, and Shanoop Kothari*

# TABLE OF CONTENTS

**Page**

I.      Introduction ................................................................................................................1

II.     Factual Background ....................................................................................................3

    A.      LuxUrban is an Innovative Force in the Hotel Industry. ...................................3

    B.      LuxUrban Warns Investors of the Risks Attendant to Its Business Model. ...........4

    C.      LuxUrban Signs an MLA for the Trinity Hotel. ......................................................5

    D.      LuxUrban Enters into a Franchise Agreement with Wyndham. ...........................6

    E.      LuxUrban Signs MLAs for The Royalton and Truss Hotels. ................................6

    F.      A Short-Seller Report Inaccurately Describes the Royalton Transaction. ..............7

    G.      LuxUrban Executes an MLA for the James Hotel. .................................................7

    H.      The Royalton Transaction Does Not Go Through, and the Company
           Changes Its Policy of Announcing Transactions Going Forward. .........................8

    I.      The Trinity Hotel Transaction Does Not Go Through. ............................................9

    J.      The James Hotel Transaction Does Not Go Through. .............................................9

    K.      The Company's Q1 2024 Financial Results. ........................................................10

III.    Legal Argument ........................................................................................................10

    A.      Heightened Pleading Standards Govern Plaintiffs' Claims. .................................10

    B.      The Challenged Statements Were True and Not Misleading. ...............................11

         1.      Statements that the Four Hotels were "Under Lease" or "Under
               MLA" (Challenged Statements A-S). ..........................................................11

         2.      Statements Regarding the Q1 2024 Financial Results (Challenged
               Statements T-V). .........................................................................................15

    C.      Plaintiffs Cannot Allege a Strong Inference of Scienter. ......................................17

    D.      Plaintiffs Fail to Plead Loss Causation. ...............................................................22

         1.      Alleged Corrective Disclosures Regarding the Leases. .............................23

      2.     Alleged Corrective Disclosures as to the Q1 2024 Form 10-Q. ...............25

IV.    Plaintiffs Do Not Plead Control Person Liability. .............................................25

V.    Conclusion ........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aegon N.V. Sec. Litig.*,
    2004 WL 1415973 (S.D.N.Y. June 23, 2004) ........................................................................14

*Afr. v. Jianpu Tech. Inc.*,
    2023 WL 5432282 (S.D.N.Y. Aug. 23, 2023)........................................................................18

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) ................................................................................................19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).................................................................................................25

*Chapman v. Mueller Water Prod., Inc.*,
    466 F. Supp. 3d 382 (S.D.N.Y. 2020)...........................................................................20, 22

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
    2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ......................................................................18

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................ 22-23, 25

*In re Eargo, Inc. Sec. Litig.*,
    656 F. Supp. 3d 928 (N.D. Cal. 2023) ...............................................................................15

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..........................................................................................17, 22

*Elliott Assocs., L.P. v. Covance, Inc.*,
    2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ......................................................................14

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018).................................................................................21

*Frederick v. Mechel OAO*,
    475 F. App'x 353 (2d Cir. 2012) .........................................................................................18

*Harris v. AmTrust Fin. Servs. Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015)............................................................................15, 23

*Hou Liu v. Intercept Pharms., Inc.*,
    2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ......................................................................22

*Hubiack v. Li-Cycle Holdings Corp.*,
   2024 WL 2943959 (S.D.N.Y. June 10, 2024) ...................................................3, 21

*Janbay v. Canadian Solar, Inc.*,
   2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ............................................22, 23, 25

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)..............................................................................20

*Kasilingam v. Tilray, Inc.*,
   2023 WL 5352294 (S.D.N.Y. Aug. 21, 2023) ................................................19, 20

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005).................................................................................23

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020) ..................................................................12

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   616 F. App'x 442 (2d Cir. 2015) .........................................................................22

*Martin v. Quartermain*,
   732 F. App'x 37 (2d Cir. 2018) ..........................................................................14

*In re MINISO Grp. Holding Ltd. Sec. Litig.*,
   2024 WL 759246 (S.D.N.Y. Feb. 23, 2024).........................................................23

*Nandkumar v. AstraZeneca PLC*,
   2023 WL 3477164 (2d Cir. May 16, 2023) .....................................................18, 20

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
   80 F.4th 158 (2d Cir. 2023) ................................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)......................................................................................11, 14

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010).................................................................................24

*Pearlstein v. BlackBerry Ltd.*,
   93 F. Supp. 3d 233 (S.D.N.Y. 2015).....................................................................15

*Podany v. Robertson Stephens, Inc.*,
   318 F. Supp. 2d 146 (S.D.N.Y. 2004)...................................................................22

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994)................................................................................19

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)..................................................................14

*Stratte-McClure v. Morgan Stanley*,
   2013 WL 297954 (S.D.N.Y. Jan. 18, 2013) ...........................................25

*Swanson v. Danimer Sci., Inc.*,
   2024 WL 4315109 (2d Cir. Sept. 27, 2024) ...........................................17

*Tamar v. Mind C.T.I., Ltd.*,
   723 F. Supp. 2d 546 (S.D.N.Y. 2010).....................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...........................................................................11, 17

**Statutes**

15 U.S.C. § 78, *et seq.*.....................................................................................11, 14

**Rules**

Fed. R. Civ. P. 9(b) ..........................................................................................3, 10, 19

## I.    INTRODUCTION

LuxUrban is an emerging company employing an innovative business model in the hotel industry. Seeking to capitalize on the emergence of the short-term rental market, and reduce the risks and exposure posed by property ownership, LuxUrban leases hotel properties from property owners, and operates those hotels under Master Lease Agreements ("MLAs"), generating revenue through the rents and fees it collects by operating and renting out rooms in those hotels.

LuxUrban experienced a surge in opportunity and business during and after the COVID-19 pandemic. As we all recall, travel and gathering restrictions severely impacted the hotel industry, and many hotels struggled to survive. Property owners sought ways to prevent going into bankruptcy and foreclosure, and LuxUrban's business model provided them with an opportunity to stay afloat. LuxUrban also predicted that travel and hotel stays would re-emerge (or surge) once the pandemic subsided, and entered into long-term leases with hotel property owners across the country. By the end of 2022, the Company operated ten hotels in Miami Beach, New York City, Washington, DC, and New Orleans. Throughout 2023, the Company accelerated its growth, adding additional hotels to its operating portfolio and catching the attention of one of the largest hotel companies in the world, Wyndham Hotels and Resorts ("Wyndham"). In August 2023, LuxUrban and Wyndham entered into a franchise agreement under which the Company's hotels would become part of the Wyndham brand and offered on Wyndham's various platforms.

However, LuxUrban's business model is not without risks. The MLA process is complex, multi-layered, and, from time to time, involves significant risk, particularly given the instability of certain of the properties the Company seeks to lease. As with any corporate transaction, a lot can transpire between the signing of a contract and the closing of a transaction. These risks—all of which the Company disclosed before and during the class period—include property owners not satisfying certain preconditions of the lease (e.g., making necessary repairs, providing proper

documentation, etc.) or otherwise not delivering possession of the property to the Company on time or at all. LuxUrban never promised or guaranteed that the leases it signed would come to fruition, nor would any reasonable investor have believed that to be the case. After the Company experienced an unfortunate series of lease terminations in late 2023 and early 2024, the Company determined that it would no longer announce lease transactions until and unless the transaction was consummated, and the Company started operating the hotels and welcoming guests.

This case rests on Plaintiffs' misunderstanding of LuxUrban's business model and distortion of its public statements. Virtually all of the allegations in the Amended Complaint ("AC") center around Plaintiffs' unfounded theory that the Company never signed, and lied about signing, leases for four hotels—the Trinity, Royalton, Truss, and James hotels (the "Four Hotels"). Fatal to Plaintiffs' claims is the fact that Plaintiffs plead no facts establishing that these leases were not signed. Instead, Plaintiffs vaguely and in conclusory fashion allege that the leases were not "fully executed"—without explaining what "fully executed" means—and cite to the uncorroborated allegation of one short-seller report that the Company never signed a lease for only one of those hotels (the Royalton). None of the other alleged corrective disclosures stated that the Company did not sign leases for any of the Four Hotels, so Plaintiffs ask the Court to infer securities fraud based on the uncorroborated speculation of a short-seller and Plaintiffs' say-so.

Unrelated to the Four Hotels, Plaintiffs also allege that LuxUrban is liable for securities fraud solely because it restated certain financial metrics in its Q1 2024 Form 10-Q. But the AC is devoid of any allegations of *fraud* in this regard, nor do Plaintiffs attempt to allege any.

Given the inherent weakness of Plaintiffs' claims, it is entirely unsurprising that the AC is devoid of any of the hallmarks of securities fraud complaints. There are no confidential witness allegations. No suspicious insider stock sales. No other motive for fraud. And as to scienter,

Plaintiffs attempt to improperly "divine scienter from the mere (assumed) falsity" of the Challenged Statements themselves. *Hubiack v. Li-Cycle Holdings Corp.*, 2024 WL 2943959, at *10 (S.D.N.Y. June 10, 2024). Plaintiffs' only other grounds for scienter are those that are routinely rejected by courts in this Circuit, namely Mr. Ferdinand's and Mr. Kothari's senior positions, knowledge of the Company's business model and/or financials, and desire to meet revenue guidance.

Plaintiffs also fail to plead loss causation. None of the alleged corrective disclosures revealed the hidden truth of any alleged fraud. Beyond the vague, anonymously sourced, and uncorroborated short-seller report alleging that the Company did not sign a lease for the Royalton, *none* of the alleged corrective disclosures revealed that the Company did not sign leases for any of the Four Hotels. Similarly, the restatement of the Company's Q1 2024 financials did not reveal any alleged fraud and cannot establish loss causation here.

In sum, the AC is devoid of any factual allegations that could possibly plead fraud under the Reform Act's stringent pleading standards or Rule 9(b), or any other pleading standard. Accordingly, the Court should dismiss the AC with prejudice.

## II.    FACTUAL BACKGROUND

### A.  LuxUrban is an Innovative Force in the Hotel Industry.

Founded in 2017 under the name CorpHousing Group Inc., LuxUrban is an innovative force in the hotel industry. AC ¶19. Similar to its largest competitor, Sonder, LuxUrban leases existing hotels from building owners on a long-term basis and rents out the hotel rooms. LuxUrban's revenues are generated through the rental of rooms to guests and other ancillary services. AC ¶24; Ex. 24 (2023 Form 10-K at 3). By leasing hotel properties, LuxUrban reduces its exposure to fluctuations in interest rates and other risks associated with property ownership and property owners benefit by procuring a stable long-term tenant. AC ¶27.

LuxUrban's business model became particularly attractive and successful during the COVID-19 pandemic. Ex. 1 (8/15/22 Prospectus, at 5). Given the prolonged restrictions on travel, many hotels shuttered or became underutilized and hotel owners experienced significant declines in hosting guests and generating revenue. Ex. 24 at 3. Even as the world was emerging from the most difficult phases of the pandemic, many hotels that did survive struggled to manage the properties, and property owners continued to seek stable sources of revenue. AC ¶27.

The success of LuxUrban's business model persisted through the pandemic and as global travel began to re-emerge. Indeed, in 2021 and early 2022, LuxUrban secured leases to operate: the Blakely and Herald Hotels in Manhattan, the Variety, Impala/Flora, and Astor Hotels in Miami, and the Georgetown Hotel in Washington, DC. Ex. 11 (Q2 2023 Form 10-Q, at 18). Capitalizing on this success, LuxUrban went public via an IPO in August 2022. AC ¶20. With the re-emergence of global travel following the pandemic, LuxUrban believed that it had an unprecedented opportunity to grow its portfolio and capture more of the short-term rental market.

The Company did just that. In the two quarters following the IPO, the Company secured leases for an additional 7 hotels: the Woodley Hotel in Washington, DC; the Washington, Tuscany, Hotel 57, and BeHome hotels in New York City; the O Hotel in Los Angeles; and the Lafayette Hotel in New Orleans. Ex. 5 (Q1 2023 Form 10-Q, at 19-20); Ex. 13 (Q3 2023 Form 10-Q, at 22-23). The Blakely, Herald, Tuscany, Hotel 57, and Washington Hotels were (and remain) the largest Hotels in the Company's portfolio, accounting for 843 units and more than half of the Company's operating units. Ex. 28 (Amended Q1 2024 Form 10-Q, at 29).

**B.  LuxUrban Warns Investors of the Risks Attendant to Its Business Model.**

As with any corporate transaction, there are risks that can threaten consummation of a transaction between the signing and closing of an MLA, or before a hotel can be opened for guests. LuxUrban disclosed these risks to investors in its public filings, including that: "the timing of lease

signings [and] building openings" are "subject to a wide variety of business . . . and competitive risks and uncertainties"; the Company "may be unable to negotiate satisfactory leases or other arrangements to operate new properties, [or] on board new properties in a timely manner"; the Company "may [] experience breaches of the terms of the leases by the property owners and may elect to terminate the related lease"; "[n]ewly leased properties . . . may be more difficult or expensive to integrate into our operations than expected," including, but not limited to, where "the landlord or developer [is] unable or unwilling to deliver the property on the date initially projected"; and that "[n]ewly-leased properties could . . . have undisclosed conditions" that could delay or suspend delivery of the properties to the Company's possession.[1]

### C. LuxUrban Signs an MLA for the Trinity Hotel.

The Trinity Hotel is a 179-unit property located in downtown Los Angeles. AC ¶30; Ex. 3 (5/9/23 *Business Wire* PR, at 2). On May 9, 2023, the Company announced that it had signed a lease "to operate the Trinity Hotel" and that it "expect[ed] to commence operations . . . on or about July 1, 2023." AC ¶30; Ex. 3. The Company also disclosed that "[a]s of May 9, 2023, the Company had 20 short-term stay hotels under MLA consisting of 1,673 rooms that will be hosting guests from early Q2 to early Q3," which included the Trinity units. Ex. 4 (5/9/23 Form 8-K PR, at 2). In the Company's Q1 2023 Form 10-Q filed the same day, the Company disclosed a "property summary" chart that was divided into two sections. Ex. 5, at 19-20. The top section of the chart listed the hotels for which the Company already commenced operations, which included 1,034 "operating units as of 3/31/2023," and which disclosed, among other things, the terms of the lease and the date the lease commenced. *Id.* The bottom section of the chart was titled "Properties added

---

[1] Ex. 2 (2022 Form 10-K, at 15-18); Ex. 5, at 32 (incorporating 2022 Form 10-K risk factors); Ex. 11, at 34 (same); Ex. 13, at 38 (same); Ex. 24, at 28-31; Ex. 27, at 43 (incorporating 2023 Form 10-K risk factors); Ex. 28, at 50 (same).

subsequent to 3/31/2023," which included Trinity Hotel, but which did not provide the terms of the lease or any date of lease commencement. *Id.* The Company reiterated this distinction and described the Trinity and its units as "under lease" but "not operating" or "not yet available for rent" in its disclosures throughout the class period. *See, e.g.,* Ex. 6 (5/15/23 PR); Ex. 9 (5/22/23 8-K); Ex. 10 (8/8/23 8-K PR)/Ex. 11, at 19;[2] Ex. 12 (8/9/23 Tr.) at 6; Ex. 13, at 23; AC ¶¶78-149.

### D. LuxUrban Enters into a Franchise Agreement with Wyndham.

On August 2, 2023, in light of the Company's continuing growth and success, LuxUrban entered into franchise agreements with Wyndham, under which the Company's hotels would become part of the Trademark Collection and Travelodge Wyndham brands. AC ¶31. This transaction was strategic: by entering into the franchise agreements with Wyndham, the Company's hotels would appear on Wyndham's booking platform where the more than 100 million Wyndham members could book accommodations. AC ¶32. In the months following the Wyndham transaction, the Company continued growing its hotel portfolio, securing leases for the Condor Hotel, Hotel 46, and Hotel 27 in New York City. Ex. 24, at 5-6.

### E. LuxUrban Signs MLAs for The Royalton and Truss Hotels.

In early fall 2023, the Company negotiated MLAs for the Royalton and Truss Hotels and agreed upon the material terms of the transaction with the property owners. Ex. 20 (2/5/24 Form 8-K); AC ¶¶33-34. On November 8, 2023, the Company included the Royalton and Truss Hotel units (168 and 86 units, respectively) in its list of "properties under lease, not operating," similar to the Trinity Hotel. Ex. 13, at 23. On November 30, 2023, the Company announced that it had signed MLAs for the Royalton and Truss Hotels, that they "will be re-branded" under the

---

[2] While Mr. Ferdinand was quoted as stating that there were 1,625 rooms available for rent as of 8/8/23 in the company's 8/8/23 PR, the rest of the press release as well as the Form 10-Q filed that same day made clear that the Trinity Hotel was a "property under lease, not operating." Ex. 10, at 2; Ex. 11, at 19.

LuxUrban and Wyndham names in coming months, and that they were "expected to begin welcoming guests early next month." Ex. 14 (11/30/23 *Business Wire* PR, at 1); AC ¶128.

While the November 30, 2023 press release also stated that the Company expected the Royalton and Truss Hotels to open "on our around December 1, 2023," the respective parties continued to negotiate the transactions and opening of the hotels was delayed. Given that the Company did not begin operating or renting out rooms in the Royalton or Truss Hotels in December 2023 or January 2024, they were disclosed as "not operating" in the Company's public disclosures.[3] *See, e.g.,* Ex. 13 at, 23.

### F.  A Short-Seller Report Inaccurately Describes the Royalton Transaction.

On January 17, 2024, short-seller *Bleecker Street* published a report attacking LuxUrban, alleging, among other things, that "LuxUrban's most recent press releases, announcing it had signed a lease for the Royalton Hotel in New York should be read with suspicion." Ex. 17 (1/17/24 *Bleecker Street* Report, at 1); AC ¶37. According to *Bleeker Street*, an unnamed "owner" of the property stated "that LuxUrban had not actually signed the lease." Ex. 17, at 1; AC ¶38.

The Company responded immediately that same day. Ex. 18 (1/17/24 PR); AC ¶43. The Company explained that the Report "reflects a fundamental lack of understanding of its operations and industry, contains unsubstantiated claims from anonymous sources, . . . and relies heavily on speculation and mischaracterizations." Ex. 18; AC ¶44. The Company also stated that "the Company is scheduled to begin welcoming guests on or before January 30, 2024[.]" *Id.*

### G.  LuxUrban Executes an MLA for the James Hotel.

On January 30, 2024, LuxUrban and 88 Madison Hotel Fee Owner, LLC ("88 Madison";

---

[3] The November 30, 2023 press release also included a forward-looking table representing what properties would be operating "effective with the opening of the Royalton Hotel and the Truss Hotel on or around December 1, 2023," based on the Company's expectations that the transactions would be consummated in early-December. AC ¶134.

an entity controlled by GFI Capital Resources Group Inc. ("GFI"), the owner of the James Hotel property), executed a lease for the James Hotel. Ex. 19 (1/30/24 James Hotel Lease).[4] That same day, the Company issued a press release stating that the Company "signed and funded" the lease, that "LuxUrban expects that the James will be rebranded," and that "[t]he Company expects to take possession of the property and begin welcoming guests on or before March 1, 2024." Ex. 20 at 5; AC ¶¶152-154. In the same press release, Allen Gross, GFI's CEO, stated that "GFI looks forward to collaborating with LuxUrban on additional transactions. . . . . We are very excited to be working with LuxUrban." Ex. 20, at 2.

### H. The Royalton Transaction Does Not Go Through, and the Company Changes Its Policy of Announcing Transactions Going Forward.

Given the parties did not finalize certain conditions related to the Royalton transaction in late-January 2024, LuxUrban was unable to go through with the transaction.[5] The Company disclosed this fact on February 5, 2024, and explained that it was withdrawing its prior statements related to the Royalton Hotel transaction:

> "The parties began working toward a transaction in early fall 2023. The Company believed based on correspondence received that the material terms of the transaction was agreed to. In addition, there was a commitment by a qualified banking institution to fund the letter of credit required under the proposed lease in a form agreeable by the landlord; however, a complete set of definitive agreements relating to the lease were not, and will not be, entered into by the Company." Ex. 20 at 2; AC ¶49.

Given the complexities of MLA transactions, and in light of the *Bleecker Street* Report's mischaracterizations of the MLA process in general and the Royalton transaction in particular, the

---

[4] *LuxUrban v. 88 Madison Hotel Fee Owner, LLC*, No. 651800/2024 (NY Sup. Ct., April 12, 2024), Dkt. #9.

[5] Later, on March 12, 2024, Mr. Ferdinand told real estate website *Bisnow* that the Royalton parties addressed certain of the issues that led to the delay of the transaction and that the Company was hopeful to proceed, stating: "We addressed and had an executed lease . . . . We are still proceeding with this property, it got delayed on their end." Ex. 23 (3/12/24 *Bisnow* Article, at 5).

Company determined that it would change its policy for announcing acquisitions and would "only announce acquisitions when they are opened for hosting guests and have completed the entire MLA process." *Id.* On February 6, 2024, Mr. Kothari further explained the new policy:

> "Talking a little bit about MLAs and why the MLAs have a significant amount of variability associated to them. So they come with multiple layers of approval. The document that governs it primarily is a lease. From there, there's a number of other documents that have to get done [indiscernible] signed off. There's transition, there's union, there's operators, there's all kinds of complexity to it. Again, we oversimplify the business from an investor perspective, but there's a number of layers and complexity associated to it. . . . Hence, part of the change in how we're approaching this going forward." Ex. 21 (2/6/24 Investor Day Tr., at 8).

In line with this policy, the Company removed any reference to non-operating hotels from its list of properties in its public disclosures. Ex. 24 at 6.

**I. The Trinity Hotel Transaction Does Not Go Through.**

On March 12, 2024, real estate website *Bisnow* reported that Michael Chetrit, the owner of the Trinity, stated that "[t]he deal did not go through." Ex. 23, at 5; AC ¶52. The article also quoted Mr. Ferdinand as stating that LuxUrban had "fully executed a lease" and "wired [the owner] money," but that Chetrit did not "make the changes necessary for operating the hotel." Ex. 23, at 5. The Company disclosed this again in the Company's 2023 Form 10-K, stating that "in late-2023, we elected to not move forward on a previously agreed to long-term lease for a hotel because required repairs had not been timely completed by the landlord." Ex. 24, at 4.

**J. The James Hotel Transaction Does Not Go Through.**

Similarly, in or around April 2024, LuxUrban determined that certain delivery conditions in the lease for the James Hotel had not been satisfied and brought suit against 88 Madison. *Supra* at 8 n.4. On April 16, 2024, during the Company's Fiscal Year 2023 earnings call, Mr. Ferdinand explained the issues related to the negotiations of the James Hotel transaction, and explained that the Company had yet to take possession: "So we are currently not operating, but in possession.

Highgate is still managing the process, and we're working through the union bond issues with the union and the owner, and ***we do expect to take possession of that property*** as we work through the balance of the union bond issues, which we're in deep negotiations with the union currently." AC ¶164; Ex. 25 (4/16/24 Tr., at 14) (Mr. Kothari: "I would expect this quarter"). The parties have not yet moved forward with the transaction.

### K.  The Company's Q1 2024 Financial Results.

On May 13-14, 2024, the Company announced its financial results for Q1 2024, including $29.1 million in net rental revenue, a gross profit loss of $4.6 million, total operating expenses of $7.6 million, and a net loss of $16.8 million. AC ¶¶169-170, 172-173, 181-182. On August 20, 2024, the Company restated the Q1 2024 financials to reflect: (1) a $1.5 million decrease in "Channel Retained Funds" and related adjustments; (2) a $7.8 million increase in bad debt expenses; (3) a decrease in receivables from On-Line Travel Agents of $6.7 million and Net Rental Revenue of $6.26 million adjusting for reservations that were booked and paid for but for which "reservations were cancelled by the merchant service provider," and certain related adjustments; (4) adjustments related to receivables due from the City of New York; (5) an increase in "Bookings Received in Advance" and corresponding reduction in "Net Rental Revenue" of $8 million to adjust for reservations that were booked and paid for, "but the guest had not yet stayed at the property"; and (6) adjusted amortization of prepaid real estate taxes. Ex. 28, at 6; AC ¶268. Regarding rental revenues, the Company stated that "future revenues will be recognized when the guest checks in." Ex. 28, at 6.

## III.    LEGAL ARGUMENT

### A.  Heightened Pleading Standards Govern Plaintiffs' Claims.

Securities claims must meet the heightened standards of the Reform Act and Rule 9(b). Under Section 10(b), in addition to pleading materiality and loss causation, a plaintiff must

"specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and, "state with particularity facts giving rise to a strong inference" that it was made with scienter. 15 U.S.C. §§ 78u-4(b)(1)(B), (2)(A). For both falsity and scienter, courts must consider the full factual context of the statements and conduct at issue. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190-91 (2015); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323-24 (2007).

### B.  The Challenged Statements Were True and Not Misleading.

The Amended Complaint challenges two categories of statements. Plaintiffs cannot plead that any statement in any category was false or misleading.

#### 1.  Statements that the Four Hotels were "Under Lease" or "Under MLA" (Challenged Statements A-S).

Plaintiffs allege that Challenged Statements A-S (AC¶¶78-168) were false or misleading primarily because the Company allegedly did not "fully execute" leases for the Four Hotels, and that it also therefore had "no basis" to expect that it would open, operate, or rebrand the Hotels (*e.g.,* AC ¶¶129, 135, 155). Plaintiffs' argument fails for several reasons.

*First*, nowhere did the Company state that it had "fully executed" any lease for any of the Four Hotels, nor do Plaintiffs explain what "fully execute" even means.[6] The Company only described the leases for the Four Hotels as having been "signed," or that the Hotels were "under lease," or "under MLA," and repeatedly described them as "not operating" or "not yet available for rent"—clearly disclosing that the transactions had not been completed. *Supra* at 5-7.

*Second*, the only source Plaintiffs cite that actually alleges that any lease was not signed is the January 17, 2024 *Bleecker Street* short-seller report. AC ¶¶37-41; Ex. 17. But this Report

---

[6] The March 12, 2024 *Bisnow* article which quotes Mr. Ferdinand as stating that the Company had "fully executed an MLA" for the Trinity Hotel is not a Challenged Statement in this case.

cannot establish that any of the Company's statements regarding the Royalton were false or misleading, and none of the other alleged corrective disclosures establish that any other lease had not in fact been signed.

This Court has explained the risks associated with crediting short-seller reports in securities cases. In *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020), the Court explained that "[s]hort sellers 'operate by speculating that the price of a security will decrease,'" and "have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *Id.* Accordingly, there is "a particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration." *Id.*

That is exactly the case here. The *Bleecker Street* Report posits that the Company did not sign a lease for the Royalton solely based on an anonymous source, and Plaintiffs have not corroborated that accusation through their own investigation or through any of the Company's public statements. *Id.* at 804 (rejecting allegations based on short-seller report); *supra* at 7. And even if credited, the *Bleecker Street* Report's other statements are too vague to establish falsity. AC ¶37, 39 (allegations attributed to anonymous hotel operators that the Company announced leases for unspecified hotels before the transactions had closed). They do not identify which hotels these unnamed "operators" were talking about, and do not mention the Four Hotels. *Id.*

Similarly, the March 12, 2024 *Bisnow* article fails to establish that the Company did not execute a lease for the Trinity Hotel. AC ¶250. That article only quoted Mr. Chetrit as saying that the "deal did not go through" and quoted Mr. Ferdinand as stating that the Company had indeed "fully executed a lease," but that the property owner failed to "make the changes necessary for operating the hotel." *Id.* While the article claims that Mr. Ferdinand forwarded an October 2, 2023

email from an unnamed LuxUrban attorney attaching a draft letter stating that the Company would not be "executing the proposed lease" and would "not be taking possession of the Premises," that statement is so vague as to be meaningless. *Id.* It is impossible to derive, particularly in light of Mr. Ferdinand's statements, what that attorney meant by that draft statement. In context, that statement is best understood as communicating that the Company would not go through with the transaction. Similarly, the Company's March 26, 2024 disclosure that it "decided to not move forward on a previously agreed to [MLA] due to repairs not being completed by the landlord" only corroborates Mr. Ferdinand's statement that a lease for the Trinity had been executed. *Id.* ¶253.

The only other sources Plaintiffs rely upon to establish the falsity of Challenged Statements A-S are the fact that starting on March 26, 2024, the Company did not include the Trinity, Truss, or James Hotels in the Company's list of properties. AC ¶¶253, 256, 260. But these alleged corrective disclosures say *nothing* about whether the Company had *signed leases* for these properties. Instead, these disclosures were in line with the Company's new policy, announced on February 2, 2024, that it would "only announce acquisitions when they are opened for hosting guests and have completed the entire MLA process." *Id.* ¶49. As discussed above, the Company had previously listed the Trinity and Truss Hotels as properties "under lease" but not "operating" or "available for rent," and the James Hotel transaction, announced only days before, had yet to be completed. *Supra* at 5-7. That the Company did not include them in its list of properties only shed light on the status of the transaction and said nothing about whether a lease had been signed.

*Third,* Plaintiffs fail to plead any facts showing that the Company's statements regarding the expected timeline for possession/operation of the Four Hotels and their expected integration into the Wyndham portfolio, the Company's belief regarding the "growing industry acceptance" of its business model, or the Company's expectations to "acquire larger scale" and realize "scale-

driven cost efficiencies," and similar and/or related statements, were false or misleading. AC ¶¶ 79, 127-135, 139-168. All of these statements were statements of opinion and/or forward-looking statements protected under the Reform Act's safe harbor. *Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) ("[E]xpressions of optimism [and] projections about the future are quintessential opinion statements."); *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *12 (S.D.N.Y. June 23, 2004) (statements of "expectations about a future event" and "growth expectations" are protected forward-looking statements); *Elliott Assocs., L.P. v. Covance, Inc.*, 2000 WL 1752848, at *9 (S.D.N.Y. Nov. 28, 2000) (concluding that the statements "regarding the expected completion of the merger were merely opinions").

For a statement of opinion to be false or misleading under *Omnicare*, a plaintiff must plead (1) facts sufficient to show that the speaker did not actually hold the stated belief at the time the statement was made; or (2) "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." 575 U.S. at 188-89, 194. The Reform Act's safe harbor protects forward-looking statements that are either (a) identified as such and accompanied by meaningful cautionary language; or (b) immaterial, or (c) not made with actual knowledge of falsity. *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010); 15 U.S.C. § 78u-5.

Plaintiffs have failed to identify or plead any facts showing that any Defendant did not believe that the transactions for the Four Hotels would go through or that they would be integrated into the Wyndham portfolio, that the Company would grow in scale and realize related efficiencies, or that the industry was increasingly accepting of the Company's business model. Nor have they identified any omitted facts that would have rendered these Challenged Statements misleading. Additionally, these forward-looking statements were all accompanied by meaningful cautionary

language, bringing them within the protection of the Reform Act's safe harbor. Ex. 4, at 3; Ex. 14, at 4; Ex. 16 (1/12/24 *Business Wire* PR), at 2; Ex. 18, at 3; Ex. 20, at 3; Ex. 22 (2/6/24 Form 8-K), at 2; Ex. 25, at 4.

### 2. Statements Regarding the Q1 2024 Financial Results (Challenged Statements T-V).

Plaintiffs do not tie the Challenged Statements related to the Q1 2024 financials to the Four Hotels. AC ¶¶169-183. Instead, Plaintiffs independently assert that these statements were false or misleading simply because they were later restated. However, the mere fact of a later restatement— or a GAAP violation—cannot establish falsity under the securities laws.

Challenged Statements T-V all center around the Company's Q1 2024 recognized revenue, and the resulting impact on gross and net loss, and operating expenses. AC ¶¶169-183. However, the GAAP provision governing revenue recognition, ASC 606, requires nuanced and subjective judgment and is otherwise "subject to interpretation and tolerate a range of reasonable treatments," rendering Challenged Statements T-V statements of opinion under the securities laws.[7] *Harris v. AmTrust Fin. Servs. Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015); *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 243 (S.D.N.Y. 2015) (revenue recognition statements involve "subjective accounting choices" and are statements of opinion); *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 939–40 (N.D. Cal. 2023) (similar). For instance, ASC 606 requires a company to determine "the amount of consideration . . . which an entity **expects** to be entitled to in exchange for transferring promised" services, factoring in the company's "***expectations***" that the transaction

---

[7] The Company's Revenue Recognition policy stated that it followed ASC 606 and explained that "[r]evenue is measured as the amount of consideration it *expects* to receive in exchange for the promised goods and services." AC ¶177 (emphasis added). The Company mostly, but not always, recognized revenue when guests completed their stays at the properties. *Id.*

may be discounted or refunded. ASC 606 (emphases added).[8] If, based on subsequent developments, the revenue recognized based on those expectations needs to be adjusted later, then the company should make a "corresponding change to . . . the amount of revenue recognized." *Id.*

That is exactly what happened here. The Company later adjusted recognized revenue for reservations of rooms that were "booked and paid for" but which were later "cancelled by the merchant service provider" or for which "the guest had not yet stayed at the property." Ex. 28, at 6; AC ¶¶177-178. That the Company later restated its previously reported revenue—all statements of opinion—does not render them false or misleading under the securities laws. *See New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 176 (2d Cir. 2023) (later "change of opinion" in restatement "does not mean the original [] opinions were disingenuous"). Plaintiffs have not pleaded *any* facts establishing that any Defendant did not believe the originally reported Q1 2024 financials, nor have Plaintiffs identified any omitted fact that rendered those statements false or misleading.[9]

Mr. Kothari's SOX certification as to the effectiveness of the Company's internal controls was also not false or misleading. AC ¶¶179-180; Ex. 27 (Q1 2024 Form 10-Q). It is well-established in the Second Circuit that SOX certifications are statements of opinion under the securities laws. *DeCarlo*, 80 F.4th at 176. Plaintiffs have not pleaded any facts establishing that Mr. Kothari did not believe what he certified at the time of the Q1 2024 Form 10-Q, and do not identify any omitted fact that rendered his certification false or misleading.

---

[8] ASC 606, available at https://asc.fasb.org/606/showallinonepage.

[9] The *Bleecker Street* Report's speculation as to the Company's GAAP treatment for the Company's Receivables for On-Line Travel Agents discussed in the Q3 2023 Form 10-Q did not say anything as to the Q1 2024 Form 10-Q and cannot establish its falsity. AC ¶41.

### C.  Plaintiffs Cannot Allege a Strong Inference of Scienter.

Plaintiffs' claims also fail for lack of scienter. To plead scienter, Plaintiffs must state "with particularity" facts giving rise to a "strong inference" that each Defendant acted with "an intent to deceive, manipulate, or defraud." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Plaintiffs must plead particularized facts showing (i) motive and opportunity for fraud or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Either way, the strong inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. This "inherently comparative" inquiry requires courts to holistically weigh "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24. Here, there was no motive, and non-fraudulent inferences abound.

Plaintiffs' only motive allegations are that (1) Defendants wanted LuxUrban to meet its guidance (AC ¶¶189-193); and (2) Mr. Ferdinand held senior positions in the Company, had "in depth knowledge of [the Company's] business operations," owned stock and sold some, and, from time to time, provided personal guarantees in connection with certain unspecified agreements (AC ¶¶194-197, 210-214). None of this establishes motive under any pleading standard.

Defendants' alleged desire to meet the Company's guidance is a goal "possessed by virtually all corporate insiders" and cannot establish scienter under Second Circuit precedent. *Swanson v. Danimer Sci., Inc.*, 2024 WL 4315109, at *3 (2d Cir. Sept. 27, 2024) ("goals that are 'possessed by virtually all corporate insiders,' such as the desire to . . . sustain the appearance of corporate profitability" insufficient to plead scienter); *Afr. v. Jianpu Tech. Inc.*, 2023 WL 5432282, at *7 (S.D.N.Y. Aug. 23, 2023) (rejecting scienter allegation that "Defendants engaged in fraud to

17

meet revenue targets" because "this is a 'goal . . . possessed by virtually all corporate insiders'").

Similarly, Mr. Ferdinand's roles at the Company and knowledge of its operations are insufficient to plead scienter. *See Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at *4 (2d Cir. May 16, 2023) (defendants' "senior executive positions" and "involvement in a key company undertaking" insufficient to plead scienter); *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *13 (S.D.N.Y. Mar. 30, 2021) (same re defendants' "senior management roles" and their "comprehensive understanding of [] integration activities").

Plaintiffs' allegations as to Mr. Ferdinand's alleged personal guarantees are insufficient as well. Plaintiffs fail to specify the agreements for which Mr. Ferdinand provided guarantees, what the guarantees were, what their monetary value was, or why he provided them. AC ¶196. These vague and conclusory allegations are in and of themselves fatal to Plaintiffs' scienter argument here. *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) (dismissing scienter allegations based on defendant officer's pledge of personal assets as collateral for corporate debts where the complaint "fail[ed] to provide any details regarding the agreements whereby [defendant] allegedly pledged" those assets). Moreover, the AC concedes that the Company's counterparties *required* Mr. Ferdinand to provide such guarantees, and his doing so can only be seen as a good faith effort to further the operations and success of the Company, putting his own skin in the game to further the Company's growth.[10] AC ¶196.

Finally, Mr. Ferdinand's stock ownership and sales strongly cut against any inference of scienter. As a threshold matter, that Mr. Ferdinand held a significant portion of LuxUrban stock is

---

[10] That the Company compensated Mr. Ferdinand for certain of these personal guarantees negates any inference of motive to defraud in order to cover any personal losses. AC ¶196, n.3.

insufficient to plead scienter.[11] AC ¶¶210-211; *Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 556 (S.D.N.Y. 2010) ("stock ownership does not provide sufficient motive to sustain the pleading burden under Rule 9(b)" or the Reform Act) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994)). And fatal to Plaintiffs' scienter allegations is the fact that Mr. Ferdinand acquired significantly more shares than he sold during the class period. While Mr. Ferdinand sold 121,052 common stock shares during the class period, he purchased 6,095,000 shares on the open market and otherwise acquired an additional 6,373,678 shares. Similarly, that Mr. Kothari acquired a significant number of shares—including 800,000 shares purchased on the open market and another 1,057,693 through grants—and did not sell any during the class period, strongly negates any inference of scienter as to him.[12] *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) (scienter undermined where defendants "bought more shares than they sold during the putative class period").

None of the other factors that courts analyze in connection with insider stock sales support an inference of scienter here. *Kasilingam v. Tilray, Inc.*, 2023 WL 5352294, at *3 (S.D.N.Y. Aug. 21, 2023) (listing factors). Mr. Ferdinand is only alleged to have received approximately $570,000 from his stock sales, well below any amount courts deem sufficient to plead scienter. *See, e.g.*, *Id.*, at *4 ($28.4 million in stock sales insufficient to plead scienter). That these sales were not made pursuant to 10b5-1 plans, on its own, does not make the sales suspicious. *Bristol-Myers*, 28 F.4th at 355-356 (no scienter even where $44 million in stock sales not made under 10b5-1 plan); *Tilray*, 2023 WL 5352294, at *4 (same for $12.4 million in stock sales). And Mr. Ferdinand's stock sales during the class period represented *0.7%* of his common stock holdings in the Company at the

---

[11] Similarly, that Mr. Ferdinand's father received shares in the IPO cannot support an inference of scienter. AC ¶197.
[12] Ex. 7 (Mr. Ferdinand's Form 4s); Ex. 8 (Mr. Kothari's Form 4s).

time, significantly below the percentages courts in this Circuit find suspicious. *Tilray*, 2023 WL 5352294, at *4; *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (no motive where defendant sold 65.6% of his shares).

As to timing, Mr. Ferdinand's four sales occurred between November 21 and December 1, 2023. The only Challenged Statements made around this time concerned inclusion of the Trinity, Royalton, and Truss hotel units in the Company's number of rooms under lease, and disclosures concerning the leases for the Royalton and Truss Hotels. AC ¶¶125-138. But the Company had already included the Trinity Hotel rooms in its number of rooms under lease since May 10, 2023, and the Truss and Royalton Hotels since November 8, 2023 (AC ¶¶79, 122). There is no basis to infer that Mr. Ferdinand sought to capitalize on the information that was already disclosed to the market. Indeed, two days after the last sale, Mr. Ferdinand gifted the proceeds from these stock sales back to the Company. *See* Ex. 15 (12/5/23 Form 8-K). Finally, the AC does not allege that Mr. Ferdinand made any stock sales shortly before any alleged corrective disclosure. AC ¶246.

"Where motive is not apparent . . . the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Recklessness in this context is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Nandkumar*, 2023 WL 3477164, at *3. The AC cannot clear this high bar.

***Knowledge of the Company's Business Model***. Plaintiffs make the conclusory allegation that because Mr. Ferdinand and Mr. Kothari were familiar with the MLA process that they were "at least reckless" when stating that the Four Hotels were "under lease." AC ¶¶184-188. But Plaintiffs have pleaded no facts establishing that LuxUrban did not sign leases for the Four Hotels. *Supra* at 11-15. In essence, Plaintiffs' theory is that because the Challenged Statements were

allegedly false, that scienter is adequately pleaded. That is not the law, and Plaintiffs' counsel's recent attempt to press this theory was soundly rejected. *See Hubiack*, 2024 WL 2943959, at *10 (rejecting scienter allegations where the "argument seeks to divine scienter from the mere (assumed) fact of falsity itself").

***Alleged "Pattern of Misrepresentations."*** Plaintiffs allege that because Defendants rebutted the *Bleecker Street* Report's inaccurate and unsubstantiated allegations that the Company did not sign a lease for the Royalton, and announced the signing the James lease, that Defendants made all of the Challenged Statements with scienter. AC ¶¶198-209. This is yet another example of Plaintiffs impermissibly asking the Court to "divine scienter from the mere (assumed) fact of falsity itself." *Hubiack*, 2024 WL 2943959, at *10. Regardless, as explained above, Plaintiffs have failed to plead any facts demonstrating that the Company did not sign those leases.

The same holds for the Company's explanations as to the complexities of the MLA process. While the Company determined that it may have previously "oversimplif[ied]" the MLA process for investor convenience, that in and of itself cannot establish that Defendants made the earlier Challenged Statements with *fraudulent intent*. *See, e.g., Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 219 (S.D.N.Y. 2018) (concluding that defendant CEO's purported admissions as to company's assumptions of sales growth did not establish scienter). That is particularly true given that throughout the class period the Company *did* disclose the risks and complexities of the MLA process in its Risk Factor disclosures. *Supra* at 4-5.

***Mr. Ferdinand's Unrelated SEC Settlement***. Plaintiffs devote significant space in the AC to describe Mr. Ferdinand's unrelated settlement with the SEC more than three years before the class period regarding a different company under different circumstances. AC ¶¶226-237. However, that Mr. Ferdinand "was involved in a prior settlement based on allegations of securities

fraud does not support an inference that [he] acted recklessly in the present matter." *Hou Liu v. Intercept Pharms., Inc.*, 2020 WL 1489831, at *19 (S.D.N.Y. Mar. 26, 2020); *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 158 (S.D.N.Y. 2004) (similar).

      ***Mr. Kothari's Preparation of the Q1 2024 Form 10-Q and its Subsequent Restatement***. Plaintiffs allege that because Mr. Kothari was involved in the preparation of the Q1 2024 Form 10-Q and worked closely with the Company's independent auditor, that he made the Challenged Statements regarding the Q1 2024 Form 10-Q with scienter. AC ¶¶215-220. Such allegations amount to nothing more than "conclusory 'accusations' . . . founded on nothing more than a defendant's corporate position" that "are entitled to no weight." *Chapman*, 466 F. Supp. 3d at 401 (rejecting scienter allegations as to defendant CFO that asserted only that he was "responsible for the financial statements"). Indeed, Plaintiffs plead no facts suggesting that Mr. Kothari was "aware" of "information [that] would require an adjustment to [the] financial statements" when he helped prepare the Q1 2024 Form 10-Q. *Id.* Nor do the alleged GAAP violations or the restatement itself (AC ¶¶221-225) establish scienter. *ECA*, 553 F.3d at 200 ("[A]llegations of GAAP violations . . . are insufficient to state a securities fraud claim"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 445 (2d Cir. 2015) ("financial restatement[s] do not themselves give rise to a plausible inference of scienter.").

### D. Plaintiffs Fail to Plead Loss Causation.

      To plead loss causation, Plaintiffs are "required to allege facts sufficient to show that the 'relevant truth' that had been concealed by Defendants' purportedly false statements was disclosed to the market, which in turn caused [the company's] stock price to decline." *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *14 (S.D.N.Y. Mar. 30, 2012) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–43, 347 (2005)). Disclosures that "do not reveal to the market the

falsity" of the challenged statements or the "alleged fraud" cannot establish loss causation, "a pleading failure that 'is fatal under Second Circuit precedent.'" *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005); *In re MINISO Grp. Holding Ltd. Sec. Litig.*, 2024 WL 759246, at *20 (S.D.N.Y. Feb. 23, 2024). Here, none of the alleged corrective disclosures revealed any alleged fraud.

### 1. Alleged Corrective Disclosures Regarding the Leases.

The only alleged corrective disclosure that states that the Company did not sign a lease for any of the Four Hotels is the January 17, 2024 *Bleecker Street* Report alleging only that "[t]he owner of that building told us LuxUrban had not actually signed the lease." AC ¶246. This is not sufficient to plead loss causation under any standard. As discussed above, the *Bleecker Street* Report merely accused the Company of not signing the lease for the Royalton Hotel based on anonymous sources and without any substantiation or corroboration, *supra* at 7, and cannot be deemed to have revealed any hidden truth of any alleged fraud. *Harris*, 135 F. Supp. 3d at 173 n.30 (rejecting loss causation allegations based on short-seller report). The Company's February 5, 2024 disclosure that a "complete set of definitive agreements relating to the lease were not, and will not, be entered into by the Company" also does not reveal that the Company had never signed any lease for the Royalton Hotel. AC ¶248.[13]

The same is true for the March 12, 2024 *Bisnow* article: it does not reveal that the Company did not sign a lease for the Trinity Hotel. AC ¶250. That article only quoted the owner of property as saying that the "deal did not go through" and quoted Mr. Ferdinand as stating that the Company indeed "fully executed a lease."[14] *Id.*; *supra* at 12-13. Similarly, the Company's March 26, 2024

---

[13] These disclosures say nothing about the Trinity or Truss Hotels or about the Wyndham relationship and thus cannot establish loss causation as to them. AC ¶¶246, 248.

[14] The "two" other unspecified "instances" where the Company announced leases but the "deals were never finalized" in the *Bisnow* article cannot establish loss causation. AC¶250.

disclosure that it "decided to not move forward on a previously agreed to [MLA]" only corroborates that a lease had been executed, and does not reveal any alleged fraud. AC ¶253.[15]

The rest of the Lease Alleged Corrective Disclosures on March 26, April 15, and May 13, 2024 that did not include the Trinity, Truss, or James Hotels in the Company's list of properties say *nothing* about whether the Company had signed a lease for them. AC ¶¶253, 256, 260.[16] Instead, these disclosures were in line with the Company's new announcement policy. *Supra* at 9. Given that the Company had previously listed the Trinity and Truss Hotels as properties "under lease" but not "operating" or "available for rent," the Company had already announced that the Trinity transaction would not go through, and the James Hotel lease had only been signed on January 30, 2024 (and had not been consummated), *supra* at 5-9, these alleged corrective disclosures, at most, only repeated previously disclosed information, which is insufficient to plead loss causation. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (corrective disclosures that repeat previously disclosed information cannot establish loss causation).

The alleged corrective disclosures discussed above (AC ¶¶246, 248, 254, 257) did not mention the Company's "integration with Wyndham," negating any claim of loss causation as to those Challenged Statements. The only two alleged corrective disclosures that discuss the Wyndham relationship are the May 10, 2024 *Bisnow* article and the Company's May 13, 2024 press release, neither of which establish loss causation. The May 10 *Bisnow* article only stated that LuxUrban's hotels were "no longer showing up on Wyndham's website, raising doubts about the status of the partnership," and that "[i]t is unclear what has transpired." AC ¶¶56, 259; Ex. 26

---

[15] The March 26, 2024 disclosure did not discuss the Truss or James hotels or the "integration with Wyndham" and thus is not a partial corrective disclosure as to those Challenged Statements.
[16] Similarly, that the 2023 10-K allegedly "disclosed doubt about the Company's ability to continue as a going concern" says nothing about the leases for the Four Hotels. AC ¶256.

(5/10/24 *Bisnow* article). This is insufficient: "the raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud as required by *Dura*." *Janbay*, 2012 WL 1080306, at \*16. Moreover, the article noted that LuxUrban's press releases since April 22, 2024 "no longer include[d] the Wyndham partnership in the descriptions of its business," such that it is merely a "negative characterization of previously disclosed facts" which cannot establish loss causation. *Id.*; Ex. 26. The May 13 press release only stated that in "May 2024, in light of discussions between our Company and Wyndham . . . we . . . [are] terminating our franchise relationship with Wyndham." AC ¶260-261. It did not reveal any hidden truth of any alleged fraud as to the Wyndham relationship.

### 2. Alleged Corrective Disclosures as to the Q1 2024 Form 10-Q.

The August 9, 14, and 24, 2024 alleged corrective disclosures concerning the restatement of the Q1 2024 Form 10-Q also cannot support loss causation because none of them reveal the hidden truth of any alleged *fraud*, as they merely disclosed a subsequent reassessment of previously reported financials. AC ¶¶263, 265, 268; *supra* at 15-16; *Stratte-McClure v. Morgan Stanley*, 2013 WL 297954, at \*11 (S.D.N.Y. Jan. 18, 2013) ("restatements of income by defendants [that] did not reveal the fraud underlying the complaint" insufficient to plead loss causation).

## IV. Plaintiffs Do Not Plead Control Person Liability.

Plaintiffs' § 20(a) claim (AC ¶¶240-244) likewise fails both because it cannot state a § 10(b) primary violation and because it fails to allege any facts showing either individual defendant "controlled" LuxUrban. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

## V. CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint with prejudice.

Dated: December 20, 2024

Respectfully submitted,

BAKER & HOSTETLER LLP

By: ___/s/ Douglas W. Greene_____

Douglas W. Greene (*pro hac vice*)
dgreene@bakerlaw.com
Zachary R. Taylor
ztaylor@bakerlaw.com
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.589.4200

*Attorneys for Defendants LuxUrban Hotels Inc.,*
*Brian Ferdinand, and Shanoop Kothari*