UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ZCAP EQUITY FUND LLC *and* ROSS
MARCHETTA, *individually and on
behalf of all others similarly situated,*

                                    Plaintiffs,

                    -v-

LUXURBAN HOTELS INC.,
BRIAN FERDINAND, *and*
SHANOOP KOTHARI,

                                    Defendants.

24 Civ. 1030 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This is a putative class action under the federal securities laws. Lead plaintiffs zCap

Equity Fund LLC and Ross Marchetta claim that defendant LuxUrban Hotels Inc. ("LuxUrban"),

which is in the short-term rental business, and its senior executives Brian Ferdinand and Shanoop

Kothari (collectively, "defendants"), gave investors a story falsely touting the company's growth.

As a result of defendants' misrepresentations, lead plaintiffs claim, they and other members of

the putative class purchased LuxUrban securities at artificially inflated prices and incurred

significant losses after the truth was revealed. They bring this action on behalf of all persons

other than defendants who purchased securities of LuxUrban between November 8, 2023 and

February 2, 2024 (the "Class Period").

The Amended Complaint ("AC"), Dkt. 30, claims violations of Sections 10(b) and 20(a)

of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5, the corresponding

rule promulgated by the Securities and Exchange Commission ("SEC"). The AC's gravamen is

that defendants falsely claimed to have added a bevy of prestigious hotels in New York and Los

Angeles to LuxUrban's property portfolio to take advantage of price dips in the hotel industry occasioned by the COVID-19 pandemic—only to disclose months later that they had not, in fact, consummated those transactions.

Pending now is defendants' motion to dismiss the AC under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court largely denies the motion. It grants the motion, however, as to a limited subset of the statements challenged in the AC.

## I.    Background

### A.    Factual Background[1]

#### 1.    The Parties

LuxUrban operates hotels and short-term rentals. AC ¶ 3. It is incorporated in Delaware and has its principal place of business in Florida. *Id.* ¶ 15. During the Class Period, LuxUrban's common stock traded on NASDAQ under the ticker "LUXH." Its shares were later delisted. *See* Dkt. 47 ("Pls.' Br.") at 13.

---

[1] These facts are drawn primarily from the AC. Dkt. 30. For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of lead plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court has also considered the documents attached to the declaration of Douglas W. Greene in support of the motion to dismiss, Dkt. 44 ("Greene Decl."). Because these documents were incorporated into the AC by reference, or are matters of public record, they are properly considered on a motion to dismiss. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (in resolving a motion to dismiss, the court may consider, *inter alia*, "any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit"). The Court considered these documents "not for the truth of the matters asserted therein," but only "for the fact that the statements were made." *Clark v. Kitt*, No. 12 Civ. 8061, 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014); *see also, e.g., Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." (emphasis omitted)).

Ferdinand served as LuxUrban's CEO from at least the beginning of the Class Period until November 8, 2023. AC ¶ 16. Between November 8, 2023 and March 1, 2024, he served as co-CEO, sharing CEO responsibilities with Kothari.[2] *Id.* Ferdinand served as chairman of LuxUrban's board from at least the beginning of the Class Period until on or around May 31, 2024, when he became Executive Chairman. *Id.* On June 27, 2024, Ferdinand resigned from the board. *Id.* As of April 18, 2023, Ferdinand controlled approximately 56.2% of the voting power of LuxUrban shares. *Id.*

Between January 2022 and June 2024, Kothari served as LuxUrban's CFO, and between November 30, 2022 and June 2024, as its president. AC ¶ 17. On November 8, 2023, he was appointed co-CEO, a position he held in tandem with his CFO and president roles. *Id.* On June 10, 2024, LuxUrban terminated Kothari from his positions with the company. *Id.*

Lead plaintiffs acquired LuxUrban securities during the Class Period. *Id.* ¶ 14.

### 2.      LuxUrban Pivots to Leasing Hotels in the Wake of COVID-19

In October 2017, Ferdinand co-founded LuxUrban's predecessor entities. *Id.* ¶ 19. Its business focused on leasing and re-leasing multifamily residential units. *Id.* ¶ 20.

In late 2021, LuxUrban pivoted to a strategy of leasing existing hotels from building owners on a long-term basis and renting out the hotel rooms. *Id.* This shift aimed to "capitalize" on (1) the marked downturn in the hotel industry caused by prolonged restrictions on travel during the COVID-19 pandemic and (2) the high-interest rate environment. *Id.* As Ferdinand publicly explained at the time, LuxUrban sought to "[e]xploit" the "depressed hotel market by leveraging [its] national cost structure and ground teams to secure unbooked hotel rooms and closed hotels on long-term master leases and marketing them under . . . [its] brands." *Id.* ¶ 24.

---

[2] Between March 1 and May 31, 2024, Ferdinand "transitioned" his CEO responsibilities to Kothari. *Id.*

LuxUrban implemented this strategy by entering into master lease agreements ("MLAs") with hotel owners. *Id.* at 8. MLAs allow a lessee to operate and profit from a property without owning it outright. *Id.* ¶ 25. They gave LuxUrban the capacity to expand its property portfolio with substantially less capital than alternative arrangements, such as buying the properties outright, would have required. *Id.* Under the MLAs, LuxUrban covered the operating expenses of the leased hotel, including taxes, insurance, utilities, and maintenance costs, and paid rent to the hotel's owners (who retained their equity in the properties). *Id.* ¶ 27. LuxUrban generated revenue by renting out rooms to guests and charging for ancillary services. *Id.* ¶¶ 3, 24. LuxUrban touted to prospective investors the advantages of its "asset-light" business model: "greater flexibility" and "potential cost savings." *Id.* ¶¶ 24, 29.

In August 2022, LuxUrban held an initial public offering ("IPO") of its shares. *Id.* ¶ 22. It sold 3,375,000 shares of its common stock at $4 per share, yielding gross proceeds of $13.5 million. *Id.* The company's prospectus, filed with the SEC in connection with the IPO, again highlighted lease agreements with hotels as the centerpiece of its business. *Id.* ¶ 20.

### 3.    LuxUrban's Growth Story

To sustain investor interest after the IPO, LuxUrban aggressively touted its ability to grow its portfolio of hotel properties and capture market share in short-term rentals. *Id.* ¶ 21. It told investors it was poised to rapidly expand its business while the hotel industry remained depressed in the wake of the pandemic. *Id.* ¶¶ 20, 25–26, 98. It announced that it "expected" to have 2,500 to 3,000 rooms in its portfolio by the end of 2023. *Id.* ¶ 26. And, highlighting its "asset-light" model, LuxUrban portrayed itself as uniquely well positioned to grow its hotel portfolio before these "favorable" market conditions turned. *See id.* ¶¶ 20, 98, 148. For instance, Kothari stated: "in terms of what we do in terms of acquisition, there's really no competition. We provide a solution. There's other solutions [sic], but our solution is unique.

4

We have the business to support that, right, and the credibility." *Id.* ¶ 28. Ferdinand, for his part, framed LuxUrban's growth potential this way: "[I]n this current environment really the only way for the owner to refinance into a fixed rate mortgage is through a triple-net master lease. LuxUrban has become and [is] becoming the go to for that." *Id.*

LuxUrban's growth story, as it told the investing public, had two main drivers: the Wyndham partnership and additions to its hotel portfolio.

***The Wyndham partnership.*** On August 3, 2023, LuxUrban announced a partnership with Wyndham Hotels and Resorts, the global hotel chain. *Id.* ¶ 31. As a result, LuxUrban announced, 17 hotels operated by LuxUrban would become part of the "Trademark Collection by Wyndham" and "Travelodge by Wyndham" brands under franchise agreements. *Id.* LuxUrban touted the benefits of expanding onto the Wyndham "platform." *Id.* ¶ 5. LuxUrban-operated hotels would appear on Wyndham's booking website, making them viewable to the more than 100 million members of Wyndham's rewards program. *Id.* ¶ 32. And, LuxUrban stated, it expected to lower its expenses as a result of Wyndham's lower online travel agency ("OTA") commission rates, and that Wyndham would provide capital in the form of Development Incentive Advances for properties under lease. *Id.* ¶ 31. The franchise agreements had initial terms of 15 to 20 years. *Id.* They required Wyndham to provide financial, sales and operational-related support with respect to 16 initial properties. *Id.*

***Portfolio additions.*** Entering into MLAs with hotels was the principal means by which LuxUrban pursued its growth strategy. The claims here center on LuxUrban's statements announcing the addition of four prestigious hotels to its portfolio of hotel properties (collectively, the "four hotels").

On May 9, 2023, LuxUrban announced it had signed a lease "to operate" the Trinity Hotel (the "Trinity"), a 179-room property in Los Angeles, and "expect[ed] to commence operations . . . on or about July 1, 2023." *Id.* ¶ 30; Dkt. 42 ("Defs.' Br.") at 11. It listed the Trinity as "under lease" in its quarterly report for the first quarter of 2023. AC ¶ 30.

On November 8, 2023, LuxUrban announced that it had signed an MLA for the Royalton Hotel (the "Royalton"), a 168-room property on West 44th Street in New York City. *Id.* ¶¶ 5, 34. It repeatedly emphasized that the Royalton would be part of the Wyndham partnership. *Id.* ¶ 34.

On November 30, 2023, LuxUrban announced that it had signed a 25-year MLA for the Truss Hotel (the "Truss") in New York City. *Id.* ¶ 35. The Company's press release issued that day said it had "signed separate 25-year" MLA for the Truss. *Id.* As soon as it announced the deals, the Company began including the Royalton and Truss hotels in the total of properties and rooms in its portfolio. *Id.* ¶ 36. This practice, the AC alleges, lent the appearance of progress towards its 2,500 to 3000 unit goal by the end of 2023. *Id.*

On January 30, 2024, LuxUrban announced that it had landed its biggest hotel MLA yet, the James NoMad Hotel (the "James"), a 353-room property in New York City. *Id.* ¶ 5. LuxUrban stated that it "expect[ed]" the James to be rebranded as The J Hotel by LuxUrban, a Wyndham Grand® Hotel." *Id.* ¶ 46. Ferdinand described the deal as "reflect[ing] the growing industry acceptance of [LuxUrban's] evolving asset-light business model and the inherent, value-driving benefits of our collaboration with Wyndham Hotels & Resorts." *Id.* ¶¶ 46, 48. He added: "As our business continues to mature, the size and quality of the hotels we are targeting are expected to continue to improve, as will our ability to be selective in the assets we acquire under long-term MLA." *Id.*

### 4.    LuxUrban Hastily Walks Back its Growth Story

On January 17, 2024, a short seller, Bleecker Street Research, published a report (the "Bleecker Report") that called into question the veracity of LuxUrban's purported growth story. *Id.* ¶ 37. It disputed LuxUrban's prior representations as to the Royalton MLA:

> The owner of that building told us LuxUrban had not actually signed the lease. . . . We confirmed with the building's owners and operator that as of January 14, LuxUrban has not officially signed the lease on this property. While the company first listed The Royalton as "under lease" in the Q3, 2023 10-Q, the company has yet to provide a Letter of Credit, several months after first engaging with the building owner

*Id.* ¶¶ 37–38. The Report added: "We spoke with another hotel operator who personally knew of three different LuxUrban hotel deals that were announced before the deal had closed." *Id.* ¶ 39. Bleecker Report also questioned the accuracy of LuxUrban's balance sheet, in particular its reported Receivables from OTAs. *Id.* ¶¶ 40–41. It stated:

> The company recorded $22.8 million in revenues in Q1 2023, with none of those sales resulting in receivables from OTAs. But in Q2 and Q3, the combined revenue of $63 million resulted in ~$13 million in OTA pending payments. Even odder, the company switched to management under Wyndham in early Q3 (August), which management claims will result in fewer OTA bookings, but the QoQ [quarter over quarter] value of OTA Receivables went from $5.9 million to $12.9 million in this first quarter under the Wyndham banner.

*Id.* ¶ 41. That same day, LuxUrban responded to the Bleecker Report. *Id.* ¶¶ 144–45. It brushed off the Report's claim as to the Royalton MLA, stating: "As previously announced, the Company is scheduled to begin welcoming guests on or before January 30, 2024 at The Royalton by LuxUrban, Trademark Collection by Wyndham and has a set date with the property's ownership to be delivered possession of the asset." *Id.*

Notwithstanding these assurances, LuxUrban's stock price fell 12% on January 17, 2024, and 10% the next day. *Id.* ¶ 45.

Less than three weeks later, on February 5, 2024, LuxUrban disclosed, as the Bleecker

Report had indicated, that it had not in fact consummated the MLA transaction with the

Royalton. *Id.* ¶ 49. It stated:

> Today the Company is announcing the termination of discussions to add the
> Royalton Hotel to its roster of properties. The removal of the Royalton Hotel (the
> "Royalton") as a prospect for the Company is not expected to have a *material
> impact* on the company's ability to achieve its previously stated financial goals for
> the full year 2024.
>
> The Company filed its Quarterly Report on Form 10-Q for the three and
> nine months ended September 30, 2023 (the "10-Q"). Under "Item 2—
> Management's Discussion and Analysis of Financial Condition and Results of
> Operations—Property Summary—Properties under lease, not operating," the
> Company included a reference to the Royalton. The Company made similar
> references to the Royalton *expressing its belief* that the Company had entered into
> a Master Lease agreement and was *expecting* the Royalton to begin operating as
> part of the Company's portfolio in subsequent press releases.
>
> Today the Company is withdrawing its prior statements regarding the
> Royalton. The parties began working toward a transaction in early fall 2023. The
> Company believed based on correspondence received that the material terms of the
> transaction was agreed to. In addition, there was a commitment by a qualified
> banking institution to fund the letter of credit required under the *proposed* lease in
> a form agreeable by the landlord; however, a complete set of definitive agreements
> relating to the lease were not, and will not be, entered into by the Company.

*Id.* (emphases added). LuxUrban also stated it had changed its "policy" as to announcing

additions to its portfolio:

> In addition, based on the complexity and multi-step process of closing an MLA
> from lease execution, which was the previous policy for announcing acquisitions,
> on a go-forward basis the Company will only announce acquisitions when they are
> opened for hosting guests and have completed the entire MLA process.

*Id.*

On March 12, 2024, a report by *Bisnow*, a real estate industry publication, cast further

doubt as to the facts underlying the growth story LuxUrban had touted (the "First *Bisnow*

Report"). *Id.* ¶ 51. It was entitled "Dogged By Mistakes, $1.2M Fine, Lawsuits And A Short

Seller, Hotel Chain Shakes Up Leadership." *Id.* ¶ 250. *Bisnow* reported that it "found two

instances of the company announcing it has signed deals to take over hotels, reporting the leases in filings with the [SEC] but then later admitting the deals were never finalized." *Id.* The first pertained to the failed Royalton transaction, as disclosed by the Bleecker Report and later admitted by LuxUrban itself. *Id.* The second involved the Trinity in Los Angeles, for which LuxUrban had announced an MLA, nearly 10 months earlier, in May 2023. *Id.* The report stated:

> The company also said in its two most recent quarterly filings that it had the 179-room Trinity Hotel in Los Angeles "under lease," a deal that was announced in May. The Chetrit Group owns that hotel and denies it has a deal with LuxUrban.
>
> "The deal did not go through," Michael Chetrit told *Bisnow* in an email.
>
> Ferdinand told *Bisnow* that LuxUrban "fully executed a lease," but claimed Chetrit didn't update the building at 741 Eighth Ave. to make the changes necessary for operating the hotel.
>
> "We even wired them money which we have not gotten returned," Ferdinand wrote.
>
> Ferdinand forwarded Bisnow an email, dated Oct. 2, from one of the company's attorneys, containing a draft letter to Chetrit outlining the lack of repairs at the building and demanding repayment. In that letter, LuxUrban attorneys wrote, "As a result, we will not be executing the proposed lease and will not be taking possession of the Premises."

*Id.* ¶¶ 51–52.

On March 26, 2024, LuxUrban issued a press release in which it stated that it had walked away from an unidentified transaction because the landlord had not made certain repairs. *Id.* ¶ 53.

On April 15, 2024, LuxUrban filed its annual report for 2023. *Id.* ¶ 54. Its Form 10-K did not list the Truss, the Trinity, or the James NoMad among LuxUrban's leased properties. *Id.* ¶ 55. On an earnings call the next day, however, Ferdinand stated that the LuxUrban was "in possession" of the James and would begin operating the hotel that quarter. *Id.*

5. **LuxUrban Exits the Wyndham Partnership and Publishes Its Q1 2024 Financials**

On May 10, 2024, *Bisnow* reported that the LuxUrban hotels earlier added to Wyndham's platform "[we]re no longer showing up on Wyndham's website, raising doubts about the status of the partnership. It is unclear what has transpired—representatives for Wyndham and LuxUrban didn't respond to Bisnow's inquiries on Friday." *Id.* ¶ 56 (the "Second *Bisnow* Report").

On May 13, 2024, LuxUrban disclosed that the Company had terminated its franchise agreements with Wyndham on May 6, 2024, and was "de-platforming" its properties from Wyndham's booking website. *Id.* ¶ 57. As alleged, LuxUrban expected the collapse of the Wyndham deal, and the resulting loss of Development Incentive Advances and other benefits, to heighten investor scrutiny of its revenue, expenses, losses, and current assets and liabilities. *Id.* ¶ 58.

That same day, LuxUrban filed its quarterly report for the first quarter of 2024 (the "original Q1 2024 10-Q"). *Id.* ¶ 59. Its Q1 2024 financials "disappointed" analysts. *Id.* ¶ 60. It reported a loss per share of $0.35, which exceeded (in absolute terms) the consensus estimated loss of $0.11 per share. *Id.*

6. **LuxUrban Announces that it Is Exploring Strategic Alternatives and Revises Downward its Q1 2024 Financials**

On June 3, 2024, LuxUrban announced that its board of directors had formed a special committee of independent directors to explore strategic alternatives. *Id.* ¶ 61.

On June 11, 2024, Nasdaq notified LuxUrban that it was at risk of delisting because its stock price was hovering below the minimum of $1 per share. *Id.* ¶ 63.

That same day, the Company announced that it had terminated Kothari. *Id.* ¶ 64. On June 27, 2024, after the market closed, the Company announced that Ferdinand had resigned from the board. *Id.* ¶ 65.

On August 9, 2024, LuxUrban announced that its new CFO had concluded that the financial metrics reported in the original 10-Q could no longer be relied upon "due to an overstatement of revenues and other errors in such financial statements." *Id.* ¶ 67. The resulting restatement was expected to (1) reduce revenues by approximately $13.75 million, (2) recognize a write-off of approximately $1.5 million, and (3) increase the Company's net loss by approximately $9.55 million. *Id.* LuxUrban also disclosed that its management had determined that its "previous conclusions regarding the effectiveness of the Company's disclosure controls and procedures as of March 31, 2024 need[ed] to be modified." *Id.* ¶ 68.

Based on this news, LuxUrban's stock price fell 14%, to $0.079 per share. *Id.* ¶ 69.

On August 14, 2024, after market hours, LuxUrban announced that it could not timely file its quarterly report for the second quarter of 2024. *Id.* ¶ 70.

On August 20, 2024, LuxUrban filed its restated financial statements for Q1 2024 (the "Restatement"). *Id.* ¶ 72. The Restatement required LuxUrban to make substantial, and downward, adjustments to multiple of its key metrics:

- Net loss for Q1 2024 was more than $42 million, not $16.79 million;
- Total current assets were $5 million, not $20.4 million;
- Net rental revenue was less than $14 million, not $29 million; and
- Operating expenses were $16 million, not $7.6 million.

*Id.*

On this news, LuxUrban's stock price fell a further 3.95%, to $0.073 per share.[3] *Id.* ¶ 75.

**B.    Challenged Statements During the Class Period**

The AC alleges that a number of defendants' public statements during the Class Period were knowingly false or misleading because they misrepresented the state of LuxUrban's business and its growth prospects.  The AC focuses on LuxUrban's representations about the (1) the growth of its hotel portfolio, centering on the addition of the four hotels, and (2) its financials for the first quarter of 2024.

**1.    Statements Heralding LuxUrban's Growth**

*May 9, 2023.*  On May 9, 2023, LuxUrban announced that it "had 20 short-term stay hotels under MLA consisting of 1,673 rooms that will be hosting guests from early Q2 to early Q3." *Id.* ¶ 79.  The AC alleges this statement was materially false and/or misleading for including the 179 rooms of the Trinity in its count of rooms "under MLA" because LuxUrban had not in fact consummated an MLA for the Trinity. *Id.* ¶ 80.  The same day, LuxUrban filed its Form 10-Q for the first quarter of 2023, in which it stated:

> We enter into triple net leases in which we are responsible for all of the costs on the property outside of exterior structural maintenance. As of March 31, 2023, we leased 12 properties with 1,034 units available for rent. As of May 9, 2023, we leased 20 properties with 1,673 units. Our portfolio of properties as of May 9, 2023, was as follows[.]

*Id.* ¶ 83.  The Form 10-Q included the Trinity and its rooms as part of LuxUrban's "portfolio." *Id.* ¶ 85.  The AC alleges these statements were materially false and/or misleading because LuxUrban did not have the Trinity "under lease" or in possession. *Id.* ¶ 86.

*May 15, 2023.*  On May 15, 2023, LuxUrban issued a press release titled "LuxUrban Hotels Signs Master Lease Agreement to Operate Luxury Hotel in New York City Adding 204

---

[3] LuxUrban received three delisting notices from Nasdaq on June 11 2024, August 20, 2024, and August 23, 2024. AC ¶¶ 63, 76.  It has since been delisted by Nasdaq. Pls. Br. at 13.

Units to Property Portfolio." *Id.* ¶ 87. It stated that "[a]s of March 31, 2023, we leased 12

properties with 1,034 units available for rent. As of May 15, 2023, we leased 20 properties with

1,807 units and our portfolio is as follows[.]" *Id.* ¶¶ 87–88. The press release included the

Trinity among its list of properties. *Id.* ¶ 89. The AC alleges these statements were materially

false and/or misleading because they created a false impression of the company's growth. *Id.*

¶ 91.

     *May 22, 2023.* On May 22, 2023, LuxUrban filed a Form 8-K with the SEC, to which it

attached an investor presentation dated "May/June 2023." *Id.* ¶ 92. In the statement, it included

slides repeating its claim that it had 1,807 units across 20 properties. *Id.* ¶¶ 93–95. The AC

alleges these claims were materially false and/or misleading because Trinity was not one of the

company's properties and that the statements created a false impression of LuxUrban's growth.

*Id.* ¶ 96.

     *August 8, 2023.* On August 8, 2023, LuxUrban filed a Form 8-K, to which it annexed a

press release stating that LuxUrban "expanded [its] operations portfolio to 17 properties under

Master Lease Agreements and 1,625 rooms available for rent as of August 8, 2023." *Id.* ¶ 98. In

its Form 10-Q filed that same day, LuxUrban stated:

> We enter into triple net leases in which we are responsible for all of the costs on
> the property outside of exterior structural maintenance. As of June 30, 2023, we
> leased 12 properties with 1,086 units available for rent. As of August 8, 2023, we
> leased 15 properties with 1,411 units available for rent. As of August 8, 2023,
> including properties under lease but not yet available for rent we leased 17
> properties with 1,625 units. Our portfolio of properties as of August 8, 2023, was
> as follows[.]

*Id.* ¶ 102. A table above that claim included the separate note that "Trinity: 741 8th 851 South

Grand Avenue, Los Angeles, CA 90017," and its 179 rooms were "*under lease*, not operating."

*Id.* ¶ 103 (emphasis added). The AC alleges these statements were materially false and/or misleading because they created a false impression of LuxUrban's growth. *Id.* ¶ 104.

**August 9, 2023.** On August 9, 2023, Kothari stated, on an earnings call, that LuxUrban "currently ha[d] under MLA 17 properties totaling 1,625 short-term rental units" and that it "continue[d] to expect year-end operating units to be between 2,500 and 3,000 short-term hotel units under MLA, up from 844 at December 31, 2022, and 1,625 as of today." *Id.* ¶¶ 106–07. The AC alleges these statements were materially false and/or misleading because they included the Trinity among the units "under MLA" and created a false impression of the LuxUrban's growth. *Id.* ¶ 108.

**September 1, 2023.** On September 1, 2023, LuxUrban filed a Form 8-K listing 17 properties, totaling 1,625 units, "under lease." *Id.* ¶ 110. The AC alleges these statements were materially false and/or misleading because they included the Trinity in that category. *Id.* ¶ 111.

**November 8, 2023.** On November 8, 2023, LuxUrban issued a press release, which stated: "As of November 8, 2023, we had 1,599 units available for rent and 2,032 units under long-term Master Lease Agreements but not yet available for rent," and "leased 21 properties with 2,032 units, including properties under lease but not yet available for rent." *Id.* ¶¶ 113–14. The AC alleges these statements were materially false and/or misleading because they included the Trinity and Royalton in those statistics and created a false impression of LuxUrban's growth. *Id.* ¶ 116.

Also on November, 8, 2023, LuxUrban filed its Form 10-Q for Q3 2023, in which it stated:

> As of September 30, 2023, we leased 16 properties with 1,446 units available for rent. As of November 8, 2023, we leased 18 properties with 1,599 units available for rent. As of November 8, 2023, including properties under lease but not yet available for rent we leased 21 properties with 2,032 units.

*Id.* ¶ 118. LuxUrban included the Trinity and the Royalton among its "Properties under lease, not operating." *Id.* ¶ 119. The AC alleges these statements were materially false and/or misleading because LuxUrban had not consummated MLAs for the Trinity and the Royalton. *Id.* ¶ 120.

**November 9, 2023.** On November 9, 2023, Kothari stated during an earnings call that LuxUrban, "as of November 8, 2023, [] leased 21 properties with 2,032 units, and these include[] properties under lease but not yet available for rent." *Id.* ¶ 122. The AC alleges these statements were materially false and/or misleading because they included the Trinity and Royalton in those statistics, whereas LuxUrban had not consummated MLAs for the two hotels. *Id.* ¶ 123.

**November 17, 2023.** On November 17, 2023, LuxUrban issued a press release, which stated "[a]s of November 8, 2023, the Company had 2,032 hotel rooms under lease, including properties not yet available for rent." *Id.* ¶ 125. The AC alleges these statements were materially false and/or misleading because they included the Trinity and Royalton in those statistics and LuxUrban had not consummated MLAs for the two hotels. *Id.* ¶ 126.

**November 30, 2023.** On November 30, 2023, LuxUrban issued a press release, which stated:

> [LuxUrban] announced that it has signed separate 25-year Master Lease Agreements (MLA), inclusive of two five-year options, to operate two new boutique hotels in New York City: The Royalton Hotel and the Truss Hotel. These properties will be re-branded as "The Royalton by LuxUrban" and "The Truss Hotel by LuxUrban" and are expected to begin welcoming guests early next month. LuxUrban expects both of these properties to be rebranded under the Trademark Collection® by Wyndham name over the next few months.

*Id.* ¶ 128. It continued: "These newest hotels add density to our primary market of New York City and increase our portfolio of properties that will be integrated into the LuxUrban operating platform . . . ." *Id.* ¶ 128. It added that "[a]s of November 30, 2023, the Company leased 20 properties with 1,853 units available for rent and, including properties under lease but not yet

available for rent, leased 21 properties with 2,032 units." *Id.* ¶ 132. The press release included the Trinity, the Royalton, and the Truss among the properties "leased" or "under lease" by LuxUrban. *Id.* ¶ 134. The AC alleges these statements were materially false and/or misleading because it included the Royalton and Truss among the properties and units "leased" or "under lease," whereas LuxUrban had not consummated MLAs for either hotel, and because it implied that the Royalton was part of the company's portfolio. *Id.* ¶ 135.

**December 1, 2023.** On December 1, 2023, LuxUrban filed a Form 8-K, to which it attached an investor presentation. *Id.* ¶ 136. There, it listed 21 properties and 2,032 units "under lease" as of November 2023. *Id.* ¶ 137. The AC alleges these statements were materially false and/or misleading because they included the Trinity, the Truss, and the Royalton among the properties "under lease," whereas LuxUrban had not consummated MLAs for these hotels. *Id.* ¶ 138.

**January 12, 2024.** On January 12, 2024, LuxUrban issued a press release stating that "The Royalton by LuxUrban, Trademark Collection® by Wyndham is expected to begin welcoming guests on or before January 30, 2024" and that "[a]s of November 30, 2023 the Company had 2,032 hotel rooms under lease, including properties not yet available for rent." *Id.* ¶¶ 140, 142. The AC alleges that these statements were materially false and/or misleading because LuxUrban had not consummated an MLA for the Royalton. *Id.* ¶¶ 141, 143.

**January 17, 2024.** On January 17, 2024, LuxUrban issued a press release stating that "[a]s previously announced, the Company is scheduled to begin welcoming guests on or before January 30, 2024 at The Royalton by LuxUrban, Trademark Collection® by Wyndham and has a set date with the property's ownership to be delivered possession of the asset" and that "[LuxUrban] is transparent and consistent in discussing its growth and operating strategies and

remains optimistic about its prospects and the strength of its evolving business profile." *Id.*

¶¶ 145–46.  It added that "[a]s of November 30, 2023 the Company had 2,032 hotel rooms under

lease, including properties not yet available for rent." *Id.* ¶ 148.  The AC alleges that these

statements were materially false and/or misleading because LuxUrban had not consummated an

MLA for the Royalton.  *Id.* ¶ 147.  The AC also alleges that the statement as to the number of

hotel rooms under lease was materially false and/or misleading because LuxUrban had not

consummated MLAs for the Trinity, the Truss, or the Royalton.  *Id.* ¶ 149.

     ***January 30, 2024.***  On January 30, 2024, LuxUrban issued a press release stating that it

had:

> signed and funded a 15-year Master Lease Agreement (MLA), plus two, five-year
> options, to operate The James NoMad Hotel in New York City.  LuxUrban expects
> that The James will be rebranded as The J Hotel by LuxUrban, a Wyndham Grand®
> Hotel.  The Company expects to take possession of the property and begin
> welcoming guests on or before March 1, 2024.

*Id.* ¶ 150.  It quoted Ferdinand as stating that LuxUrban had acquired "the long-term operating

rights"; that the "[t]he J Hotel will mark LuxUrban's 13th hotel under long-term lease in our core

market of New York City and expand our range of offerings to business and leisure travelers";

that "[a]s our business continues to mature, the size and quality of the hotels we are targeting are

expected to continue to improve, as will our ability to be selective in the assets we acquire under

long-term MLA." *Id.* ¶¶ 151, 153.  The AC alleges these statements were materially false and/or

misleading because LuxUrban had not consummated an MLA for the James and thus created a

false impression of the company's growth.  *Id.* ¶ 155.

     ***February 6, 2024.***  On February 6, 2024, LuxUrban held an "analyst/investor day" to

present its business.  *Id.* ¶ 156.  Kothari stated "1 month in [2024] -- we acquired The James, our

largest property to date, our best property in terms of quality, asset quality.  Look, our goals are

to continue acquiring larger scale." *Id.* ¶ 157.  Kothari added:

But what makes this relevant is really 2 specific things. One is it's our largest acquisition to date. So what we're seeing now in the pipeline are bigger acquisitions, greater impact to unit count growth with less individual transactions, right?

So cleaning really sort of coming down and making the larger impact with smaller -- with less deals. The second is -- it's the highest quality today, right? So in terms of star category, it's 4.5 to 5 stars, slightly better than where we are maybe at this property or some of the other properties in our portfolio. Has on-site facilities that are going to be third-party operated and it's a New York City landmark property, right? So we're very proud of this. Just shows the ability of our team to execute as well as the support that we're getting not only from our partner, but also from third parties like The James.

*Id.* ¶ 158. In the presentation, LuxUrban labeled the James as the "largest property MLA to date." *Id.* ¶ 159. The AC alleges these statements were materially false and/or misleading because LuxUrban had not consummated an MLA for the James and thus created a false impression of the company's growth. *Id.* ¶ 160.

In response to a question, either Ferdinand or Kothari said they weren't allowed to tell the audience "what the key money was on the James hotel." *Id.* ¶ 161. The AC alleges that this statement was materially false and/or misleading because "key money," under the Wyndham Partnership, was only available for leased properties, thus creating a false impression of the company's growth. *Id.* ¶ 162.

**April 16, 2024.** On April 16, 2024, Ferdinand and Kothari spoke during an earnings call with investors. *Id.* ¶ 163. Ferdinand said LuxUrban was "in possession" of the James. *Id.* ¶¶ 164, 167. The AC alleges these statements were materially false and/or misleading because LuxUrban had not consummated an MLA for the James, thus creating a false impression of the company's growth. *Id.* ¶ 168.

### 2.    Statements Regarding Q1 2024 Financials

**May 13, 2024.** On May 13, 2024, LuxUrban issued a press release stating that for the first quarter of 2024, its net rental revenue "rose 27.6% to $29.1 million from $22.8 million,"

"[g]ross profit (loss) was $(4.6) million as compared to gross profit of $5.4 million," "Total

operating expenses rose to $7.6 million, or 26.2% of net rental revenue, from $4.2 million, or

18.5% of net rental revenue," and that "Net loss was $(16.8) million compared to a net loss of

$(2.8) million." *Id.* ¶ 170. The AC alleges these statements were materially false and/or

misleading because they overstated net rental revenue and understated gross loss, total operating

expenses, and net loss. *Id.* ¶ 171.

> That same day, LuxUrban filed the Original Q1 2024 10-Q. It stated:
>
> Revenue Recognition — The Company's revenue is derived primarily from the rental of units to its guests. The Company accounts for revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. The Company recognizes revenue when obligations under the terms of a contract are satisfied and control over the promised goods and services is transferred to the guest. For the majority of revenue, this occurs when the guest occupies the unit for the agreed upon length of time and receives any services that may be included with their stay. Revenue is measured as the amount of consideration it expects to receive in exchange for the promised goods and services. The Company recognizes any refunds and allowances as a reduction of rental income in the consolidated statements of operation.
>
> Payment received for the future use of a rental unit is recognized as a liability and reported as rents received in advance on the balance sheets. Rents received in advance are recognized as revenue after the rental unit is occupied by the customer for the agreed upon length of time. The rents received in advance balance as of March 31, 2024, and December 31, 2023, was $6,576,403 and $4,404,216, respectively and is expected to be recognized as revenue within a one-year period.
>
> We record cash collected prior to stays as "bookings received in advance" on our balance sheet as a liability. These collections are then recognized as revenue when guests stay at our properties. In the event that there is a refund in accordance with our refund policy, revenue is not recognized.

*Id.* ¶ 177. The AC alleges these statements were materially false and/or misleading because they

improperly reported revenue in violation of GAAP. *Id.* ¶ 178.

Kothari also certified that he had "[e]valuated the effectiveness of the [Company's]

disclosure controls and procedures and presented in this report [his] conclusions about the

19

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation," and disclosed all "significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]" *Id.* ¶ 179.  The AC alleges these statements were materially false and/or misleading because the 10-Q for Q1 2024 could not be relied upon.  *Id.* ¶ 180.

*May 14, 2024.*  On May 14, 2024, LuxUrban held an earnings call.  During this call, Kothari stated:

> Let's discuss our results for the first quarter.  Net rental revenue rose 27.6% to $29.1 million from $22.8 million driven by an increase in average units available to rent to 1535 from 571 partially offset by lower total RevPAR, the impact of seasonality to our current portfolio and other operational impacts mentioned above. . . .
>
> We reported a gross profit loss of $4.6 million as compared to a gross profit of $5.4 million. . . .
>
> Total operating expenses, including non-cash items, comprised $26.2 million of net rental revenue on Q1 2024 compared to $18.5 in last year's first quarter.  Our operating loss for the quarter was $12.2 million.  Net loss was $16.8 million compared to a net loss of $2.7 million. . . .
>
> Moving to the balance sheet, as compared to December 31, 2023, cash and cash equivalents rose to approximately $1.0 million compared to $0.8 million at December 31, 2023.  Total debt was approximately $6.8 million as compared to total debt of $4.3 million.  Accounts payable and accrued expenses increased approximately $28.9 million from $23.2 million.

*Id.* ¶ 182.  The AC alleges these statements were materially false and/or misleading because the financial results reported were incorrect.  *Id.* ¶ 183.

### C.    Procedural History

On February 12, 2024, plaintiff Janice Pack filed this putative class action on behalf of all individuals who purchased shares of LuxUrban between November 8, 2023 and February 2, 2024.  Dkt. 1 (Complaint) ¶ 1.  That day, her counsel, Glancy Prongay & Murray LLP, published

a notice of this action on *Business Wire*, *see* Dkt. 6, Ex. A, a "widely circulated national

business-oriented publication or wire service," 15 U.S.C. § 78u4(a)(3)(A)(i); *see Li Hong Cheng*

*v. Can. Goose Holdings Inc.*, No. 19 Civ. 8204, 2019 WL 6617981, at *4 (S.D.N.Y. Dec. 5,

2019).

On June 18, 2024, the Court granted a motion by zCap Equity Fund LLC and Marchetta

to be appointed lead plaintiffs and to have their attorneys, Pomerantz LLP, appointed lead

counsel. Dkt. 26. On July 3, 2024, the Court set a schedule for the filing of an amended

complaint and briefing of defendants' anticipated motion to dismiss. Dkt. 28.

On September 4, 2024, lead plaintiffs filed the AC, the operative pleading today.

Dkt. 30. On December 12, 2024, defendants moved to dismiss, Dkt. 41, and filed a supporting

memorandum of law, Dkt. 42, and declaration, Dkt. 44 ("Greene Decl."). On February 26, 2025,

forgoing the opportunity provided by the Court in its scheduling order to file a second amended

complaint, lead plaintiffs opposed defendants' motion. Dkt. 47; *see also* Dkt. 45. On March 27,

2025, defendants replied. Dkt. 49 ("Defs.' Reply Br.").

## II.    Applicable Legal Standards

### A.    Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is

properly dismissed where, as a matter of law, "the allegations in a complaint, however true,

could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the Court

must accept as true all well-pled factual allegations in the complaint and draw all reasonable

21

inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*"). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

Second, the Private Securities Litigation Reform Act ("PSLRA") imposes "[e]xacting pleading requirements" on plaintiffs asserting securities fraud claims. *Tellabs*, 551 U.S. at 313 (citing 15 U.S.C. § 78u-4(b)). In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In addition, a plaintiff must, "with respect to each act or omission . . . state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

### B.    Elements of the AC's Claims

The AC brings claims under §§ 10(b) and 20(a) of the Exchange Act, and Rule 10b-5. AC ¶¶ 199–213.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim under § 10(b) of the Exchange Act, a complaint must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citation omitted). A complaint must ultimately allege conduct involving manipulation or deception; § 10(b) does not cover "instances of corporate mismanagement . . . in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977).

Section 20 extends liability to persons who "control" entities alleged to have violated Section 10. To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled

person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236

(2d Cir. 2014) (quoting *ATSI Commc'ns*, 493 F.3d at 108). If a plaintiff has not adequately

alleged a primary violation—that is, a viable claim under another provision of the Exchange

Act—then the § 20(a) claims must be dismissed. *See id.*

## III.    Discussion

Defendants raise a host of challenges to the AC's legal sufficiency. They argue that it

does not adequately plead falsity; that its allegations fail to raise a strong inference of scienter;

that it does not allege loss causation; and, as to its control-person claims, that it does not plead a

primary violation or control over LuxUrban by Ferdinand or Kothari.

The Court addresses these in turn.

### A.    Falsity

#### 1.    Applicable Law

##### a.    *False or Misleading Statements or Omissions*

To survive a motion to dismiss, a complaint must adequately plead "that the defendant

made a statement that was 'misleading as to a material fact.'" *Matrixx Initiatives*, 563 U.S. at 38

(quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (emphasis omitted)). "Disclosure of

. . . information is not required . . . simply because it may be relevant or of interest to a

reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). An omission of

information not affirmatively required to be disclosed is, instead, actionable only when

disclosure of such information is "necessary 'to make . . . statements made, in the light of the

circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at

44 (quoting 17 C.F.R. § 240.10b–5(b)); *see also Macquarie Infrastructure Corp. v. Moab

Partners, L.P.*, 601 U.S. 257, 264 (2024).

The materiality requirement, meanwhile, "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231–32). Because the materiality inquiry is fact-intensive, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted).

    *b. Statements of Opinion*

  Like objective statements of material fact, subjective statements of opinion can be actionable as fraud. Such statements of opinion can give rise to liability in two distinct ways.

  First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting facts she supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185 (2015)). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004). "The Second Circuit has firmly rejected this 'fraud by hindsight' approach." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

  Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement

25

misleading to a reasonable investor." *Sanofi*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S at 194).

To adequately allege that a statement of opinion was misleading through the omission of material

information, "[t]he investor must identify particular (and material) facts going to the basis for the

issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did

or did not have—whose omission makes the opinion statement at issue misleading to a

reasonable person reading the statement fairly and in context." *Id.* at 209 (quoting *Omnicare*,

575 U.S at 194). As the Second Circuit has explained, "a reasonable investor, upon hearing a

statement of opinion from an issuer, 'expects not just that the issuer believes the opinion

(however irrationally), but that it fairly aligns with the information in the issuer's possession at a

time.'" *Id.* at 210 (quoting *Omnicare*, 575 U.S at 189). "The core inquiry," then, "is whether the

omitted facts would 'conflict with what a reasonable investor would take from the statement

itself.'" *Id.* (quoting *Omnicare*, 575 U.S at 189).

The Supreme Court has instructed that this second theory of liability for opinions, based

on omissions of material facts that may render a statement of opinion actionable, should not be

given "an overly expansive reading"; rather, establishing liability on such a theory "is no small

task for an investor." *Id.* (quoting *Omnicare*, 575 U.S at 194). "Reasonable investors understand

that opinions sometimes rest on a weighing of competing facts, . . . [and do] not expect that every

fact known to an issuer supports its opinion statement." *Id.* (quoting *Omnicare*, 575 U.S at 189–

90). "[A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to

disclose, some fact cutting the other way.'" *Id.* (quoting *Omnicare*, 575 U.S at 189).

       *c.*    *The PSLRA Safe Harbor for Forward-Looking Statements*

The PSLRA amended the Exchange Act to provide a safe harbor for forward-looking

statements. *See* 15 U.S.C. § 78u–5(c). Forward-looking statements are defined as those that

contain, among other things, "a projection of revenues, income, [or] earnings," "plans and

26

objectives of management for future operations," or "a statement of future economic performance." *Id.* § 78u–5(i)(1). A forward-looking statement is not actionable if it "is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Because the statute is written in the disjunctive, statements are protected by the safe harbor if they fit any one of these three categories. *Id.* Materiality is defined above; the other two categories are defined as follows:

*Meaningful cautionary language*. To qualify as "meaningful," cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Id.* at 771 (quoting H.R. Conf. Rep. 104–369, at 43 (1995)). Language that is "vague" or "mere boilerplate" does not suffice. *Id.* at 772. "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials— including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). A plaintiff may establish that cautionary language is not meaningful "by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin*, 295 F.3d at 359.

*Actual knowledge*. The scienter requirement for forward-looking statements—actual knowledge—is "stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only

upon proof of knowing falsity," *Slayton*, 604 F.3d at 773 (quoting *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)), pled with the required particularity, *see* 15 U.S.C. § 78u–4(b)(2).

### 2.    Application

#### a.    *Statements Heralding LuxUrban's Growth*

The AC centrally alleges that the growth story touted by LuxUrban was false. It alleges that LuxUrban's statements that it had added four prestigious hotels—the Royalton, the Trinity, the Truss, and the James—to its portfolio are exposed as false by (1) information revealed by the Bleecker Report and *Bisnow*, including statements by LuxUrban's counterparties in those transactions, and (2) the company's own later statements disavowing its claims of portfolio growth.

The challenged statements concern presently existing, objectively verifiable facts regarding specific purported additions to LuxUrban's portfolio of hotel properties. Given that, lead plaintiffs argue, and defendants do not dispute, that these were not statements of opinion or forward-looking statements protected by the PSLRA safe harbor. *See* Defs. Reply Br. at 8–9.[4]

---

[4] Nor were these statements non-actionable puffery. Statements are mere puffery, and hence non-actionable, when they are "too general to cause a reasonable investor to rely upon them," *ECA*, 553 F.3d at 206; *see also Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013). LuxUrban's statements as to its portfolio growth fall outside that category, as they announced the addition of specific hotels, on specific dates, and on specific terms. *Cf. Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (statement that company's "business strategies would lead to continued prosperity" constituted "the type of 'puffery' that [the Second Circuit] and other circuits have consistently held to be inactionable"); *Helo v. Sema4 Holdings Corp.*, No. 22 Civ. 1131, 2024 WL 3593677, at *9 (D. Conn. July 31, 2024) (statements that "2021 was a transformative year," "Company [wa]s 'super pleased with the health systems partnerships we formed today,'" and "we're off to a strong start" were puffery); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, No. 11 Civ. 8332, 2013 WL 566805, at *24 (N.D. Ill. Feb. 13, 2013) (statement that company's new project would "transform" its operations was puffery).

As to each hotel, the AC pleads specific statements of historical fact that were false or misleading, the identity of the speaker(s), when the statements were made, and why these statements were false or misleading when made:

*The Royalton.* The AC alleges with particularity that LuxUrban's statements as to the Royalton falsely implied that it had added the hotel to its portfolio on November 30, 2023. LuxUrban issued a press release that day stating that LuxUrban "ha[d] *signed*" a "25-year Master Lease Agreement[]" to operate the Royalton, which was "expected to begin welcoming guests early next month" and to be "rebranded under the Trademark Collection® by Wyndham name over the next few months." AC ¶ 128 (emphasis added). On December 1, 2023, and January 12, 2024, LuxUrban doubled down on those statements, representing that the Royalton was "under lease" at that time. *Id.* ¶¶ 137, 140, 142. The AC alleges that these statements were false when made because LuxUrban had not in fact "signed" an MLA for the Royalton or otherwise consummated the transaction, such that it could truthfully represent to the investing public that the Royalton was part of its hotel portfolio. These misrepresentations, the AC alleges, created a false impression that LuxUrban's short-term rental business was growing, or stood to grow, rapidly. That allegation is plausible, for two reasons.

First, the Bleecker Report, published January 17, 2024, contradicted LuxUrban's earlier statements. It contained a statement by the Royalton's owner—who presumably knew the facts firsthand—that "LuxUrban had not actually signed the lease." *Id.* ¶ 37. And the Report "confirmed with the building's owners and operator that as of January 14, LuxUrban ha[d] not officially signed the lease on this property." *Id.* ¶ 38. Nearly six weeks after LuxUrban had announced the addition of the Royalton to its portfolio, the Report stated, the company "ha[d] yet

to provide a Letter of Credit" to the Royalton—a necessary step in an MLA transaction. *Id.* ¶¶ 38, 49.

Second, and most important, LuxUrban itself repudiated its statements as to the Royalton transaction shortly after the Bleecker Report was published. On February 5, 2024, it formally "withdr[ew] its prior statements regarding the Royalton." *Id.* ¶ 49. Whereas its earlier press release had touted a "signed" agreement with the Royalton, its February 5, 2024 statement characterized the document as a "*proposed* lease." *Id.* (emphasis added). LuxUrban revealed that LuxUrban had *not* added the Royalton to its portfolio as of November 30, 2023. It stated:

> Today the Company is announcing the termination of discussions to add the Royalton Hotel to its roster of properties. The removal of the Royalton Hotel (the "Royalton") as a prospect for the Company is not expected to have a material impact on the company's ability to achieve its previously stated financial goals for the full year 2024.

*Id.*

**The Trinity.** The AC also adequately pleads that LuxUrban's statements that the Trinity was "under lease" beginning in May 2023 were false and left investors with a misleading impression of the company's growth. *Id.* ¶¶ 79, 83, 92–96. On May 9, 2023, LuxUrban announced that it had signed a lease "to operate the Trinity Hotel," and it listed the hotel as "under lease" in its quarterly report for the first quarter of 2023. *Id.* It represented that the Trinity was part of its "portfolio of properties as of May 9, 2023." *Id.* In publicly filed investor materials, too, LuxUrban counted the 179 rooms of the Trinity in the total of 1,673 rooms that it reported as being "under lease." *Id.* ¶¶ 92–95. The AC alleges that these representations were false when made because LuxUrban had not in fact consummated the Trinity transaction.

The AC's claim of falsity is well-pled for two reasons. First, the *Bisnow* Report of March 12, 2024 reported that LuxUrban had not executed the lease as of October 2, 2023—some five months after LuxUrban had reported the Trinity as "under lease." *Id.* ¶ 52. It stated that

LuxUrban's CEO "Ferdinand forwarded *Bisnow* an email, dated Oct. 2, [2023] from one of the company's attorneys, containing a draft letter" in which "LuxUrban attorneys wrote . . . we will not be executing the *proposed* lease and will not be taking possession of the Premises." *Id.* ¶¶ 51–52. The agreement with the Trinity by definition could not have been a mere "proposed lease" as of October 2, 2023 if LuxUrban had, in fact, signed it on or before May 9, 2023 as the company had publicly claimed. Second, *Bisnow* reported that Chetrit Group, the Trinity's owner, "denie[d] it ha[d] a deal with LuxUrban." *Id.* It quoted the Trinity's owner as stating that "[t]he deal did not go through." *Id.* The statements by Ferdinand and Chetrit Group contradicted LuxUrban's prior statements implying that the Trinity transaction was a done deal. These support the falsity of LuxUrban's representation that the Trinity was part of its hotel portfolio as of May 9, 2023.

 **The Truss.** The AC also plausibly alleges that LuxUrban's statements as to the Truss were false, in implying that it had added the hotel to its portfolio, and that these contributed to the false impression of rapid growth. On November 30, 2023, LuxUrban announced that it had "signed" an MLA to "operate" the Truss. *Id.* ¶ 128. Its press release was titled "LuxUrban Hotels to operate two new four-star boutique hotels in New York City: the Royalton and the Truss Times Square to begin welcoming guests in December." *Id.* ¶ 127. It quoted Ferdinand as stating: "These newest hotels add density to our primary market of New York City and *increase our portfolio of properties.* . . . We are continuing to manage a robust opportunity pipeline and expect to consummate several additional MLAs in the near term." *Id.* ¶ 130 (emphasis added). Ferdinand's reference to "consummate[ing] several *additional* MLAs" indicated that the MLA with the Truss was already complete. *Id.* Moreover, the AC alleges, LuxUrban backed away from its representations that the Truss transaction was "signed" or "consummate[d]" as of

31

November 30, 2023 in that its later disclosures—on March 26, April 15, and May 13, 2024—did not include the Truss in its list of company properties.

*The James.* The AC also viably alleges that LuxUrban falsely represented, on multiple occasions, that it had added the James to its portfolio on January 30, 2024. That day, LuxUrban issued a press release stating that it had "signed and funded a 15-year Master Lease Agreement (MLA), plus two five-year options, to operate The James NoMad Hotel in New York City." *Id.* ¶ 150. It added that it "would take possession of" the hotel, and "begin welcoming guests to the property," on or before March 1, 2024. *Id.* On February 6, 2024, Kothari stated that "1 month in [to 2024,] -- we *acquired* The James, our largest property to date, our best property in terms of quality, asset quality. Look, our goals are to continue acquiring larger scale." *Id.* ¶ 157 (emphasis added). Kothari declared the purported James transaction evidence of "the ability of our team to *execute*." *Id.* (emphasis added). Next, on an earnings call on April 16, 2024, when an analyst inquired whether the James "is in possession in March as expected," Ferdinand stated: "So we are currently not operating, but in possession." *Id.* ¶ 163–64. The AC alleges that LuxUrban made false statements implying that the James transaction was complete as of January 30, 2024; stating that LuxUrban had "acquired" the James as of February 6, 2024; and stating that it was "in possession" of the property as of April 16, 2024.[5] Again, it notes that LuxUrban's later disclosures—on April 15 and May 13, 2024—did not list the James as a company property.

---

[5] Defendants improperly urge the Court to rely on a purported lease agreement filed in New York state-court litigation to discredit the AC's allegations as to the James transaction, Dkt. 50 at 12. *See, e.g., Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 148 n.1 (2d Cir. 2024) ("[A] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (citation omitted)); *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (reversible error for the district court, at the pleadings stage, to "rel[y] on [external] materials to make a finding of fact that *controverted* the plaintiff's own factual

Defendants make two challenges to the AC's falsity theory.  Neither is persuasive.

First, defendants fault the AC for citing the Bleecker Report as evidence of the falsity of its allegations as to the Royalton.  They argue that all attributions to the Bleecker Report should be put aside, because the Report was issued by a short-seller.  Defs.' Reply Br. at 6.  And short-sellers, they argue, have a motive to exaggerate the infirmities of the securities in which they speculate.  Defs.' Br. at 18.  Defendants are correct that factual statements by short-sellers must be viewed with skepticism when cited in a securities fraud lawsuit as a basis for claiming falsity of an issuer's statements.  A short-seller can have a sizable financial motivation to make statements that cause a decline in share price, and thus, as the Court has canvassed, the case law "reflects the need for caution and care" in assessing factual attributions to short-seller reports. *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020); *see also In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023) (courts "critically analyze factual attributions to short-seller reports").  But courts have generally sustained pleadings where "independent factual allegations corroborated the factual allegation in the complaint drawn from short-sellers." *Long Miao*, 442 F. Supp. 3d at 801.  Such is the case here.  The AC pleads that LuxUrban itself effectively confirmed Bleecker Street Research's reporting when it recharacterized the "signed" MLA as a "proposed" agreement and removed the Royalton from its list of properties "under lease," among other measures walking back its growth story.  AC ¶ 49.  Further supporting its veracity, the Bleecker Report identifies its source—the Royalton's owner—rather than terming the source confidential or anonymous.  The hotel's owner, as the ostensible counterparty to LuxUrban, "was in position"—arguably the best position—"to know

_____

assertions set out in its complaint" (emphasis in original)); *cf. Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) ("Courts have declined to consider unsigned documents in ruling on motions to dismiss.").

the facts attributed to [him]" when the Bleecker Report was published. *In re DraftKings Inc.*, 650 F. Supp. 3d at 154; *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) (sustaining allegations attributed to confidential source where it was "probable that [she] would have had access to information about the prior status of the MBC deal"); *Long Miao*, 442 F. Supp. 3d at 801–03 (allegations lacked particularity where short-seller report's attributions to confidential witnesses were "entirely unmoored in time" and did not specify the "sources of their knowledge"). Thus, well-pled independent and particularized facts corroborate those attributed to the Bleecker Report. This case thus tracks those sustaining allegations drawn from short-seller reports where there were strong indicia of reliability. *See, e.g., Saskatchewan Healthcare Emps.' Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 383 (S.D.N.Y. 2024) ("Courts in this district frequently accept allegations based on short-seller reports' at the motion to dismiss phase." (cleaned up)); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 Civ. 214, 2014 WL 285103, at *3–4 (S.D.N.Y. Jan. 27, 2014) (same); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (denying motion to dismiss complaint that relied, in part, on short-seller report); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012) (same); *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700, 2012 WL 3957916, at *14 (S.D.N.Y. Sept. 10, 2012) (same).

Second, defendants argue that the AC misunderstands the nature of MLA transactions. They contend that there is a way to reconcile LuxUrban's apparently inconsistent statements about the four hotels. Defs.' Br. at 17; *see also* Dkt. 50 at 5. They argue that the statements that these were "under lease" (or alternatively, that they were "under MLA," or that the leases had been "signed") were not false or misleading, because "under lease" is a term of art used in MLA

34

transactions to describe transactions *before* they are "fully executed." Defs.' Br. at 17. The "MLA process," they argue, is "complex" and "multi-layered," but that investors would have appreciated this term of art. *Id.* at 1. As a result, they argue, the investing public could not reasonably have concluded that LuxUrban had added the four hotels to its portfolio based on its representations. *Id.* at 2.

This argument fails for two independent reasons. First, defendants' suggestion that LuxUrban had announced nothing more than *the initiation* of the MLA process with the four hotels is at war with the actual words defendants used contemporaneously. These included "under lease," "consummated," and "acquired." A reasonable investor would not have understood those words to mean that LuxUrban had merely embarked on negotiations with the hotels. Second, defendants' self-serving spin as to the import of their public statements is "entitled to little weight at this stage of litigation, when [the Court] must 'accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor.'" *Blanford*, 794 F.3d at 307 (quoting *Simon v. KeySpan Corp.*, 694 F.3d 196, 198 (2d Cir. 2012)); *City of Warren*, 477 F. Supp. 3d at 132 ("While Rule 9(b) and the PSLRA require a plaintiff to allege fraud with particularity, they in no way dispose of the traditional rule that, at the motion to dismiss stage, the Court accepts as true the complaint's well-pleaded allegations of fact and draws all reasonable inferences in plaintiff's favor, and is prohibited from engaging in any fact finding of its own."). At this stage, the Court instead must assume that the expression "under lease" carried its ordinary, plain language meaning, not the specialized and counter-textual one

defendants urge. A reasonable investor could easily have understood LuxUrban's statements to convey that it had consummated the transactions and added the hotels to its portfolio.[6]

### b.    The Misstated Q1 2024 Financials

The AC also alleges that LuxUrban falsely portrayed its financial performance in the first quarter of 2024. It alleges that, when LuxUrban restated the financial results it had reported in its Q1 2024 Form 10-Q, these supplied a dramatically different picture of its financial condition than that reported in its original filing. AC ¶ 174. Among other corrections, the Restatement disclaimed LuxUrban's earlier representation that it had disclosed all "significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." *Id.* ¶ 179. And, the AC alleges, the Restatement reported materially worse results across a range of key financial metrics: it decreased LuxUrban's current assets by 75%, increased current liabilities by 20%, cut net rental revenue by half, and tripled the Company's loss from operations. *Id.* ¶ 74.

These particularized allegations are sufficient to plausibly allege falsity. Although the Restatement did not admit *wrongdoing*, it operated as an "admission . . . that earlier statements were false when made." *Venkataraman v. Kandi Techs. Grp., Inc.*, No. 20 Civ. 8082, 2022 WL

---

[6] Defendants similarly argue, based on exhibits attached to the Greene Declaration, that other statements by defendants in those exhibits undermine the AC's reliance on the First *Bisnow* Report and the Bleecker Report to plead falsity. Dkt. 50 at 5. That is wrong. The Court can rely on these judicially noticed documents only for the fact that the statement was made, not for the truth of those statements. *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022); *see also, e.g.*, *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 314 (S.D.N.Y. 2024) ("The Court accepts as true only the complaint's well-pleaded allegations.").

4225562, at *6 (S.D.N.Y. Sept. 13, 2022).[7] And courts have often held that the fact of

restatement supports finding falsity plausibly pled. *See Africa v. Jianpu Tech. Inc.*, No. 21 Civ.

1419, 2022 WL 4537973, at *9 (S.D.N.Y. Sept. 28, 2022) ("Courts in this District have generally

held that 'misreported financial data are . . . false statements of fact.'" (quoting *In re DRDGOLD

Ltd. Sec. Litig.*, 472 F. Supp 562, 569 (S.D.N.Y. 2007))); *Fresno Cnty. Emps' Ret. Ass'n v.

comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017) ("[T]he mere fact that financial

results were restated is sufficient basis for pleading that those statements were false when

made."); *Venkataraman*, 2022 WL 4225562, at *6 (same); *Varghese v. China Shenghuo Pharm.

Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) ("Misreported financial information

clearly amounts to a false statement of fact."); *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F.

Supp. 2d 199, 217 (S.D.N.Y. 2008) (similar); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077,

1083–84 (N.D. Cal. 2001) ("[T]he mere fact that the statements were restated at all supports . . .

an inference" that the original financial statements were false when made); *see also In re Grupo

Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720 (S.D.N.Y. 2019) ("Misstatements made in its

certifications concerning the design and efficacy of internal controls are actionable.").

Defendants attempt to classify the challenged statements in the original 10-Q as

statements of opinion. With respect to rental revenue—which the Restatement cut in half—they

argue that the original 10-Q reflected "previous management's *opinion* that certain bookings paid

for in advance could be recognized as revenue at the time." Defs.' Reply Br. at 10 (emphasis

added). That argument fails. As the Restatement reflects, the revised rental revenue figures did

---

[7] Defendants do not, and cannot plausibly, argue that the Restatement was so small as to be immaterial as a matter of law. *See ECA*, 553 F.3d at 197 (court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance" (citation omitted)).

not reveal a difference in opinion with respect to the *method* of revenue recognition. They reflected a difference in its application. The original Q1 2024 10-Q stated that "[p]ayment received for the future use of a rental unit is recognized as a liability" and is not "recognized as revenue after the rental unit is occupied by the customer for the agreed upon length of time." AC ¶¶ 73, 177. The Restatement used the same method of revenue recognition. The results reported diverged between the original 10-Q and the Restatement for a different reason: The original 10-Q had recognized payments for future rentals as revenue even though the guest had not yet stayed at the property, whereas the Restatement disdained that practice. *Id.* ¶ 268. The AC plausibly alleges that the initial statement effectively was factually errant in representing that a guest had stayed at a property, and that this error was corrected by the misstatement. Thus, it plausibly alleges, the company's misreported rental revenue is fairly pled as a false statement of fact.

Even assuming *arguendo* that the misstatements in the original 10-Q qualified as opinion statements, they are actionable under *Omnicare*. As reviewed above, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting facts she supplied were untrue.'" *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 185). And "subjective judgments about the sufficiency of historical evidence to support a particular accounting treatment presuppose the existence of *some* historical evidence." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 45 (2d Cir. 2023). Here, the AC has plausibly alleged the "absence of such evidence" to support the original 10-Q's claim of rental revenue. It alleges that LuxUrban's publicly stated practice as to revenue recognition required it, before recognizing a booking as revenue, to determine that the guests had already stayed at the property "for the agreed upon length of time." AC ¶ 177. As a

38

result, LuxUrban's claims about its revenue are plausibly alleged to have "misled investors to conclude that the company was aware of some historical evidence in support of [$29 million in rental revenue], when in (alleged) fact it was not." *DeCarlo*, 80 F.4th at 174. And the scale of the Restatement—reducing rental revenue by more than 50%—supports that defendants "did not base the company's statements . . . on a meaningful inquiry" or that these "statements did not fairly align with the information in the issuer's possession at the time." *DeCarlo*, 122 F.4th at 46 (citing *Omnicare*, 575 U.S. at 188-89) (cleaned up); *see also In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 546 (S.D.N.Y. 2024) ("Accepting these allegations as true, Defendants' various representations about the revenue and resulting cash holdings from the fabricated LotteryLink Credits sales misled investors to conclude that the company was aware of some historical evidence in support of the existence of $30 million in LotteryLink Credits sales, when in (alleged) fact it was not." (cleaned up)); *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270, 305 (E.D.N.Y. 2025) ("Because those financial results were incorrect, the opinion either contained one or more embedded factual statements that can be proven false, or implied facts that can be proven false."); *Fresno Cnty.*, 268 F. Supp. 3d at 544 (similar).

The AC, in sum, identifies with particularity multiple statements that are plausibly alleged to be false or misleading.

**B.    Scienter**

Defendants next challenge the AC's allegations as to scienter.

To state a claim for securities fraud under § 10(b) and Rule 10b–5, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This requires an adequate pleading that the defendant acted with intent "to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (citation omitted). A plaintiff can clear this threshold by pleading facts showing either "(1) that

defendant[] had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198.

To show motive and opportunity, a complaint must allege that defendants "benefitted in some concrete and personal way from the purported fraud." *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.*; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (prolonging time in position of authority or desire for increased incentive compensation inadequate motives). The motives of increased compensation and to assure that the company completes announced initiatives are common to corporate officers. *See Saltz v. First Frontier, L.P.*, 485 Fed. App'x 461, 464 (2d Cir. 2012).

Alternatively, scienter can be based on a pleading of recklessness, "a sufficiently culpable mental state for securities fraud in this circuit." *ECA*, 553 F.3d at 198. Recklessness is defined as "'at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Novak*, 216 F.3d at 308). Recklessness may be pled based on strong circumstantial evidence, *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001), and a plaintiff may rely on allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor," *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311).

Application of these principles yields different outcomes as applied to defendants' statements about (1) LuxUrban's portfolio growth and (2) its Q1 2024 financials. The Court thus analyzes these statements separately.

### 1. Statements Heralding LuxUrban's Growth

The AC's allegations provide strong circumstantial support that Ferdinand and Kothari actually knew or recklessly disregarded that their statements announcing the addition of the four hotels to LuxUrban's portfolio were false when made.[8]

The AC alleges that Ferdinand and Kothari were directly involved in negotiating MLAs with the four hotels and thus presumably knew in real-time the true state of those transactions. As to Ferdinand, the AC alleges that he was required to issue personal guarantees with respect to MLAs, including in connection with the failed Royalton transaction. AC ¶ 196. As to Kothari, the press releases announcing the purported addition of each of the four hotels listed him as a contact. *Id.* ¶¶ 87, 128. Beyond that, both Ferdinand and Kothari held themselves out, in multiple public statements, as highly knowledgeable about the mechanics of the MLA transactions through which LuxUrban purportedly had "acquired" properties. *See id.* ¶¶ 157, 202, 215–220.

Ferdinand and Kothari also made specific representations about the purported addition of the four hotels consistent with their personal involvement. For example, in connection with LuxUrban's announcement of the James transaction, Ferdinand stated that the company had acquired "long-term operating rights" and that "this transaction reflect[ed] the growing industry

---

[8] The AC's claim of LuxUrban's scienter is derivative of its claim of Ferdinand's and Kothari's scienter. *See Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) ("Where a defendant is a corporation, [a plaintiff must] plead[] facts that give rise to 'a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" (citation omitted)).

acceptance of our evolving asset-light business model and the inherent, value-driving benefits of our collaboration with Wyndham Hotels & Resorts." *Id.* ¶ 152; *see also id.* ¶ 157 (Kothari's statement that "Look, in 2024, what we've done so far to date, 1 month in—we acquired The James, our largest property to date, our best property in terms of quality, asset quality"). And Kothari's later admission that LuxUrban had "oversimplif[ied]" the MLA process in the announcements that the company later withdrew supports that he knew or recklessly disregarded the misleading quality of the company's statements to the effect that the hotels were "under lease." AC ¶¶ 202, 205.

Viewed in totality, these allegations strongly support that Ferdinand and Kothari were "privy to important details of th[ose] transaction[s]," including the true state of negotiations with the hotels and whether these were truly "under lease." *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 234 (S.D.N.Y. 2023). Such "[a]llegations that defendants had actual knowledge that their statements were false or misleading are sufficient to plead scienter." *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *8. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (citation omitted).

Two other sets of allegations in the AC reinforce the inference of scienter.

First, the AC alleges that rapid portfolio expansion was central to LuxUrban's business model. That undermines any inference that top executives Ferdinand and Kothari were unaware of the true state of negotiations with the four hotels. To sustain investor interest in the company, the AC alleges, Ferdinand and Kothari had aggressively touted its ability to grow its portfolio of hotel properties while the hotel industry remained depressed due to the COVID-19 pandemic. AC ¶ 20. They had represented to investors that the company was uniquely well positioned to

grow its hotel portfolio, and capture market share, before these "favorable" market conditions turned. *Id.* So Ferdinand and Kothari were under pressure to deliver on this narrative—or so the AC alleges. And their own statements heralding the addition of the four hotels reflects how central each was to the growth story LuxUrban had told investors. It is thus "virtually inconceivable" that Ferdinand and Kothari were unaware that the hotel transactions they touted had not been consummated. *City of Warren*, 477 F. Supp. 3d at 136; *see Cosmas*, 886 F.2d at 13 (inferring knowledge of new regulations in an area that represented a significant part of business); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made."); *see also In re Wachovia*, 753 F. Supp. 2d at 352–53 ("'[C]ore operations' allegations . . . constitute supplementary but not independently sufficient means to plead scienter.").

Second, as alleged, Ferdinand and Kothari, who, as CEO and CFO, had run the company during the alleged fraud, left LuxUrban under suspicious circumstances—soon after LuxUrban disclosed that LuxUrban did not, in fact, have the four hotels "under lease." LuxUrban terminated Kothari three months after he took over as sole CEO. AC ¶¶ 16, 64. And Ferdinand—LuxUrban's co-founder and Executive Chairman—abruptly resigned from the Board two weeks later. *Cf. In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) ("Fraud may lead to a director's resignation—to escape personal liability, if for no other reason."). The "resignation and retirement of company insiders alleged to have been involved in the scheme" bolsters the inference of scienter. *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d

457, 474 (S.D.N.Y. 2013); *see also, e.g., Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598

(S.D.N.Y. 2011) ("highly unusual or suspicious" resignations added to circumstantial evidence

of fraud, including "when independent facts indicate that the resignation was somehow tied to

the fraud alleged"); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233

(S.D.N.Y. 2008) (resignations of company's CEO and auditor supported inference of scienter);

*In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) ("[T]he

resignations of [defendants], although not sufficient in and of themselves, add[ed] to the overall

pleading of circumstantial evidence of fraud."); *In re Adaptive Broadband Sec. Litig.*, No. 1 Civ.

1092, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (officers' resignations supported

inference of scienter because, *inter alia*, they "occurred as [the company]'s financials were being

restated and as [the company] was conducting its own internal investigation").

   Thus, the AC adequately alleges scienter as to defendants' statements regarding the

addition of the four hotels to LuxUrban's portfolio.

### 2. The Misstated Q1 2024 Financials

   The AC allegations of scienter as to the misstated Q1 2024 financials, however, are

threadbare. They do not meet the PSLRA's "[e]xacting pleading requirements," *Tellabs*, 551

U.S. at 313.

   As to Ferdinand, the AC does not allege *any* facts supporting that he knew or was

reckless in not knowing that the Q1 2024 financials reported in the Q1 2024 Form 10-Q were

inaccurate. Nor does it adequately allege motive or opportunity to defraud with respect to the

accounting misstatements. Insofar as lead plaintiffs allege Ferdinand's motive based on his

transactions in LuxUrban stock during the Class Period, those stock sales represented a mere

0.7% of his holdings in LuxUrban stock and generated $570,000 in proceeds. *See* Defs.' Br. at

25. This *de minimis* decrease in Ferdinand's overall holdings of LuxUrban stock does not

support that he aimed to enrich himself by selling shares while the company's share price was briefly fraudulently inflated. *See Acito*, 47 F.3d at 54 (sale representing less than 11% of defendant's holdings did not support strong inference of intent to deceive); *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) (same, for sales representing 13% of holdings). And the AC does not allege that there was anything "unusual" about the timing of Ferdinand's stock sales, which occurred between November 21 and December 1, 2023—months before LuxUrban filed its original 10-Q. *See Scholastic Corp.*, 252 F.3d at 74–75. ("Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling.").

As to Kothari, the AC again does not allege motive or opportunity to defraud. It does not allege that Kothari sold any LuxUrban shares in the period surrounding its publication of the Q1 2024 financials. Defs.' Br. at 25. That undermines the AC's claim of scienter as to misstatements in the original 10-Q. *See Glaser*, 772 F. Supp. 2d at 588, 593 (S.D.N.Y. 2011) ("It defies reason that an entity looking to profit on a fraudulently inflated stock price would hold close to ninety percent of its shares as prices fell, while knowing that the information illuminating the fraud was seeping into the market."); *Hubiack v. Li-Cycle Holdings Corp.*, No. 23 Civ. 9894, 2024 WL 2943959, at *9 (S.D.N.Y. June 10, 2024) (same); *see also Damri v. LivePerson, Inc.*, 772 F. Supp. 3d 430, 468 (S.D.N.Y. 2025) (similar).

With respect to circumstantial evidence of Kothari's scienter, the AC alleges that his position as CFO, "accounting background," and involvement in preparing the 10-Q, combined with the magnitude of the Restatement, support an inference of scienter as to the accounting misstatements. For four reasons, those allegations do not so support.

45

First, the AC does not plead facts suggesting that Kothari was "aware" of "information [that] would require an adjustment to [the] financial statements" at the time he helped prepare the Q1 2024 Form 10-Q. *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020); *see also Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 251 (S.D.N.Y. 2012) (scienter not adequately pled as to accounting misstatements where there was no "allegation that the . . . defendants had any contemporaneous basis to believe that the information they related was incorrect"). Nor does the fact of the Restatement, by itself, establish scienter. *See ECA*, 553 F.3d at 200 ("[A]llegations of GAAP violations . . . are insufficient to state a securities fraud claim"); *Novak*, 216 F.3d at 309 (same); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 445 (2d Cir. 2015) ("[F]inancial restatement[s] do not themselves give rise to a plausible inference of scienter."). For that reason, courts have commonly found accounting misstatements sufficient to plead falsity but not scienter. *Jianpu Tech.*, 2022 WL 4537973, at *12; *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846, 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014) ("Although a restatement inherently acknowledges an error in a company's financial statements, the Complaint's allegations do not support an inference that this error was intentional or that Defendants furthered the error, condoned it or were even aware of it until steps to review and ultimately correct it began."); *see also, e.g.*, *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) ("The law is well-settled that where a claim is based on the timing of an accounting write down, it is not sufficient to simply allege the write down should have occurred earlier; instead, the complaint must include factual allegations from which a reader could infer Defendants intentionally or recklessly failed to take write downs when they should have."); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600,

at *7 (S.D.N.Y. May 24, 2018) (same); *In re Forcefield Energy Sec. Litig.*, 2017 WL 1319802, at *13 (S.D.N.Y. Mar. 29, 2017) (similar).[9]

Second, the AC's attempt to derive scienter from the fact that Kothari is a "key officer" well versed in a company's financials is undermined by the assembled case law. It rejects the premise of omniscience, *ex officio*, of relevant financial metrics. *See In re ShengdaTech, Inc. Sec. Litig.*, No. 11 Civ. 1918, 2014 WL 3928606, at *9 (S.D.N.Y. Aug. 12, 2014) (collecting cases). Shorn of that faulty premise, the AC's theory becomes one of "fraud by hindsight." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978). The AC has not sufficiently alleged that Kothari, *at the time the 10-Q was filed*, knew or was reckless that the financial statements were inaccurate. *See Stevelman*, 174 F.3d at 85; *City of Roseville Emps.' Ret. Sys.*, 2011 WL 7158548, at *10 ("Plaintiff's burden to plead scienter is not satisfied by merely demonstrating that Defendant [] made a false statement because, absent additional factual allegations, Plaintiff is not entitled to an inference that Defendant [] must have known his statement was false."); *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019).

Third, contrary to lead plaintiffs' claim, Pls.' Br. at 21, that Kothari signed LuxUrban's Q1 2024 10-Q filing does not prove his scienter. That argument "would allow lead plaintiffs to plead the scienter of whole classes of defendants solely by alleging a misstatement." *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 485 (S.D.N.Y. 2006); *see also Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) (collecting cases holding that signing SEC filings "add nothing substantial to the scienter calculus"). And to

---

[9] Lead plaintiffs argue that because the AC alleges that the Bleecker Report "called into question" the LuxUrban financial reporting as to OTA receivables in Q2 and Q3 2023, that should have alerted Kothari to misstatements in the 10-Q for Q1 2024. Pls.' Br. at 24. That argument fails. The AC does not link the concerns raised in the Bleecker Report to any of the allegedly false statements in the Q1 2024 Form 10-Q.

the extent AC alleges that LuxUrban's internal controls were imperfect, it does not plead any

facts supporting that these "imperfect controls amounted to more than negligence." *Jianpu*

*Tech.*, 2022 WL 4537973, at *12; *Novak*, 216 F.3d at 312 ("conscious recklessness" is required

for scienter, not merely "a heightened form of negligence").

Fourth, although relevant to scienter, the magnitude of the Restatement does not by itself

prove Kothari's scienter. *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 250

(S.D.N.Y. 2012) (While "the magnitude [of a restatement] can be relevant to the scienter inquiry

. . . it is clear that the size of the fraud alone does not create an inference of scienter[.]"); *In re*

*Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014)

(allegation based on "magnitude of a restatement" insufficient where it was "unsupported by

other factors that would lead to an inference of scienter"). The Restatement was sizable. But the

balance of the AC does not support its claim of Kothari's scienter.

Accordingly, (1) the AC pleads scienter as to defendants' statements regarding

LuxUrban's growth, but (2) not so as to their alleged misstatement of Q1 2024 financials.

### C.    Loss Causation

To state a claim for securities fraud under § 10(b) and Rule 10b–5, the AC must also

adequately plead loss causation. Loss causation "is the causal link between the alleged

misconduct and the economic harm ultimately suffered by the plaintiff." *In re Lehman Bros.*

*Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011) (citation omitted). It "requires

demonstrating that the subject of the fraudulent statement or omissions was the cause of the

actual loss suffered." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (citation

omitted). A complaint may allege loss causation by pleading, *inter alia*, (1) a corrective

disclosure or (2) a materialization of a concealed risk. *In re Omnicom Grp., Inc. Sec. Litig.*, 597

F.3d 501, 511 (2d Cir. 2010).

"[P]laintiffs need not allege that their entire loss was caused by the misstatements and omissions complained of." *In re Lehman Bros.*, 799 F. Supp. 2d at 305. "[T]he complaint must allege facts that support an inference that [the defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that lead plaintiffs would have been spared all or an ascertainable portion of the that loss absent the fraud." *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)). "Nor are plaintiffs required to allege that the particular misstatements and omissions directly caused the alleged losses. . . . [M]isstatements or omissions that conceal a risk, the materialization of which causes all or part of the plaintiffs' loss, . . . suffice." *Id.*

Here, the AC plausibly alleges that the Bleecker Report and the *Bisnow* article exposed the falsity of statements touting LuxUrban's portfolio growth and caused a decline in its share price.[10]

The Bleecker Report expressly refuted LuxUrban's claim that it had added the Royalton to its portfolio. Its stock price fell 12% on January 17, 2024, despite the Company's mid-day rebuttal, and another 10% the next day. The Report also constituted a partial corrective disclosure of LuxUrban's false statements that the Trinity and the Truss were "under lease," the AC alleges, because it revealed contrary facts from Bleecker's own research: "We spoke with another hotel operator who personally knew of *three different* LuxUrban hotel deals that were announced before the deal had closed." AC ¶ 39 (emphasis added). The AC's allegations reasonably support that the prematurely announced deals referenced in the Bleecker Report involved the Trinity and the Truss. Courts have widely held that "a short seller's report can

---

[10] In light of its holding that the AC does not adequately plead scienter as to the misstated Q1 2024 financials, the Court does not address whether it pleads loss causation with respect to those.

constitute a corrective disclosure, if the report reveals accurate information about a company that exposes actual misstatements by the company." *Behrendsen v. Yangtze River Port & Logistics Ltd.*, No. 19 Civ. 24, 2021 WL 2646353, at *15 (E.D.N.Y. June 28, 2021) (collecting cases). And the Bleecker Report "contributed new information extracted from the short-seller['s] own investigation." *In re GigaCloud Tech. Inc. Sec. Litig.*, No. 23 Civ. 10645, 2025 WL 307378, at *8 (S.D.N.Y. Jan. 27, 2025); *see In re Signet Jewelers Ltd. Secs. Litig.*, No. 16 Civ. 6728, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019).  After market close on February 5, 2024, LuxUrban "withdr[ew] [its] prior statements regarding the Royalton," referred to the Royalton MLA as a "proposed" lease, and abandoned its "belie[f]" that "the material terms of the transaction was agreed to [sic]." AC ¶ 248; *see Meyer v. Greene*, 710 F.3d 1189, 1199 n.10 (11th Cir. 2013) (short-seller opinions can constitute corrective disclosures where they "reveal to the market something previously hidden or actively concealed").  A reasonable investor could plausibly have read those disclosures by LuxUrban as repudiating, or at least walking back, its earlier statements.

Similarly, the *Bisnow* article revealed accurate information that exposed actual misstatements by LuxUrban.  It (1) reported that LuxUrban had not signed a lease for the Trinity and (2) recited Ferdinand's confirmation that a transaction defendants had previously implied was complete was, in fact, merely "proposed." AC ¶ 250.  LuxUrban's stock price fell in response. *Id.* ¶ 252.  On March 26, 2024, LuxUrban disclosed that it had decided in late 2023 not to move forward with an unnamed transaction (which the AC alleges involved the Trinity) and had incurred nearly $6 million in write-offs and accruals as a result. *Id.* ¶¶ 206–07, 253.  LuxUrban also excluded the Trinity from its list of properties under lease. *Id.*  In response to these disclosures, its stock price fell 29.9%. *Id.* ¶ 255.  Thus, the AC amply pleads that the

*Bisnow* article showed the market that defendants' "prior statements were not entirely true or accurate," which "constitutes a sufficient foundation for loss causation allegations." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008); *see Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) (false statement "is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations alleged by a disappointed investor"); *Wilamowsky v. Take–Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 751 (S.D.N.Y. 2011) ("[A] plaintiff must tie his loss to the dissipation of an inflated (or deflated) price upon a disclosing event that reveals the false information to the market."); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (loss causation is "at bottom . . . a consideration properly analyzed under proximate cause" and "the chain of causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss" (emphasis in original) (citation omitted)); *Lentell*, 396 F.3d at 174 ("Loss causation is a fact-based inquiry and the degree of difficulty in pleading will be affected by circumstances . . . .").

Thus, the AC plausibly pleads that LuxUrban's stock price dropped, and investors suffered losses, because of its false statements as to the four hotels.

Defendants are wrong that the revelation of the alleged fraud must have manifested in a *complete* corrective disclosure for a § 10(b) claim to survive a motion to dismiss. "A corrective disclosure need not be a full recount of the alleged fraud. It only needs to reveal the 'alleged misstatement's falsity.'" *In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17 Civ. 1954, 2018 WL 2943746, at *7 (S.D.N.Y. June 12, 2018) (quoting *In re Lululemon*, 14 F. Supp. 3d 553, 575 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)); *see, e.g.*, *In re Vivendi*, 838 F.3d at 262 (specific corrective disclosure not required where complaint's theory of loss causation "rested on

the revelation of the truth"); *id.* ("Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus."); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 282–83 (S.D.N.Y. 2008) ("In order to form an adequate basis for loss causation, a given disclosure need not emanate from a particular source, take a particular form, or be of a particular quality." (citation omitted)); *In re Winstar Commc'ns*, No. 1 Civ. 11522, 2006 WL 473885, at \*14 (S.D.N.Y. Feb. 27, 2006) (no specific requirements as to how truth reaches the public).

Thus, the AC has adequately pled loss causation as to defendants' statements about LuxUrban's portfolio growth.

### D.    Control-Person Claims Under Section 20 of the Exchange Act

The AC also brings control-person claims against Ferdinand and Kothari under Section 20(a) of the Exchange Act, based a primary violation § 10(b) by LuxUrban. AC ¶ 296. To make out a Section 20(a) claim, a complaint must plausibly allege: (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the defendant"; and (3) "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108.

Defendants make two arguments for dismissal of the AC's control-person claims. First, they argue that the AC does not adequately plead a primary violation by LuxUrban. That fails given the Court's holding that the AC adequately pleads a § 10(b) claim against LuxUrban.

Second, they argue that the AC does not plausibly allege control over LuxUrban by Ferdinand or Kothari. That argument also fails, because the AC's allegations support that Ferdinand and Kothari controlled LuxUrban during the Class Period. The AC alleges that

Ferdinand and Kothari, as LuxUrban's senior-most officers,[11] exercised authority over its daily operations, including, over the filings containing the allegedly actionable statements. *See* AC ¶ 298 (alleging their control over "the contents of the various reports, press releases, presentations and public filings which LuxUrban disseminated in the marketplace during the Class Period"); *id.* ¶ 195 (alleging Ferdinand's "in-depth" involvement in "operations"). And, as to Ferdinand, the AC alleges an additional lever of control: his ownership of LuxUrban shares amounting to approximately 56.2% of the voting power in the company. *Id.* ¶ 16; *see also id.* ("The Company disclosed in the IPO Prospectus and through June 2023 that it was a 'controlled company' under Nasdaq rules because of Defendant Ferdinand's massive holdings of Company stock."). The AC thus goes beyond arguing an inference of control based on the individual defendants' titles. It plausibly alleges that they held "the power to direct or cause the direction of the management and policies of" LuxUrban. The AC's allegations therefore survive the motion to dismiss. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 575 ("Courts in the Second Circuit have found that a primary violation combined with a sufficient level of control constitutes culpable participation."); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 772 (S.D.N.Y. 2017) (defendant was secondarily liable under § 20(a), as person who had had control over fillings, after he had been found primarily liable); *see also, e.g., In re Alibaba Grp. Holding Ltd. Sec. Litig.*, No. 20 Civ. 9568, 2023 WL 2601472, at *15 (S.D.N.Y. Mar. 22, 2023) ("[W]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved

---

[11] Ferdinand not only co-founded LuxUrban, he also served as its CEO from the start of the Class Period until November 8, 2023. AC ¶ 16. Between November 8, 2023 and March 1, 2024, he served as co-CEO. *Id.* Between March 1 and May 31, 2024, Ferdinand transitioned his CEO responsibilities to his successor, Kothari. *Id.* Kothari, for his part, served as CFO from January 2022 to June 2024, and as President from November 30, 2022 to June 2024. *Id.* ¶ 17. On November 8, 2023, he took on the additional role as co-CEO. *Id.*

on a motion to dismiss." (quoting *In re Tronox, Inc., Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011)); *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (similar).

Thus, lead plaintiffs may proceed to discovery on their theories of primary and secondary liability as to Ferdinand and Kothari. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 661 (S.D.N.Y. 2007) ("[C]ourts have consistently held that although a defendant ultimately may not be held liable as both a primary violator and a controlling person, pleading such alternative theories of liability is permissible." (alterations omitted)); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 378 (S.D.N.Y. 2023) ("[T]here is no impediment to the twin theories of primary and secondary liability by Zhou proceeding to discovery."); *In re Braskem*, 246 F. Supp. at 772 (similar).

## CONCLUSION

For the foregoing reasons, the Court (1) denies defendants' motion to dismiss as to the AC's claims based on their statements regarding LuxUrban's portfolio growth, and (2) grants it as to those based on defendants' statements regarding the company's Q1 2024 financials. The Clerk of Court is respectfully directed to terminate the motion pending at docket 41.

This case will now proceed to discovery. The Court schedules an in-person initial pretrial conference on September 2, 2025 at 3:00 p.m., in Courtroom 1305 of the Thurgood Marshall United States Courthouse. All conferences with the Court are scheduled for a specific time; there is no other matter scheduled for that time, and counsel are directed to appear promptly. All pretrial conferences must be attended by the attorney who will serve as principal trial counsel.

The Court directs the parties file by August 26, 2025 a joint letter outlining a proposed agenda for the conference, a joint proposed case management plan for discovery, and a proposed briefing schedule for class certification. The Court also directs the parties to email EngelmayerNYSDChambers@nysd.uscourts.gov, no later than 24 hours before the conference, the names of any counsel who wish to enter an appearance at the conference with the names of lead counsel designated with an asterisk.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: July 25, 2025
New York, New York